# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| IN RE: WASHINGTON PRIME GROUP, INC. SECURITIES LITIGATION | Master File No.: 2:21-cv-2757<br><br>**PLAINTIFFS' CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**CLASS ACTION** |

## TABLE OF CONTENTS

I.  INTRODUCTION ............................................................................................................ 1

II.  JURISDICTION AND VENUE .................................................................................... 6

III.  PARTIES ........................................................................................................................ 6

IV.  DEFENDANTS BOAST THAT WPG IS CREATING "DOMINANT TOWN CENTERS" .................................................................................................................... 8

   A.  Financial Metrics Relevant to REITs .......................................................................... 8

   B.  WPG's Corporate History ........................................................................................... 9

   C.  Malls Face Troubled Times ....................................................................................... 10

   D.  WPG's Answer to the Retail Apocalypse is to Redevelop Malls In Smaller Cities To Be Dominant Town Centers ..................................................................................... 11

V.  DEFENDANTS INFLATED REDEVELOPMENT YIELDS ................................... 19

   A.  Defendants Spend Hundreds of Millions of Dollars on Redevelopment Projects and Ask Investors to Judge WPG Based on these Projects' Yields ................................. 19

   B.  Defendants Artificially Inflated Reported Yields ...................................................... 21

      1.  All Defendants Sat On the Investment Committee That Approved All Substantial Redevelopment Projects ....................................................................................... 22

      2.  Defendants overstated income .............................................................................. 27

         a)  Defendants overstated income from co-tenancy cures ................................... 27

         b)  Defendants overstated income by recording speculative leases ..................... 29

         c)  Defendants overstated income by assuming 100% occupancy ....................... 32

         d)  Inclusion of percentage rent ........................................................................... 34

      3.  Defendants understated costs ............................................................................... 34

         a)  Defendants arbitrarily deemed project costs unrelated ................................... 34

         b)  Defendants arbitrarily reduced costs by counting unrelated transactions ....... 36

         c)  Defendants reduced costs by misclassifying tax abatements .......................... 37

   C.  WPG Can't Survive the Shock of COVID Because Its Redeveloped Properties Were Nowhere Near as Profitable as Defendants Had Represented .................................... 39

      1.  COVID's Impact On WPG's Finances Was Manageable ..................................... 39

      2.  Had WPG's Redevelopment Substantially Improved WPG's Malls, as Defendants Claimed, WPG Could Have Sold Them to Raise Cash to Stay Afloat .......................... 40

      3.  WPG Maxes Out Its Borrowing Capacity ........................................................... 44

VI.  LOSS CAUSATION .................................................................................................... 49

VII.  DEFENDANTS' FALSE STATEMENTS .................................................................. 51

i

**A.    False Statements Concerning Development** ................................................................. **51**

**B.    False Statements Concerning Bond Covenants** ........................................................... **61**

**CLASS ACTION ALLEGATIONS** ............................................................................................ **62**

**APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD ON THE MARKET) 64**

**CLAIMS FOR RELIEF** ............................................................................................................... **67**

**SECOND CLAIM** ........................................................................................................................ **70**

**PRAYER FOR RELIEF** .............................................................................................................. **71**

**DEMAND FOR TRIAL BY JURY** ............................................................................................ **72**

Lead Plaintiff Randy Slipher and Named Plaintiffs Erik H. Rorvik, Logan Koltz, Josef Jonathan, and Michael Larney, individually and on behalf of all others similarly situated, for their Amended Complaint against Defendants Washington Prime Group, Inc. ("WPG"), Louis G. Conforti, Mark E. Yale, and Melissa Indest ("Individual Defendants") allege the following based on personal knowledge as to themselves and their own acts and information and belief as to all other matters.

## I. INTRODUCTION[1]

1. This is a securities class action brought on behalf of all persons who purchased the publicly traded securities of WPG, including common stock, Series H Preferred Shares, and Series I Preferred Shares, or who purchased call options or sold put options, from February 22, 2018 through March 3, 2021, both dates inclusive, and who held such securities through at least one of the corrective disclosures alleged below. Excluded from the Class are (i) Defendants, (ii) officers and directors of WPG, and any subsidiaries thereof, (iii) the family members, heirs, assigns, and legal representatives of all persons set out in (i) and (ii), and (iv) all entities controlled by the persons set out in (i)-(ii). Plaintiffs bring claims under Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 ("Exchange Act").

2. The 2010's saw significant declines in shopping mall finances, leaving investors asking operators one question: how do you differ from the failing malls? Defendants' answer: WPG acquired dominant malls in smaller cities and redeveloped them to replace old mainline stores like Sears with more vibrant, local, and eclectic offerings like brew pubs, gyms, and other "main street" businesses. Defendants implored investors to evaluate WPG's overall performance by the yield achieved in these individual redevelopment projects. Yet internally, Defendants

---

[1] Unless otherwise noted, all emphases are added.

1

manipulated the yields by excluding project-related expenses and including unrelated or wholly illusory benefits. With malls no different than those that were regularly failing, WPG had no resources to withstand the impact of COVID. It could not sell its malls to get the cash it needed to surmount to bridge an entirely temporary problem. When WPG failed to make a payment on its bonds, its stock price fell. It fell again when Bloomberg revealed that WPG was preparing for its bankruptcy. Investors who believed Defendants' false and misleading statements lost almost everything.

3.     WPG is a real estate investment trust, or REIT, that owns and operates enclosed and strip malls.

4.     From Q1 2010 through Q1 2020, online sales grew from 4% to 13% of total retail sales.

5.     Over the same period, digital natives who had less interest in malls and associated spending time in malls with their parents' generation came of age.

6.     These twin shocks created the so-called Retail Apocalypse. The first question on investors' lips was how operators would evolve to survive.

7.     WPG's answer, which Defendants repeated regularly, was that it: (1) acquired malls in smaller cities that are the only mall in town; and (2) redeveloped the malls to replace struggling older stores like Sears and Macy's or youth fashion stores like Forever 21 with vibrant shops including brew pubs, athletic facilities, and higher-end sit-down restaurants. Guests would visit WPG malls not just to shop but also to engage in activities. By substituting these main street type businesses, Defendants claimed, WPG's malls would serve as what it called "dominant town centers" with "curated" offerings.

8. Defendant Conforti expressed contempt for other stores and operators. He publicly called stores like Sears "insipid" and said that other mall operators were "lazy" "rent-collectors". Conforti publicly welcomed the retail apocalypse, claiming that it would rid the industry of these stores and operators that, unlike WPG, were not providing attractive offerings.

9. The Class Period begins two years into WPG's transformation. By that point, Defendants were pointing to existing successes as well as redevelopment projects to convince investors WPG's business plan was succeeding.

10. To measure success, Defendants focused investors' attention on a metric called yield. Yield was the annual increase in income generated by the redevelopment project divided by the costs of the project. Defendants claimed that they were circumspect in calculating yields, including only additional income from signed leases, while including all and only project costs. Thus, Defendants claimed, the yield figures did not include any "fluff" or speculative income. Yield was just math.

11. Defendants reported yields for each project costing more than $5 million. The reported individual project yields typically were typically in the range of high single to low double digits. During the Class Period, WPG reported weighted-average global yields of around 9-10%.

12. In truth, the yields Defendants reported were manipulated.

13. Defendants prepared two yield numbers for each project. The first was the internally-considered yield numbers. Defendants used this internal yield when considering whether to approve projects and for internal budgeting purposes. The second was the externally-reported yield, which in most cases was materially higher, sometimes strikingly so.

14. Defendants employed a series of tricks to inflate externally-reported yields. When calculating income, Defendants included revenues that were not related to the project, revenues

from leases that were entirely speculative, revenues from businesses whose rent WPG was itself financing; Defendants also double counted revenues from certain stores. They also increased income by failing to take a provision for bankruptcy losses – effectively assuming that their tenants would never go out of business, despite copious evidence to the contrary.

15.     Defendants also manipulated externally-reported yields by artificially lowering reported project costs. Defendants excluded from costs actual project costs and reduced costs by including assumed one-time revenues completely unrelated to the project.

16.     Using these tricks, Defendants reported global yields to investors that were about double what Defendants had internally considered when approving the projects.

17.     All of these tricks were discussed and implemented by WPG's senior management, including Conforti, Yale, and Indest. The true numbers were discussed at length in monthly Investment Committee meetings Conforti, Yale, and Indest attended. After Conforti, Yale, and Indest approved the projects based on the true numbers, Yale and Indest held meetings at which they personally determined the "manual adjustments" they would make to the approved yields to arrive at externally-reported yields.

18.     Defendants made their intent clear. Yale and Indest held a meeting to manipulate yields on February 10, 2020. According to a participant, Indest began the meeting by stating: ***"We can't disclose this level [of yield], we need to find a way to enhance returns."***

**_Covenants_**

19.     In March 2020, the COVID pandemic struck the U.S.

20.     In-person shopping was now a hazard rather than a hobby. For a time, mall companies' revenues fell.

4

21.     Yet COVID was a temporary blow. WPG's Q4 2020 revenues were already 87.9% as high as Q4 2019. Mall companies did not need to radically restructure their business. They just needed enough capital to make it through COVID.

22.     In August 2020, WPG claimed to have struck a deal that would suffice. WPG announced that it had renegotiated the terms of about $1.3 billion of its debt to temporarily waive covenant compliance and permanently increase leverage covenants. Defendant Yale billed the agreements as "a bridge to the other side of the pandemic."

23.     It was no such thing. Unbeknownst to investors, WPG had not obtained covenant relief on its bonds. The leverage covenants on these bonds, once exceeded, prevented WPG from taking on *any* additional debt.

24.     On November 6, 2020, during trading hours, Defendants revealed that WPG had exceeded the covenants on its bonds and that it could not borrow any additional funds. That day, WPG's stock price fell $0.68 (11.9%).

25.     WPG's inability to take on additional debt should not have been a fatal blow. WPG's recently redeveloped successful malls purportedly held billions of dollars in value. WPG should have been able to sell some of the malls to clear a path to the other side of COVID.

26.     Because WPG had overstated both the direct and indirect returns of its redevelopment projects, its malls were far from the regional powerhouses Defendants reported. They found no buyers.

27.     On February 12, 2021, WPG paid the Individual Defendants their 2021 annual bonuses. These bonuses were not due until 2022. Defendant Conforti received $3.48 million.

28.     On February 15, 2021, after close of trading, WPG disclosed that it failed to make a payment on its bonds. Over the next two days, WPG's stock price fell by $5.99 (49.7%).

5

29.     Then, on March 4, Bloomberg reported that WPG was putting together plans for its bankruptcy. That day, WPG's stock price fell by $2.51 (60%), damaging investors.

30.     Defendants told investors WPG had discovered a solution to declining mall fortunes. Their story depended inextricably on the false positive statements they made about their redevelopment projects. COVID exposed that WPG's assets were no more than the run-of-the-mill middlebrow malls Conforti had publicly held in contempt. Investors who had believed Defendants' false statements lost almost their entire investment.

## II.     JURISDICTION AND VENUE

31.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

32.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

33.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered into and subsequent damages were suffered in this judicial district.

34.     In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of a national securities exchange.

## III.     PARTIES

35.     Plaintiffs purchased WPG securities during the Class Period at artificially inflated prices and were damaged thereby. Plaintiffs Slipher and Jonathan's PSLRA certifications were

previously filed and are incorporated by reference herein. The PSLRA certifications of Plaintiffs Rorvik, Koltz, and Larney are appended hereto and are incorporated by reference herein.

36.     Defendant Washington Prime Group, Inc., was a REIT that owned and operated enclosed and strip malls. WPG itself was a holding company that held an approximately 85% interest in a partnership, Washington Prime Group LP ("WPG LP"). WPG LP, in turn, held subsidiaries that owned and operated individual malls and took out mortgages secured by the malls. WPG's bankruptcy was confirmed in 2021. WPG is sued solely to the extent of the available insurance. WPG's securities traded on the NYSE during the Class Period under ticker WPG, WPGPRH, and WPGPRI.

37.     Defendant Louis Conforti was WPG's CEO from October 2016 through October 2021, its interim CEO from June 2016 to October 2016, and a director from May 2014 through at least October 2021. From June 2000 to October 2003, Conforti served as CFO of Prime Group Realty Trust, an office space REIT. He was fired for "failure to be fully devoted and committed to the business goals that have been established by the company's board of trustees." Conforti also has experience as an investor in real estate. From 2003 through June 2016, Conforti worked at hedge funds and banks that invested in and/or provided financing to real estate projects, including REITs.

38.     Defendant Mark E. Yale served as WPG's CFO from January 2015 to October 2021. Yale served as CFO of Glimcher Realty Trust, which merged into WPG, from May 2006 through January 2015. Yale holds a B.Sc. in Accounting and has received a CPA license.

39.     Defendant Melissa A. Indest served as a WPG Executive Vice President – Finance and Chief Accounting Officer from February 2019 through at least October 2021. Indest has worked for WPG in various positions since May 2003. Defendant Indest holds a B.Sc. in

7

Accounting. From 1986-1991, Indest worked as an auditor at Coopers & Lybrand. Then, from 1991-2002, Indest worked in senior positions at Corporate Express.

## IV. DEFENDANTS BOAST THAT WPG IS CREATING "DOMINANT TOWN CENTERS"

### A. Financial Metrics Relevant to REITs

40. Real Estate Investment Trusts, or REITs, are tax-advantaged companies that own or finance income-producing real estate. To maintain their tax advantage, REITs must distribute 90% of their income as dividends.

41. REITs are income investments. Thus, when evaluating REIT investments, investors focus on metrics that show how much cash the operator is regularly generating from its operations and whether these cash flows are safe.

42. Funds From Operations, or FFO, is a key metric for REIT investors. FFO is based on net income but eliminates certain accounting changes that are not applicable to REITs. Calculating FFO begins with net income, then:

      a.  Adds back in any funds that had been expensed to amortization or depreciation. Income-producing properties do not necessarily decrease in value over time; frequently, their value increases. Thus, including amortization and depreciation gives a potentially misleading picture of the REIT's financial health.

      b. Cancels accounting gains or losses from property sales. Property sales are nonrecurring. Including these one-time gains or losses also presents a potentially misleading picture. Moreover, gains from property sales do not add to a REIT's taxable income and need not be paid out as dividends.

    c. Removes any interest income. REITs are not in the business of lending money. Interest income is a temporary aberration.

43. Net operating income, or NOI, measures all income from properties minus all reasonably necessary operating costs. NOI excludes principal and interest payments on loans, capital expenditures, depreciation, amortization, and taxes.

44. Return on invested capital, or ROIC, measures the profitability of the REIT's investment. It is measured as net annual income minus dividends divided by total debt plus equity. It can be measured for individual projects, groups of projects, or for whole companies. Thus, if a project generates annual cash flows of $1 million based on acquisition price, closing costs, and renovation costs of $3.3333 million each, the yield is 10%. ROIC is similar to Return on Investment, or ROI.

**B.     WPG's Corporate History**

45. WPG was spun off from Simon Property Group, a shopping mall REIT, in May 2014.

46. At inception, WPG had relatively little mortgage debt or corporate debt. It was expected that WPG would use its additional debt capacity to acquire additional assets.

47. In January 2015, WPG acquired Glimcher Realty Trust for $4.2 billion consisting of cash, stock, and assumption of debt.

48. To raise cash after the Glimcher acquisition, WPG entered into two major joint ventures with funds managed by private mall investors, the O'Connor Group. For each joint venture, WPG placed premier assets into a separate entity and sold 49% of the interest in that entity to O'Connor investors. WPG continued to operate the properties.

49. WPG entered into the first joint venture ("JV 1") on June 1, 2015. WPG contributed assets including Polaris Fashion Place, Pearlridge Center, the Mall at Johnson City, Town Center

Plaza, Gateway Centers, and Scottsdale Quarter, collectively valued at about $1.625 billion. O'Connor paid $796 million consisting of a proportionate share of the mortgages on these properties and $432 million in cash (after transaction fees and costs).

50.    WPG entered into the second ("JV 2") on November 2, 2016. WPG placed premier malls into JV 2 valued at $608 million, including the Oklahoma Properties and the Arboretum. WPG then sold a 49% interest in JV 2 for a total of about $340 million, including $215 million in new mortgage debt secured by several properties shortly before they were contributed to JV 2.

### C.    Malls Face Troubled Times

51.    The 2010's saw a slow-moving disaster that has been dubbed the "Retail Apocalypse".

52.    The share of online sales as a percentage of total U.S. retail sales grew steadily throughout the decade from about 4% in Q1 2010 to about 13% in Q1 2020, immediately before the pandemic.

53.    E-commerce devastated the market for the kinds of middle-brow stores like Sears. Before online shopping, customers who wanted either premium or value-priced goods might both reluctantly purchase the middle-brow goods available at Sears. But with e-commerce as well as other options like Walmart, customers can get exactly what they want, whether it is cachet or value. The change in consumers' preferences towards online sales took a particular toll on malls. Malls' bread-and-butter are local outlets of large brands, typically with a focus on sales to teens or young adults.

54.    Moreover, previous generations of teens, who enjoyed spending time at malls, supported these stores. But today's teens and young adults do not remember a time when they did not have internet access or, for some, a smartphone in their pocket. They are much more

comfortable online and much less comfortable in malls.  As a result, mall attendance stagnated and in some cases collapsed.

55.    Unable to survive the new environment, the Sears of the world – including Bon-Ton, Forever 21, Payless, Toys R' Us, American Apparel, Aeropostale, RadioShack, and many others – filed for bankruptcy.

56.    The middle-brow stores' bankruptcy took many malls down with them. Abandoned mall photojournalism became a recurring feature in mainstream media. One artist published a book of such pictures.[2]

57.    Investors in companies that operate malls had one question on their lips: how will they survive the retail apocalypse? As one analyst put it on a call to discuss WPG's Q4 2017 earnings taking place on February 22, 2018:

> Okay. And [Defendant Conforti], one the more frequent questions I get is – and there's no gentle way to say this – is that, is why is WPG going to be any different than CBL [a poorly performing mall REIT] in terms of – you probably know, the last couple of quarters, they put up some pretty poor numbers and kind of guidance.

**D.    WPG's Answer to the Retail Apocalypse is to Redevelop Malls In Smaller Cities To Be Dominant Town Centers**

58.    WPG's answer, as summarized by Conforti in a presentation at the September 15, 2020 Bank of America Merrill Lynch Global Real Estate Conference, was: "we have a thesis, our dominant town center [] in a robust secondary trade area."

59.    Their thesis has two elements. First, WPG acquired or retained malls located in smaller cities that only have one mall, while disposing of malls in more competitive locations. Second, WPG redeveloped its malls to make them more appealing not only to shop in but to engage in activities. Instead of traditional stores like Sears, WPG developed more vibrant community

---

[2] https://sephlawless.com/inside-creepiest-abandoned-malls/

spaces like brew pubs, gyms, or dog runs, as well as higher-end food options than traditional mall food courts. The mall common areas might also host concerts or similar activities. WPG's malls would have both open air and enclosed common areas, taking advantage of the complementary uses such spaces can be put to. So WPG's malls, Defendants stated, served as de facto town centers.

60.     Defendants claimed their transition was well advanced. Defendant Conforti stated on an April 25, 2019 call to discuss Q1 2019 earnings that already about two thirds of WPG's malls had both open air and enclosed portions.

61.     WPG purportedly relied on both local knowledge and advanced analytics. As Defendant Conforti explained at the Citi Global Property CEO Conference on March 7, 2018, unlike the "vast majority" of its competitors, WPG "curat[ed]" malls:

> I am unequivocal that dominant secondary – everyone knows that or everyone will know that I don't say the word mall. We either have enclosed or retail venue – open air venues. But indeed, we focus on a hybrid model. I believe that this opportunity is unlike I've ever – anything I've ever seen. ***And the reason is that the vast majority of this sector has just been lazy and reactive and been rent collectors as opposed to, I know it's a hipster word, but as opposed to curators.***

62.     Conforti explained that WPG's competitors were ignorant and so allowed WPG to seize secondary markets with its dominant town centers:

> ***And remember, you guys don't get the joke. You are – we all live in rarified air.*** In our middle America, which doesn't necessarily mean geographic middle, but we are the town center. And sometimes, I'm befuddled that people have still hung around with the lack of anything exciting or differentiated that we've brought. [] So if you're really fancy, you get a Dylan's. You know what we get in middle America? Those [expletive] gumball machines or some weirdo local operator.

63.     Indeed, on March 5, 2019, at the Citi Global Property CEO Conference, Defendants claimed that ***60%*** of WPG's discussions were with "what we consider lifestyle for service-oriented tenants" citing gyms, food, entertainment, and home furnishings.

64.     "Curating" required both local knowledge and expert analytics, and Defendants claimed WPG excelled in both.

65.     Defendants emphasized that WPG held an advantage over its peers because of its local knowledge. As Defendant Conforti stated on WPG's Q3 2018 earnings call taking place on October 25, 2018:

> The progress Washington Prime Group has witnessed over the previous two years is admirable. And I would like to thank my colleagues who contributed by grinding it out every single day. ***They understand progress is incremental and a dog park in Albuquerque can be just as important as an ALDI-anchored redevelopment in Kokomo. Their hard work has resulted in better assets, improved operations, and stronger finances, as well as our company distancing itself from its peers.***

66.     Later in the call, Conforti emphasized both WPG's analytics and local knowledge:

> What we're doing in terms of new initiatives and understanding and from a multivariate standpoint that if you're long 43% junior fashion – well, who's wearing Victoria's Secret undergarments here? I know [Defendant Yale], me. Stuart? No. Unless 4 out of – of yes, you are, liar – unless 4 out of 10 of us are wearing a Claire's bauble or a junior – or a Vicky's or a PINK, we're too long. Just like you have long/short, you have directional biases. ***We are way too long certain retail categories. And it's incumbent upon us just to modulate and to fix it. So we have been doing it with real-time incentive – incenting of our leasing professionals.***

67.     Further, at the June 5, 2018 NaREIT REITweek conference, Defendant Conforti boasted that while competitors were using simple demographic data, WPG's expert analysis team was "doing second derivative analysis".

> Q: You and virtually every other mall operators have used categorically many of the same tenants, whether it's Dick's Sporting Goods or some other. As we go forward and have more department stores close, no matter who they are, do you think that the tenant sprung from 16 [stores], 19 [stores], retenanting will have legs enough to go to 25 [stores]?
>
> **DEFENDANT CONFORTI**: From a square footage standpoint, this might be blasphemous, but I don't know if we want them to go to 25. I think that one of the things that we also have to do is understand rightsizing. And so no, notwithstanding, we continue to fill those, whether it's a big box, which I was on the phone today with a home furnishings company or – I mean, we can give you Markland Mall as an example. We actually proactively said no to Sears and nine months later, who do we have there? We have an ALDIs. Yeah. So, yeah, I mean, it ain't easy. ***But again, if we can provide the substantiation as to why you should be within our catchment and we are the dominant***

*town center and we're doing it in a very contemplative fashion, where we have an analytics team that is doing second derivative analytics as opposed to those stupid, well, over a 3-mile radius, the median household income… No, we look at the proximity to universities, we look at – again, it's just the basic mantra of respecting and understanding your demographic constituency.*

68.     Then, Conforti dedicated more than ten minutes of WPG's Q4 2018 earnings call to arguing with the data and conclusions set out in a recently published research report that concluded that there was a downtrend in mall visits.

69.     In sum, as Conforti maintained in prepared remarks as early as 2017, WPG's purportedly expert redevelopment team offered a "distinct advantage compared to many of our public and private peers."

70.     WPG came to its business model early. Beginning Q4 2016 – the second full quarter after he became CEO – Conforti emphasized that redevelopment "is our most intriguing value proposition." He added that it is "our best return on invested capital proposition," on which WPG would be "spending a heck of a lot of time."

71.     Soon, all WPG executives were signing from the redevelopment hymnbook. On the Q1 2017 earnings call, Conforti stated that:

> Redevelopment is crucial – is also crucial, as you guys are all aware, as we promote our hybrid asset model of combining Enclosed and Open Air [strip mall] formats into vibrant town centers. We currently have 45 projects ranging between $1 million and $60 million, which substantiates our $125 million to $150 million of annual capital spend. And again, we've projected average ROIs, and this is from a historical precedent standpoint, of 9.5%, and we hope to continue as such.

72.     WPG's then-Chief Operating Officer added that "[a]s we previously stated, redevelopment within our portfolio is the best return on investment[.]" Defendant Yale added that WPG was "fully commit[ted]" to its redevelopment pipeline.

73.     In an oft-repeated phrase, Defendants claimed the mall business was "not a rent-collecting business any longer."

14

74.     As Conforti stated (for example) on the Q2 2018 earnings call:

Q: [] So [Defendant Conforti] you've been there a couple of years now. Just, when you think about what's worked and what hasn't, and incremental thoughts? Because you try a lot of different, creative things at WPG. So What's kind of worked, and what are other things that maybe haven't worked that well?

**DEFENDANT CONFORTI**: I don't know what – I don't want to be impetuous. I don't know what hasn't worked. Give me time, I'm sure, I'll screw up. And – but one of the things, and this is actually, this is a good lead-in. I have no problem with cost-contained failures that inure to the benefit of our guests and our tenant. But what's worked? Us shutting our mouths, cleaning up the financials, our balance sheet, creating operating efficacy. And I don't want to think – and redefining physical retail and understanding that we have a – well, what's worked is respecting our demographic constituency, plain and simple. As opposed to giving them the same old, same old, you know what for the past 25 years. And that's why I am out pretty much every single day visiting assets and just enfranchising our local management and diversifying tenancy and aggravating common area.
    This is – I can go on and on and on, with respect to – I regard this business as really a blank canvas that we, with the added benefit of we have an annuity stream that we've proven with pursuant to cash flow stability. ***And everything we do around the edges and it's not even around the edges, diversifying tenancy and the like, is only going to fortify or buttress our objective of being the dominant town center, whether it's open air, enclosed and the most, in the vast majority of it, is now hybrid.***

75.     With this business model, WPG welcomed the Retail Apocalypse. Conforti called companies that had not kept up with the times, like Bon-Ton and Sears, "insipid." The Retail Apocalypse, Defendants claimed, gave WPG an opportunity to replace them with more contemporarily relevant stores. These new stores would drive more traffic to WPG's malls and increase rents.

76.     For example, on June 4, 2019 at the NaREIT REITweek conference, Defendant Conforti stated:

And so over the last couple years, this has been about taking in this subsector that was just [expletive] lazy and I said. And we relied upon junior fashion and this kind of marginal junior fashion tenant which generally was over levered and private equity-sponsored, one, two, we didn't realize that department stores aren't only a draw, in many instances, and there are some great merchandisers and I think Dillard's is one of them he's – Mr. Dillard is a tough cookie from a negotiating standpoint, but great margins, I just – ***with the vast majority, and that's Sears, Bonton, I mean they were really insipid. They were insipid,***

15

*but we thought that the department stores were the draw when realistically we continue to lease space in spite of them.*

77.    Indeed, Conforti then said that then-current WPG customer Dress Barn was not only "insipid", but "with a name like Dress Barn, why were they in business in the first place?"

78.    Thus, as Conforti summarized at the March 3, 2020 Citi Global Property CEO Conference, the Retail Apocalypse was "healthy" and a benefit to WPG:

> We've lost the industry. It's as liquid as we – have we – no, actually. We lost or we were subject to 14% bankruptcy in our in-line space over the last 3-4 years. And look at our occupancy levels today, look at that 55% of our new leasing, incremental new leasing, which has totaled about 12.5 million square feet over the last 3 years, has been to lifestyle tenancy. ***Every s\*\*\*\*y retailer that went away, overlevered private equity-sponsored, junior fashion and accessory retailer that went away should have. And this is a business – this is an operating business as well, and it's allowed us to do things that this sector should have been for the last 25 years, actually curate and give a s\*\*\* about the assets and be incremental from a special – we created a special projects group that makes aesthetic improvements. This has been healthy, and I might have been the craziest person in the world to like step into it when [Conforti's former boss] asked me to do as such. But this is good. This is good. And quite frankly, in a dominant – if you're the dominant town center in a secondary marketplace, it is the absolute place to be because our guests continue to visit us. And every time we do something interesting for them, it works***. It works, and we'll – you guys should go and look at our latest couple of beta tests that we've done for social media and how many – there are about 12,000 discrete guests out with a TikTok influencer campaign and 8 assets. We've had 38 million views. ***We're in the curation and activation business.***

79.    Overall, as Defendant Conforti stated in response to an unrelated question on the Q3 2019 earnings call:

> And during that last, those tough years, we have materially improved our assets and we continue to do as such. We've improved the tenancy profile. We have exhibited minimal variance in the grand scheme with respect to operating and financial metrics. And we – our focus upon being the dominant town center in our secondary or whatever – our trade area is becoming increasingly apparent. And by the way, I thought you said, I'm sorry, I thought you said that, congratulations on an incremental increase in sales per square foot and occupancy costs, which means that tenants can be profitable at 11.2%, I must have missed that.[3]

---

[3] Conforti was sarcastically chiding the analyst for failing to sufficiently congratulate him on the quarter.

80.    Redevelopment took two forms. First, WPG might build additions to its malls. But the second form, which accounted for a substantial majority of WPG's development spend, involved improving malls in connection with replacing an anchor tenant. The latter form of investment was especially important because many of WPG's malls had been anchored by Sears, Bon-Ton, JCPenney, or other companies that had filed for or were at risk of bankruptcy.

81.    On the Q2 2018 earnings call, Defendants began a practice of discussing the status of WPG's replacement of bankrupt anchor stores, which would continue throughout the Class Period. Then, Defendants disclosed that WPG was in active negotiations with tenants to replace 23 of the 28 anchor locations whose parent company was bankrupt or at risk of bankruptcy. Defendants stated that replacing these 28 stores would cost approximately $300-350 million over 3-5 years, or the majority of WPG's $100 million per year redevelopment budget.

82.    On a call to discuss Q3 2018 earnings, Conforti reiterated that redevelopment was proceeding apace:

> We recently supplemented our institutional investor presentation with a detailed progress report for the 28 department store spaces we consider at risk. Within Tier One and Open Air, excluding spaces owned by Seritage and other third parties, we are actively planning redevelopment or – and/or are in discussions for 24 to 28 spaces. Stay tuned
>
>         *            *            *            *            *
>
> Now furthermore, we've allocated $300 million to $325 million [sic] of capital necessary to retrofit the aforementioned 28 spaces, with consideration over a 3 to 5-year period and that is included within our previously announced redevelopment spend of $100 million per annum.

83.    Then, on the Q4 2018 earnings call, Yale reiterated the timeline:

> As [Defendant Conforti] mentioned, we are making solid progress with respect to addressing the 28 department store boxes in our Tier 1 and Open Air Portfolios, which we believe will need to be repositioned over time. With approximately 25% specifically addressed and active planning on another 60% of the pipeline, we are confident in our originally projected $300-$350 million estimate of additional capital spend necessary to transition this real estate over the next 3 to 5 years.

84.     On a call to discuss Q2 2019 earnings, Conforti hammered away at the number in

answer to an unrelated question:

> Think about it sequentially. **We continue to lease in line space. Dan and the entire team have dealt with 15 out of 22 of our vacant [Sears] spaces. They come on line and some are sales, some are rentals that are rented, come on line at various times. It addresses co-tenancy and obviously replaces rental income. This is an iterative process and it seems like there's always a god\*\*\*n disconnect with respect to the leasing that Josh and Dan are doing. I mean – quite frankly, it's beating our expectations.** And we provided absolute visibility and transparency with respect to co-tenancy. And so with that being said, you lease space, you resolve boxes, you get to forecast 2% same-store NOI growth.

85.     On the same call, Defendants claimed that the anchor tenant bankruptcies were a

positive:

> Q: Ok. Then the other one was in terms of the Sears boxes. So I know you guys have been making good progress on refilling those. If we look though at what portion of your enclosed properties have – Sears, whether they're open today or ones that you're still working through. And JCPenney, there's definitely concern out there on JCPenney, I hear it from people. I'm guessing you guys hear it too, so I was wondering if you could give any sort of sensitivity or detail on the impact to your NOI if 10%, 20%, 30% of those currently open Sears or JCPenney locations did go dark?
>
> **DEFENDANT CONFORTI**: Well, we have seven – I'll turn it over to Mark in a second. So how many remaining Sears? Seven? Seven Sears. And, again, just like Ki Bin, I thought that people would be saying "Holy cow! You guys really have hit 15 out of 22 vacant?"[4] But instead, let's take the other side. **So, of those seven, I don't think there is not one instance where we would not want that box back yesterday [if Sears returned].**

86.     Then, on a call to discuss Q3 2019 earnings, Conforti told investors and analysts

that:

> **Starting with the department store update, we have now resolved 17 of the 23, which equates to 74% of the vacancies within the company's portfolio [] and we expect to announce several others within short order.** While pundits were expecting a more bitter than sweet symphony[5], we were able to provide solutions ahead of schedule and attract a wide array of tenants which markedly diversify current rosters. I'll let you decide what's

---

[4] Conforti was again complaining that analysts were not sufficiently praising WPG.

[5] In his prepared remarks on that earnings calls, Conforti embedded references to popular music from the 1970's through the early 2000's. "More bitter than sweet symphony" is a reference to Bittersweet Symphony by The Verve.

better for our assets: FieldhouseUSA, HomeGoods, PetSmart, Round1, ALDI, RoomPlace, T.J. Maxx, just to name a few, or a lackluster Sears or Bon-Ton.

87.    In a March 3, 2020 presentation at the Citi Global Property CEO Conference, Conforti stated that "[w]e've now resolved 75% of all of our department store vacancies and have several other underway." And Defendant Yale stated that "And we think it's critically important to address those vacant department stores without our portfolio."

## V.    DEFENDANTS INFLATED REDEVELOPMENT YIELDS

### A.    Defendants Spend Hundreds of Millions of Dollars on Redevelopment Projects and Ask Investors to Judge WPG Based on these Projects' Yields

88.    Washington Prime Group's strategy could only have been viable if it had been profitable. As Conforti explained on the Q4 2017 call:

Redefining retail is no small task. While I'd like nothing more than to have sequential robust growth, *our steadfast focus is to provide shareholders with cash flow stability characterized by minimal variance as we optimize our assets. We're delivering on this promise.* And, admittedly, it isn't easy in spite of continued volatility. And we welcome the much-need purging within he retail space.

89.    And as Conforti explained in the Q3 2018 call:

Let me address a basic reality. Many of our assets have been neglected for 20 or so years. Nonetheless, we have exhibited cash flow stability for 2 basic reasons: our guests continue to shop at our assets and tenants are able to operate profitably. *I mention this because as we transform assets via such measures as operational enhancement, tenant diversification, common area activation and symbiotic prudent redevelopment, we'll make decisions which serve to strengthen our company over the long haul. If this means flattish, minimally variant cash flow over the short term, then so be it. I'm confident our strategy is ultimately going to result in outsized growth.*

90.    And Defendants claimed WPG was on the way to completing the task:

Let me put this into perspective. Since 2014, we've had 2.3 million square feet, or about 10% of our in-line space, go belly up. Despite this kick in the behind, occupancy has increased by 170 – by only – to have decreased by about 170 basis points. Comp NOI growth actually increased by about 100 basis points. And tenant allowances have decreased overall. There's still a heck of a lot to be accomplished. Notwithstanding, our incremental progress confirms that our labor is not Sisyphean in nature. While there is still an uphill battle, the slope has become dramatically less steep. Each day, we and as a collective, we

muster our formidable operational, financial, and strategic resources in a concerted fashion. And every time we roll up that stone up the hill, it's with purpose. Rest assured, my colleagues and I will keep on pushing until this proverbial boulder gathers momentum and on its way down crushes those pundits who doubted us.

91.     In the years ended December 31, 2018, 2019, and 2020, WPG spent $117 million, $103 million, and $131 million on redevelopment. These are enormous sums for a company of WPG's size.

92.     Defendants measured the profitability of their redevelopment through a metric they called "yield", a measure of the annual income from an investment as a proportion of the project cost.

93.     While yield can be measured in different ways, Defendants emphasized on earnings call that by yield, they meant ROIC (or equivalently ROI). For example, on the Q4 2016 earnings call, Defendant Conforti stated that WPG's "ROI" on its projects was 9.5%, the same as its then-yield. Likewise, on the Q2 2018 call, Defendant Conforti once again equated the purported 10% ROI from redevelopment to their yield.

94.     Defendants asked investors to judge WPG based on its ROI. In a pre-Class Period call, Defendant Yale stated that "[w]e grade [] projects, *we have different factors because that is probably our most important process we have, is getting that capital allocation done correctly. Our capital is precious and we have to get it right and we have to allocate it in the right way.* And I think we feel good about the process we've built and the level of attention and focus we have on it."

95.     Defendants accompanied quarterly or annual financial statements with an additional filing titled Supplemental Information. The Supplemental Information filings included a list of all development projects greater than $5 million that were then underway. For each project,

Defendants listed, among other things, estimated total costs and estimated project yield. Defendants did not itemize the costs. An example of the disclosure is set out as **Exhibit A** hereto.

### B. Defendants Artificially Inflated Reported Yields

96. At a presentation during the NaREIT REITweek conference on June 5, 2018, Conforti falsely claimed that WPG calculated reported yield by mathematically dividing the existing locked-in returns from the development by all the costs of the development:

> Q: Okay, then I want to hearken back to my original questions, because a lot of these have 6-7%, or 7-8% cash returns on the leases with the redevelopment, but a lot of the leases now are 10 years, so the risk around the redevelopment and how do you look at tenant diversification and if the tenant doesn't renew, the ability to renew lease to a live tenant and how that sort of composition on the REIT investment and the risk on that?

> **DEFENDANT CONFORTI**: What we think about that hearkening back to – lease diversification is our primary focus and ***we're actually seeing quantified at about 9.5% return, that's a direct, as Mark will point out, a direct return on invested capital.*** We don't kind of play around with the fluffiness of, okay, an unproductive space is going to pick up another 100 basis points or 200 basis points of return. ***It's numerator/denominator. When we embark upon the development, and that development is vastly leased, we're not in the speculative redevelopment business.***

97. Defendant Conforti claimed that as a result, reported yields ***understated*** true returns from redevelopment. Indeed, according to Conforti, if WPG's returns were limited to reported yields of 9-10%, ***it wouldn't do any redevelopment at all***. As he and Yale falsely stated in the Q4 2018 earnings call taking place on February 21, 2019:

> Q: So if I look at your development yields, it's in the high single digits. And I think about the cost of equity and your CapEx needs and development needs. And there's a few ways to think about cost of equity but one simple way is dividend yield. It's about 17% today. I appreciate that there are gains from these asset givebacks or sales that you have to think about. But at this point, what keeps the dividend rate at this level?

> **DEFENDANT CONFORTI**: Well, yes. Let me kind of deconstruct those two questions. I think you asked two questions. I can answer the first simple – the first in a straightforward fashion. What keeps the dividend rate at its current level is surplus cash flow and our Board of Directors. As it relates to the – in effect, the comparison between what our marginal return on invested capital is as pursuant to

development and what our implied equity cost is, which is our dividend yield, if we did it – if we were – if it was univariate, *if the idea of the only return we were ever going to get was 9% or so based upon our development, we would – we wouldn't develop.*

**DEFENDANT YALE**: Yes. *And I think an important point is that's the direct yield on our investment so that is certainly the rents, maybe some cotenancy cure.* What's not factored in there is what's the cost of not moving forward with that redevelopment. Where do our cash flows go. You start looking at our multiple right now on AFFO [Adjusted FFO]. And clearly, there's a question regarding stability of the cash flows. So we certainly believe that our portfolio is viable. *We think we demonstrated stability but obviously, moving forward, addressing the lost rent, the cotenancy, having some organic growth. All of a sudden, you start looking at our multiple significantly differently.* And we think – *and that's why redevelopment is by far our best use of capital.* And as we stated in our remarks, we're very comfortable that we have the capital right now to fully commit to that redevelopment pipeline.

98.     Had Defendants' claim about yield been true, their redevelopment projects would have significantly improved WPG's properties. A 9-10% return without including increased or speculative rent or other gimmicks to increase income and that accurately accounts for all and only project costs is a good return. And because the redevelopment projects were large, so were the returns. WPG should have been able to sell these properties at high prices in a pinch.

99.     But their claims were false. In fact, the reported yields dramatically *overstated* WPG's true returns.

       *1.     All Defendants Sat On the Investment Committee That Approved All Substantial Redevelopment Projects*

100.     Former Employee 1 ("FE 1") served as a Senior Strategic Analyst at WPG from January 2016 through October 2017, when he became Director, Capital Markets. FE 1 reported directly to Defendant Yale. FE 1 "ran all transactions" involving acquisitions and dispositions of assets, financing, and capital allocations.

101.     According to FE 1, WPG had an Investment Committee which met at least monthly. At these meetings, the Investment Committee, which included all Defendants, would consider and

review all significant redevelopment projects proposed by WPG management employees. FE 1 was the "master of ceremonies" for Investment Committee meetings. The Investment Committee reviewed, at a minimum, all projects costing more than $1 million.

102.    The Investment Committee was responsible for approving individual projects. The Investment Committee relied on project-level approval request memoranda ("Approval Requests"). FE 1 also prepared these Approval Requests using information submitted by other WPG employees.

103.    The Investment Committee Reports required that the employee proposing a project disclose extensive information on its economics. For large projects, the Approval Requests could run to dozens of pages. The projects would be discussed at monthly Investment Committee meeting which all Defendants attended. There were signature blocks on project approval forms with lines for Defendants Conforti, Yale, and Indest; they all had to sign off on every project the Investment Committee approved. After approval, the Investment Committee would sign formal meeting minutes ("Investment Committee Minutes"). The Investment Committee Minutes included a summary of the principal economic terms of the approved transactions, including project costs and yields. Defendants Yale, Conforti, and Indest were required to approve the Investment Committee Minutes.

104.    Former Employee 2 ("FE 2") served as a WPG VP of Development from April 2018 through April 2020. FE 2's responsibilities included developing redevelopment plans, evaluating their feasibility and profitability, and presenting the redevelopment plans to the Investment Committee for decisions.

105.    FE 2 reports that he had to enter the details of prospective redevelopment projects into a "deal sheet". The deal sheet had numerous fields for the various costs and projected returns

of the projects. According to FE 2, the deal sheets were very detailed, and difficult and time-consuming to fill out. The deal sheets were "very specific".

106.  FE 2 then presented FE 2's proposed redevelopment plans to the Investment Committee. According to FE 2, the Investment Committee met at least once or twice a month. The second monthly Investment Committee meeting was to present answers to questions at the first Investment Committee meeting, or for more general follow-up thereon.

107.  According to FE 2, the Investment Committee meetings usually took place in the largest conference room in WPG's Columbus headquarters, though occasionally they were held in WPG's Indianapolis office, likewise in that office's largest conference room. According to FE 2, Conforti and Yale both attended the Investment Committee meetings, as did WPG's head of construction, and FE 1.  According to FE 2, FE 1 was responsible for organizing the meetings.

108.  According to FE 2, the Investment Committee used the deal sheets in the Investment Committee meeting. The Investment Committee meetings were very serious, with a lot of questions asked.

109.  According to FE 2, every deal went before the Investment Committee for a deal review and also had to be written up in the deal sheets.

110.  After the projects were approved, FE 1, Indest, and Yale, among others, held meetings to make "manual adjustments" to project costs and yields as approved by the Investment Committee to make them look more profitable. The cost and yield figures generated by these manual adjustments were the figures reported in WPG's Supplemental Information filings. Indest and Yale directed and approved all manual adjustments. FE 1's responsibility was to calculate yield using these manual adjustments.

111.    To make these manual adjustments, Defendants employed various improper tricks to report misleadingly high yields. FE 1 called the resulting numbers as "mickey mouse accounting", in that they were fake. As a result, the yield schedules included in the Supplement Information filings throughout all of 2019 and 2020 consisted of "a bunch of made up numbers".

112.    According to FE 1, Defendants used these manual adjustments to report reported yields that were as close to 10% as possible. FE 1 added that WPG chose the 10% figure so that the projects would pass a basic "sniff test" demanded by public markets. Thus, FE 1 describes the process of applying the tricks as "solving to an answer." Defendant Yale told FE 1, including in or around February 2020, that WPG could not disclose the true yield numbers because they would show that WPG was not capable of creating profitable projects.

113.    FE 1 reports that these tricks were already well established by the time he joined WPG and continued essentially unchanged throughout his tenure.

114.    The tricks Defendants employed both understated the costs of redevelopment and overstated additional revenues generated by the project.

115.    According to FE 1, understating costs and overstating revenues helped conceal that many of the projects were simply not worth completing. Because WPG manipulated externally-reported yields, it "always fell short of" its publicly disclosed yields.

116.    On February 10, 2020, FE 1 met with Defendants Yale and Indest and other senior WPG managers to plan manual adjustments to the costs and yield of the Polaris, Aurora, Southern Park, and Mall at Johnson City projects.

117.    The purpose of the manual adjustments was to make the projects seem more palatable to WPG investors before they were first reported to the public.

118. According to FE 1, Defendant Indest began the meeting by stating: *"We can't disclose this level [of yield], we need to find a way to enhance returns."*

119. These four projects are a representative sample of instances in which Defendants used these tricks in particular cases are alleged below. In each case, the manual adjustments led to materially overstated project yields.

120. The global impact of the manual adjustments on WPG's finances was enormous. WPG invested approximately $100 million on redevelopment per year for the four years in FE 1's tenure, reporting yields of 9-10%. According to FE 1, on average, the true yields for WPG's projects were only half what WPG reported, or 4-5%. The difference amounts to tens of millions of dollars in income per year. As to additional revenues, FE 1 estimates that WPG overstated annual revenues for projects approved in any 2-year period by $20 million to $50 million.

121. According to FE 1, the so-called indirect benefits were laughable. For internal purposes, WPG did not quantify the projects' indirect benefits during Investment Committee Meetings. Moreover, externally-reported yields already included much of the indirect benefits, as Defendants publicly defined them. WPG's externally-reported yields depended in large part on entirely speculative revenues.

122. Tellingly, WPG reported notably lower yields for redevelopment projects of O'Connor Joint Venture properties – because, according to FE 1, it had to be approved by O'Connor, which did not tolerate WPG's "fluff".

2.    *Defendants overstated income*

a)    *Defendants overstated income from co-tenancy cures*

123.    Malls typically have anchor tenants ("Anchors"), which are large stores owned by well-known brands. These Anchors drive traffic to other non-anchor stores in the mall ("non-Anchors").

124.    Anchors might actually drive down sales if they directly compete with smaller stores. For example, a Trader Joe's is less profitable in a mall whose Anchor is a Whole Foods, and vice versa.

125.     To ensure that non-Anchors can continue to receive the benefits of having an Anchor without the drawbacks of direct competition, malls will often agree to co-tenancy provisions in leases with non-Anchors. For example, a co-tenancy provision with a non-Anchor Trader Joe's might reduce its rent if there is no Anchor or if the Anchor is, say, a grocery store.

126.    The 28 Anchors WPG lost threatened to trigger material rent adjustment or termination protections in numerous co-tenancy clauses. If triggered, these clauses would collectively significantly reduce WPG's income.

127.    According to FE 1, because of stiff competition, WPG had to offer its new Anchors far below market leases or a year or more of free rent. Because WPG was forced to offer such generous terms, its redevelopment projects' yields were so low that they would not pass a market "sniff test".

128.    As a first step in overstating reported yield, WPG would improperly double count benefits from curing non-Anchor's co-tenancy rights.  A redevelopment project might bring in an Anchor and thereby keep non-Anchors paying their full rents. The money saved by avoiding or curing non-Anchors' co-tenancy might legitimately be included in calculating the project yield,

given proper disclosure. But instead of counting only avoided or cured costs, WPG would also add the non-Anchors' total rent.

129.    Thus, for example, if a non-Anchor's rent was $1,000 with an Anchor that satisfies co-tenancy clauses but is reduced to $600 when there is no such Anchor, WPG could properly include $400 in rent from the non-Anchor in calculating yield, because the reduction of rent was attributable to replacing the Anchor. But instead, WPG included both the non-Anchor's avoided co-tenancy costs **and** the non-Anchor's full rent, for a total benefit of $1,400 in this example. WPG thus recognized $1,400 in increased rent from a non-Anchor who was only paying $1,000 in rent.

130.    The double-counted co-tenancy cures had a significant impact on reported yields.

131.    Defendants reported in WPG's SEC filings that the total cost of redeveloping Southern Park was $16-18 million and the project yield was 7-8%

132.    In truth, total costs neared $30 million while projected yields were "sub 4%".

133.    A spreadsheet used to calculate project yields for external reporting emailed to Defendants Yale and Indest on or around February 10, 2020, includes both full anticipated rents from all stores after redevelopment and $450,000 in avoided co-tenancy. FE 1 confirms that the $450,000 was improperly double counted.

134.    According to FE 1, WPG improperly double-counted revenues from curing co-tenancy in all projects that had such cures.

135.    FE 1 estimates that double counting revenues from co-tenancy cures for projects approved in any 2-year period  overstated annual revenues by $5 million to $10 million in total.

136.    According to FE 1, about half of WPG's projects included co-tenancy cures. WPG double-counted revenues from co-tenancy cures in every case.

*b)*　　*Defendants overstated income by recording speculative leases*

137.　　As set out above, Defendants claimed that WPG calculated yield by mathematically dividing the existing locked-in returns from the development by all the costs of the development. Thus, Defendants implied that the yield numbers were based on signed leases or commitments.

138.　　In truth, Defendants recognized revenues from empty stores even if they had no commitments.

139.　　In fact, the form used in Investment Committee Minutes to document approval included a line item titled "Revenue – Speculative".

140.　　For example, in Southern Park, WPG was in very preliminary talks with a few potential tenants, including a combination coffee shop and bar. There were no letters of intent or build-out plans for these tenants. Thus, WPG did not know whether the customer would sign, how much they would pay in rent, or whether WPG would have to spend money to prepare the store for the customer.

141.　　In reporting yield, WPG nonetheless recognized $500,000 of annual revenues from these tenants.

142.　　In many cases, Defendants recognized revenues from stores when negotiations had not even begun.

143.　　The Town Center at Aurora, a suburb of Denver, was a flagship project.

144.　　Acquired in 1998, Aurora had one of the longest tenures with WPG or its predecessors of any WPG malls.

145.　　The Aurora redevelopment called for WPG to replace an anchor store owned by a company that had filed for bankruptcy ("Company A") with FieldhouseUSA and mixed-use component including hospitality.

146.    According to Defendants, Fieldhouse was a catch.

147.    On October 26, 2019, WPG issued a lengthy press release boasting that it had secured three Fieldhouse stores as tenants, quoting Conforti as saying:

> "Having three Washington Prime Group assets recently selected as FieldhouseUSA locations is akin to proudly standing upon the highest podium with my teammates including Dan Scott, Don Massey, Tamra Bower and Charlie Kretzer to name a few, as an Olympic gold medal dangles tantalizingly around my muscular shoulders and chest while the national anthem majestically trumpets our victory.

> *           *           *           *           *

> "Let me take a few seconds to tell you about FieldhouseUSA. They own and operate premier athletic facilities within the nation providing tournaments and leagues for children, teenagers, adults and companies. In addition, FieldhouseUSA also offers individual performance training.  In fact, according to a highly regimented physical training program, I'm actually writing this press release while performing jumping jacks and deep knee bends. Disclaimer: Do not, I repeat, do not attempt this without the supervision of a FieldhouseUSA professional.

> "I could go on for hours and hours about how much I love these guys. CEO Gary Oliver actually let me throw a football to him at least four or five times and...humble brag...I only dropped it 80% of the time. [6]

148.    WPG reported that Aurora would cost $21-23 million and yield 5-6%.

149.    The Investment Committee approved the Town Center at Aurora project in a meeting held on November 5, 2019. Investment Committee Minutes for that meeting report that the Town Center at Aurora project was approved at a cost of $24.9 million with a yield of 2.04%.

150.    The difference between the true yield and the publicly reported yield was due in large part to recognizing more than $1 million in speculative rent from non-Anchor tenants.

151.    No tenant was identified for any of the leases other than Fieldhouse. IWPG had not begun any serious negotiations. Defendants calculated rents by multiplying the stores' square

---

[6]https://washingtonprime.com/company/News--Views/News-Details/2019/FieldhouseUSA-to-Join-Polaris-Fashion-Place-and-Town-Center-at-Aurora/default.aspx . Conforti seeded the press release with references to the 2004 comedy *Dodgeball: A True Underdog Story*.

footage by a price per square foot. The prices per square foot used to calculate leases for 26 stores were each one of three round numbers. Defendants recognized leases from three speculative tenants identified as "Proposed Restaurant". All WPG had was land; none of the structures that would house the restaurants had even been built. WPG assumed that each restaurant would have the same square footage, the same price per square foot, and even the same broker's commission.

152. In the Q4 2019 Supplemental Information, Defendants first disclosed the project to redevelop the Mall at Johnson City.

153. Defendants reported that the project would cost $14-16 million in total and return yields of 5-6%.

154. Defendants considered the Mall at Johnson City at an Investment Committee meeting held on December 19, 2019.

155. According to the December 2019 Investment Committee Minutes, 39% ($335,458) of the $858,426 reported increase in revenues was identified as "Revenue – Speculative". No tenants were identified, no letters of interest had been signed, and no terms had been agreed to. True yields were approximately 3-4%.

156. Defendants describe Polaris Fashion Place as "Columbus, Ohio's premier retail destination." Polaris has almost 1.4 million square feet of stores. It is held by JV 1, and WPG holds a 51% interest therein.

157. On WPG's Q4 2019 Supplemental Information, Defendants disclosed a project to replace an anchor store in the Polaris mall owned by a bankrupt tenant ("Company B") with a Fieldhouse. Defendants reported a total project cost of $24-28 million and yield of 4-5%.[7]

---

[7] Specifically, Defendants reported that their 51% share of project costs amounted to $12-14 million.

158.    The Polaris redevelopment was approved at the November 5, 2019 Investment Committee meeting. The Investment Committee Minutes for that meeting reported that the project was approved with costs of $26.6 million and with a yield of only 1.92%.

159.    The difference between the approved and reported yields was made up by phantom tenants.

160.    In general, including speculative development contradicted Defendants' claim that they only considered signed leases. But Polaris was particularly glaring. The majority of its speculative leases were for outparcel restaurants that WPG proposed to build. According to FE 1, WPG internally acknowledged that restaurants would not be interested in the parcels because there was too little foot traffic. However, in order to increase externally-reported yields, Defendants assumed that the restaurants would be viable because redevelopment would increase foot traffic. Defendants' assumption completely contradicts their public assertion that they did not include impacts on adjacent unproductive space in reporting yields.

161.    As of December 2021, no tenants had taken up residence.

162.    According to FE 1, by recognizing income from phantom tenants, WPG overstated annual revenues for projects approved in any 2-year period by up to $10 million.

c)    *Defendants overstated income by assuming 100% occupancy*

163.    Tenant bankruptcies are a fact of life for mall operators. While large brands like Sears take the limelight, smaller stores regularly turn over, too.

164.    As a result, mall operators distinguish between credit tenants and non-credit tenants.

165.     Credit tenants are companies that have investment-grade ratings by one of the three major commercial credit agencies. Every other tenant is a non-credit tenant. Non-credit tenants typically pay higher rents.

166.     There is always a risk that non-credit tenants will file for bankruptcy and their tenancy will take some time to be replaced.

167.     Industry standards call for a vacancy provision of 1-5% of revenues for modeling purposes unless more specific data exists for a given project. The vacancy provision is taken off of revenues from non-credit tenants for modeling purposes.

168.     Many of WPG's tenants were far shakier than even ordinary non-credit tenants. For example, while WPG did ultimately sign the combination coffee shop/bar for low six figure rent, the tenant could only afford its lease because WPG provided it with a loan for more than its annual rent. The annual interest rate on the loan was 1% with no compounding. For this and other similar tenants, WPG was loaning money to be paid to WPG, "roundtripping" the funds to inflate revenue. Likewise, WPG made an equity investment into Shelby's Sugar Shop because the company could not otherwise stay afloat. According to FE 1, the purpose of the lease was simply to fill up space in WPG's malls. When reporting yields, WPG included rent from these tenants, even though they could only pay their rent because of cash from WPG.  Once the cash from WPG was spent, the tenant would likely not be able to pay rent.

169.     According to FE 1, a substantial majority of WPG tenants were non-credit tenants. They accounted for about half of the total rent WPG earned.

170.     Defendants disclosed at the Mach 5, 2019 Citi Global Property CEO Conference that WPG's overall occupancy as of then was 94%. Many of WPG's redeveloped properties fared much worse. At a total cost of more than $40 million, redevelopment of the Jefferson Valley Mall

was one of WPG's largest projects ever. It was completed in Q4 2017. Yet as of December 31, 2019, the mall's occupancy was only 88.3%. Thus, WPG was losing a large amount of revenues, as compared to what they would have earned if the mall had achieved their average occupancy rate.

171.     According to FE 1, the failure to take a provision for non-credit tenants by itself caused externally reported yields to exceed internally considered yields by $4 million to $5 million for redevelopment projects approved during any 2-year period.

<em>d)     Inclusion of percentage rent</em>

172.     Shopping mall tenants' contracts sometimes include a provision requiring the tenant to pay a percentage of the tenant's sales as rent after a certain threshold of sales is reached ("percentage rent").

173.     Percentage rent is more speculative than base rent. Stores might – or might not – become popular. Retail sales follow broader economic trends. A recession can eliminate percentage rent entirely.

174.     Yet WPG included substantial percentage rent in calculating yield. In reporting yields for the Aurora project, WPG assumed that each tenant would pay the same amount of percentage rent per square foot. WPG thus added $465,359 in revenues for external reporting purposes at the stroke of a pen.

<em>3.     Defendants understated costs</em>

<em>a)     Defendants arbitrarily deemed project costs unrelated</em>

175.     The anchor stores WPG was replacing were used by businesses that had been flailing and had typically seen little redevelopment for a long time. Accordingly, new anchor

tenants customarily required that WPG modernize their space. These improvements accounted for the lion's share of the reported costs of redevelopment.

176. Yet, as FE 1 explains, WPG could not simply ignore the other parts of the mall. Failing to modernize these other parts would create a poor contrast with the mall's new, modern parts. Stores located in the old parts would be stigmatized as second class. They would not renew their leases.

177. Thus, when modernizing anchor tenants' spaces, WPG would modernize the entire mall. Yet WPG customarily excluded the costs of modernization from the reported costs used to derive the reported yield.

178. These costs could be significant. For Southern Park, they were approximately $3 million. Yet Defendants arbitrarily excluded them.[8] WPG thus artificially understated the cost of the Southern Park renovation by $3 million, thereby inflating yield.

179. For each of Polaris and Aurora, Defendants also excluded more than $5 million WPG had spent purchasing stores from development cost.

180. Company B had owned its Polaris store outright. WPG paid $11 million to acquire Company B's store. As set out in a map set forth in an Excel spreadsheet circulated to Defendants Yale and Indest on or about February 10, 2020, the new Fieldhouse store and a speculative hotel to be built on a small parking lot Company B had owned occupied all the real estate WPG purchased from Company B.

---

[8] While Defendants cryptically noted in a footnote that the cost "does not include unallocated portions of the planned interior renovation", they neither explained what unallocated portions were nor disclosed that they were very high. Moreover, investors would have assumed that these excluded costs were *de minimis* because of Conforti's claim that reported yields were conservative and "a direct return on invested capital." Further, Defendants thereby suggested that the interior renovation was a separate redevelopment project which would additionally increase revenues, while in truth the Southern Park yield depended on recognizing revenues driven by the renovation.

181.    By the time of the February 10, 2020 meeting, the costs of the Polaris redevelopment had ballooned by about $7 million. At that time, WPG still had not signed any tenants and was not engaged in serious discussions with any. But these additional costs were necessary to make the stores minimally acceptable to tenants, including by building a structure that the tenant could turn into a restaurant.

182.    To avoid public disclosure, Defendants (a) removed the $5.5 million cost of acquiring half of the Company B store from project costs, and (b) removed an additional mid-seven figure amount relying on an entirely speculative plan to sell Company B's small parking lot to a hotel developer. As of today, WPG has not sold the parking lot to any hotel.

183.    Thus, the total costs of the Polaris project were $8-13 million higher than Defendants publicly reported. Removing the costs made the Polaris yields look much better.

184.     Company A had also owned its Aurora store. WPG had paid $5.2 million to acquire the store. Yet when Defendants publicly reported the cost of the Aurora redevelopment in WPG's Supplemental Information filings, they completely excluded the costs of purchasing Company A's store. Thus, the total Aurora redevelopment project's price was $5.2 million higher than disclosed (in addition to further costs alleged below).

> b)    *Defendants arbitrarily reduced costs by counting unrelated transactions*

185.    WPG also arbitrarily reduced project costs by counting profits that had nothing to do with the project, most commonly from potential sales of undeveloped land parcels adjacent to their developed land.

186.     WPG's properties sometimes included adjacent undeveloped land. Rather than use the land to expand the mall, WPG at times floated the idea of selling the land to residential or other developers.

187.     WPG's redevelopment plans did not involve or contribute to the land sales. They were completely unrelated. Yet in its publicly reported yields, WPG reduced costs by an amount attributed to these unrelated sales. The Town Center at Aurora was one such instance.

188.     WPG owned land at Aurora that was neither used by nor designated for mall development.

189.     In connection with the Aurora project, WPG recognized a $1.5 million benefit from selling that land. WPG thereby reduced costs by $1.5. million.

190.     The $1.5 million was not associated with the redevelopment project being considered and disclosed. Any sale would be completely unrelated to redevelopment. A sale was not part of the redevelopment plans and redevelopment would not make a sale more likely. Indeed, WPG had not even sought any government approvals in connection with the land and did not seek any in connection with redevelopment.

191.     Thus, the $1.5 million was simply a trick to reduce reported costs to make the yield look better.

192.     In total, the reported cost of the Aurora project was $6.7 million lower than its true cost.

                    c)        *Defendants reduced costs by misclassifying tax abatements*

193.     Malls frequently receive tax abatements or other civic financial benefits from local authorities. These tax abatements may provide that if mall owners redevelop a mall, they will not

have to pay particular taxes, or will pay less of those taxes, for some years into the future. These benefits are not provided in one lump sum.

194.     Companies can generally use either of two methods to recognize these benefits when reporting ROIC: they can lower the reported annual costs by the annual amount of the tax break, thereby raising reported annual income, or they can lower reported investment costs by the present value of the tax abatement discounted to account for the fact that the funds could be productively invested elsewhere during the intervening time.

195.     WPG did neither. Instead, WPG reduced reported investment costs by the ***undiscounted*** value of the future tax abatement.

196.     In Southern Park, local authorities approved a 15-year tax abatement. The total undiscounted dollar value of the tax abatement over these 15 years was $6 million. Conforti and Yale were well aware of the details of the tax abatements. Conforti personally met with the local authorities to negotiate the abatement terms.

197.     WPG reported in a footnote that "Estimated Costs are shown net of the approved public incentives package." Thus, it appeared that WPG had chosen to reduce costs by the present discounted value of the tax abatement.

198.     While determining the discount rate WPG should have applied requires subjective judgment, the reduced annual costs approach provides a guide. The abatement would amount to about $400,000 in extra income per year. The extra income would have an effect on yield equivalent to decreasing costs by $4.7 million.

199.     But WPG reduced costs by the entire $6 million. Thus, WPG recognized an extra $1.3 million from misclassifying tax abatements.

**C.     WPG Can't Survive the Shock of COVID Because Its Redeveloped Properties Were Nowhere Near as Profitable as Defendants Had Represented**

*1.     COVID's Impact On WPG's Finances Was Manageable*

200.     WPG derives its liquidity from operating activities, corporate and mortgage debt, and property sales.

201.     In early 2020, COVID-19 quietly spread through America. In March 2020, America discovered the scope of COVID-19. Cases, hospitalization, and deaths grew exponentially with no end in sight. By April 3, 2020, most states had issued stay-at-home orders. Few shoppers were inclined to visit malls even when legally permitted.

202.     COVID-19 put a strain on WPG's finances.  WPG's cash flows from operations fell from $209.3 million in 2019 to $78.6 million in 2020, a gap of $130.7 million.

203.     But Defendant Conforti repeatedly stated that COVID-19 was far from a knockout punch. The numbers seemed to back him up. WPG had historically paid quarterly dividends of $0.25/share. In 2019, WPG paid out $237.5 million in dividends. In Q1 2020, WPG lowered its quarterly dividend to $0.125/share. After Q1, it cut the dividend entirely. As a result, WPG only paid out $42.3 million in dividends in 2020, a gap of $195.2 million, or more than the drop in cash flows.[9]

---

[9] Though admittedly the dividend was lowered to $0.125 in February 2020 because to some extent a $237.5 million dividend was not sustainable.

> 2. *Had WPG's Redevelopment Substantially Improved WPG's Malls, as Defendants Claimed, WPG Could Have Sold Them to Raise Cash to Stay Afloat*

204. Had WPG's redevelopment been as successful as Defendants maintained, WPG should have been able to fill the remaining gap by selling its profitable redeveloped malls.

205. WPG had historically not been averse to selling off malls. As Defendant Conforti explained on the Q1 2019 Earnings Call:

> Q: Okay and then, also in terms of – given the kind of CapEx and redevelopment needs going forward – I know, [Defendant Yale], in the beginning, *you mentioned that future asset sales could be an option for future liquidity*. Would you consider selling any of the open-air properties?
>
> **DEFENDANT YALE**: *Of course*
>
>        \*        \*        \*        \*        \*
>
> **DEFENDANT CONFORTI**: [] I'll give you kind of a combination answer. *Well, first and foremost – at the right price, and I think I said this in my first earnings call, we are a seller of one asset or the entire company at the right price. And that's my fiduciary [duty] to shareholders. People know our number. We think that the assets that we have are important, from a holistic example with respect to our portfolio, but they're not crucial. No asset is. We are a dynamic operating company that has proven things that quite frankly no one else has in our space. And at the right time, we'll make the right strategic decision.*

206. During the years ended December 31, 2017, 2018, and 2019, WPG received net proceeds from dispositions of properties and outparcels of $224.4 million, $39.2 million, and $53.4 million, respectively.

207. WPG's core value proposition was its redevelopment plan. By 2020, WPG had four years' worth of redeveloped properties. Redevelopment purportedly left WPG with a cluster of vibrant and profitable dominant town centers. Moreover, while WPG had mortgaged the majority of the properties to pay for redevelopment, these well-spent funds purportedly increased the value of the malls well beyond the new debt.

208.    On an October 24, 2019 call to discuss WPG's Q3 2019, Conforti stated that "really, really, really smart institutional and private equity investors" had already inquired about buying its malls or making an equity investment:

> Q: No, I'm just curious *if you think selling Tier One malls could be a viable source of capital for either delevering or funding future redevelopment plan?* I'd love to get your thoughts on the broader mall private market today and where you're seeing malls being negotiated in the market and how debt market or mortgage financing availability is today maybe versus six months ago?
>
> **DEFENDANT CONFORTI:** *I'll start and whoever – listen, there is still very little evidencing of price discovery, but what is happening is – I'll do three reallys: really, really, really smart institutional and private equity investors are beginning to call us and saying "You guys have built a hell of an operating infrastructure. Is there an aggregation thesis?" And we're hearing it. So I mean the reason I bring that up is because – albeit there is still very little price discovery – people are getting interested in what we're doing and our focus was to be the best in our business. And I mean there is no hubris. We work our behinds off 24x7. But we've built an infrastructure that's quite frankly as formidable – more formidable than anybody in our – I guess our sub-sector. So, really not a lot of sales data out there. But I don't want to disclose anymore, but there – it's getting more interesting, which will obviously inure to the benefit of our multiple because everybody – again it's binary.* You're either E-commerce or physical retail, you're either primary versus secondary, you're either us versus somebody else. And there has just been no nuancing whatsoever. It's been a blunt-edged instrument. Does that help?

209.    Later in the call, Yale and Conforti both emphasized that WPG could easily sell assets if necessary:

> Q: On your ability to find some interesting liquidity sources. So, as I think about this next year – I know you priorly addressed a lot of the debt maturities, but should we expect any other liquidity events from WPG, whether it be selling more outparcel sales in addition to what you have announced or some other kind of secured lending – or borrowing, secured borrowing?
>
> **DEFENDANT YALE**: I think we are always looking for sources of capital, ways to enhance liquidity. But I think what we would be focused on is deleveraging, not necessarily looking at debt transactions per se. But we're always looking for ways to bring strategic capital into the company. *And I think, Lou, as you mentioned, there is folks coming to us who believe in this space and believe in this company.*
>
> **DEFENDANT CONFORTI**: Well, and they believe in this – and I sound like – you guys know me, the name of – the type of folks that have been reaching out, it's a pretty

41

impressive list. And from a creative capital source, ***I mean, there is always the Faustian deal that we can do.***

210. Indeed, even as COVID hit WPG, sharply reducing its revenues, Defendants continued to claim redevelopment was boosting WPG's portfolio. Defendant Yale explained the purpose of renegotiating the covenants on WPG's debt: "[I]t does allow us to run our business ***and most importantly, continue with our strategic redevelopment investment***."

211. COVID did not destroy the market for all malls. Instead, it sharpened existing differences between good and bad malls. As a March 2021 Bloomberg article reported, less profitable malls that had not kept up with the times lost nearly all their value.[10] As the Bloomberg article noted, the value of such malls is "the land minus the cost of demolition." But there continued to be a market for more profitable and modern malls. The Bloomberg article quoted a Compass Point analyst as saying that "[t]here's a huge bifurcation between good and bad quality." Indeed, as Bloomberg noted sales prices in January 2021 were down just 1.8% from 2020, because only high-quality malls were trading.

212. WPG should have been less affected than most. WPG's focus was to develop properties so they had both open-air and enclosed areas. Open-air malls, particularly those with grocery store anchors, did very well during the pandemic and retained most of their value.

213. Indeed, on the Q2 2020 earnings call, Conforti boasted that WPG was "going to monetize [two malls, Clay Terrace and WestShore] and several other interesting opportunities within our portfolio." Yale added that the discussions were ongoing:

> **DEFENDANT YALE**: Just to emphasize, I mean we are in active conversations on [Clay Terrace and WestShore]. And this has all transpired this year and over the last several months. ***So even in the current environment, there are clearly folks interested in these***

---

[10] John Gittelsohn, Mall Values Plunge 60% After Reappraisals Triggered by Bad Debt, March 1, 2021, **Exhibit B** hereto and available at https://www.bloomberg.com/news/articles/2021-03-01/mall-values-plunge-60-after-reappraisals-triggered-by-bad-debt?sref=L0o59hMS

*opportunities at all three of the properties [including a third, Westminster] we have previously identified.*

214.    Yet WPG's redevelopment had never been anywhere close to as profitable and productive as Defendants claimed. WPG's malls were still the same mid-level, mid-quality malls after redevelopment that they had been before. Because WPG's redeveloped properties were much less profitable than advertised, they were also worth far less than WPG suggested.

215.    As Defendant Conforti explained in a presentation at the September 15, 2020 Bank of America Merrill Lynch Tower Global Real Estate Conference, there was no interest in WPG's properties:

> Q: Maybe some of your views on the transaction market, when may it start to get more active? What are you seeing in terms of enclosed assets versus open air? What are you seeing out there?
>
> **DEFENDANT CONFORTI**: I mean, there's no evidence of price discovery. I mean, and in the enclosed, if it does occur, I mean—again, put aside the current, from a situation standpoint, all things, coronavirus, and the environment—but prior, you were either a primary asset and you can look at implied cap rates, and Craig, that—you provide and add a little premium and then you would improvise the corporate cap rates, and then you —and want to check what an asset would go for. And then there was everything else.
>
> And unfortunately, and this is why we're going to prove all the shorts and all the pundits wrong is that everything included s*** that we got rid of, that [Defendant Yale] was prudent enough to get rid of, 17, 18 assets. And there needs to be a little bit more nuance. And we sold our stuff to folks that—they're not truly operators, they're not, they don't— it's a different business. It's a milk-cash-flow-and-probably-functionally-have-to-have-in business until it goes away, and maybe you get a couple of pennies of reversionary value. That's not our business.
>
> *And again, I'm going to quote, look on the transcript, our big brother [Simon Property Group CEO] said, look for a resurgence in midsize and Midwest cities, in his earnings call, and that has been something that we have—that has been our thesis for a long, long time. And you need to have that nuance, that the world isn't a premier asset in Los Angeles and everything else.*
>
> So not really meaningful price discovery. And when we got – I quite frankly think that it, inures to our benefit that there's going to be opportunities as a result. *And open air has obviously evidenced a little bit more stability and a little bit more kind of normal course behavior.*

216.    After COVID struck, there was no market for low- or mid-level malls. So there was no market for WPG's malls, either.

217.    In the end, it turned out that WPG's vaunted malls were only worth "the land minus the cost of demolition." WPG had completed redeveloping Westminster Mall in March 2018. In November 2020, WPG announced that it had sold about 80% of the land under which Westminster Mall was built. The purchaser was a residential housing developer who would bulldoze the mall and replace it with townhouses. WPG was negotiating the sale of portions of Clay Terrace and WestShore Plaza. According to FE 1, the purchasers would bulldoze large portions of the malls as well.

218.    Redevelopment had not had the impacts Defendants touted. As a result, Defendants could not create any interest in WPG's properties. WPG could not rely on asset sales to remedy a deficit in its operating cash.

### 3.    WPG Maxes Out Its Borrowing Capacity

219.    WPG takes on two types of debt. First, the subsidiaries that hold its individual properties take on mortgage debt. And second, WPG and WPG LLP took on plentiful additional corporate debt.

220.    WPG's corporate debt as of December 31, 2019, consisted of:

   a.  Publicly-traded notes ("Bonds") with a face value of $720 million;

   b.  Two term loans of $350 million and $340 million ("Term Loans"); and

   c.  A revolving credit facility allowing for borrowing of up to $650 million ("Revolver").[11]

---

[11] Excluding notes due April 2020 which were paid off in full.

221.    In addition to the dividend cut, WPG withdrew $120.0 million from the Revolver on April 14, 2020. These additional funds ensured that WPG ended 2020 with more cash on hand than it had at its beginning.

222.    But WPG could borrow no more.

223.    All of WPG's debt was subject to covenants. The covenants on the Bonds prohibited WPG from taking on additional loans if:

> a.  ***All outstanding indebtedness***. The company could not take on additional debt that would cause its indebtedness to exceed 60% of its Total Assets[12] ("Total Asset Covenant"). As of December 31, 2019, the Total Asset Covenant was at 56.9%.
>
> b.  ***Secured indebtedness***. The company could not take on additional debt that would cause its secured debt to exceed 40% of its Total Assets ("Total Secured Covenant").

224.    The definition of Total Assets in the Total Asset Covenant depended substantially on WPG's EBITDARe.

225.    Remedies for a breach of the Total Asset Covenant included acceleration of maturity, including principal and all accrued and unpaid interest.[13]

226.    Any default could only be waived by a vote of holders of two thirds of the Bonds.

227.    Defendants reported the Total Asset Ratio in all Supplemental Information filings accompanying every 10-Q and 10-K for every quarter until Q3 2020.

---

[12] "Total Assets" is a defined term meaning the sum of: (1) for stabilized enclosed properties, EBITDARe at an 8% capitalization rate; (2) for stabilized unenclosed properties, EBITDARe at a 7% capitalization rate; and (3) for unstabilized properties, undepreciated book value under GAAP. EBITDARe is calculated for the trailing 12 months.

[13] Indenture Dated as of March 24, 2015, Section 502.

228.    WPG's other corporate debt also included negative covenants. These negative covenants similarly restricted WPG's total indebtedness to 60% of total assets and its secured indebtedness to 40% of its assets.[14]

229.    But the negative covenants on WPG's Term Loans and Revolver did not just prevent WPG from raising cash if its leverage exceeded the ratios. Rather, the covenants were automatically tripped if the indebtedness exceeded the ratios.

230.    In its Q1 2020 10-Q, filed May 7, 2020 in the middle of the first COVID wave, Defendants disclosed that they were in talks with their lenders to modify certain covenants, while warning that the failure to obtain such modifications might cast substantial doubt on WPG's ability to continue as a going concern:

> We are engaged in discussions with our unsecured creditors and based upon these discussions we believe, to the extent that the impact of COVID-19 results in potential non-compliance with financial covenants, it is probable that we will remain compliant with such covenants through some combination of waivers, modifications or other amendments to the related agreements. However, no assurances can be made in this regard, and if we are unable to agree on the terms of such waivers or changes, this could create substantial doubt about our ability to continue as a going concern through May 7, 2021.

231.    Analysts had been concerned with debt covenants, but the potential covenant restructuring reassured them. In a June 4, 2020 report, an analyst employed by Compass Point noted:

> **Leverage High, Watching Debt covenants** – the shares have been one of the worst performing REITs this year as investors question the company's high leverage of 9.5x, based on our estimate. ***We expect WPG could trip its [Loan To Value] covenants later this year but understand management has been in contact with lenders regarding relief.***

(First emphasis in original)

232.    On the Q2 2020 Earnings Call, Defendants announced that WPG had all but signed an agreement to obtain covenant relief ("Covenant Restructuring Agreement").

---

[14] Measured slightly differently than on the Bonds.

233.    As Defendant Yale explained, the modifications would address WPG's covenant issues:

> Obviously, the significant news from a balance sheet perspective involves the pending credit facilities modification. Today, we've received the requisite lender consents for such modification and we expect to close by the end of the week on the revised facility. As [Conforti] mentioned, through the immediate waiver of certain financial covenants and less restrictive thresholds into next year, including a permanent increase to the limit for overall leverage to 65%, *the modification should provide us with a bridge to the other side of the pandemic.*

234.    Defendant Yale assured investors that WPG would be able to modify all its covenants:

> We should also mention that we are in compliance with the bond covenants as of the second quarter of 2020 both prior to and proforma for the credit facilities modification. When considering the uncertainty associated with COVID, significant risks exist to any projections, [but] we believe the company should have the necessary flexibility that will allow us to navigate and maintain compliance with our *modified credit facilities and bond covenants for the foreseeable future*.

235.    On August 17, Defendants announced that they had formally signed the Covenant Restructuring Agreements.

236.    The Covenant Restructuring Agreements purportedly waived leverage compliance covenants for Q2 and Q3 2020, while significantly loosening them thereafter. In exchange,  WPG among other things:

a.    Obligated itself to maintain $65 million in unrestricted cash at all times, measured monthly;

b.    Provided $1 billion of collateral to the counterparties made up of previously unencumbered property.

237.    On September 15, 2020, Defendants Conforti and Yale made a presentation at the Bank of America Merrill Lynch Tower Global Real Estate Conference, in which they stated that the covenant modification would give them a "bridge to the other side" of the pandemic.

47

Q: Okay. And maybe you could describe the modification of your $1.3 billion credit facility?

**DEFENDANT YALE:** Yes. So I mean, we're certainly pleased to be able to execute on that, have the support of our debt partners*, really a bridge to get through the other side of the pandemic. That was important to us, to make sure we got the flexibility that we believe we needed with our covenants. We also wanted to make sure that we had the flexibility to continue to run our business. And there's ample flexibility in the modification for us to continue to reinvest through our redevelopment, which is most critical*. And it did come at a cost in terms of pricing. We had to provide some temporary collateral, but not full security. And I think it demonstrates the fact that our banking partners believe there's clearly a path forward for us. And they're being supportive because if they didn't, they probably would have taken a different tack with regard to the modification. So, simply put, it provides a bridge to the other side. And that's what we were looking for.

*          *          *          *          *

**DEFENDANT CONFORTI**: *Yes. I mean, I'd just on just very quickly, they have our banking partners throughout the capital structure.* And I think it's a function of us focusing on operating infrastructure, tenant diversification, common area activation, adaptive reuse, that we are the logical aggregator in this business. *And our debt partners, and again, throughout the capital stack, have in effect, told us as such.* And we are incrementalists. We are doing things on a step-by-step basis and this was a very favorable outcome of every kind of modification. And they wouldn't have been – they wouldn't have evidenced this flexibility if not for their belief in us, and just stay tuned.

238.  But unbeknownst to investors, the Covenant Restructuring Agreements had not made WPG's position any more secure because they had not and could not secure any relief on the Bond covenants. As a result, WPG could not take on the debt it needed to dig itself out of the hole created by the pandemic. Moreover, by mortgaging $1 billion of previously unsecured properties, Defendants made it much more difficult for WPG to remain within its Bond covenants when it sold one of its unencumbered properties.

239.  According to FE 1, after COVID struck, WPG started a team effort to renegotiate the Bond covenants. According to FE 1, the Senior Note covenants were "critical" to WPG. But, as FE 1 recalls, the senior noteholders were too "disorganized".

240.  FE 1 recalls that there was ultimately "no way" to change the covenants.

48

241.    On November 6, 2021, during trading, Defendants revealed that WPG had exceeded its Bond leverage covenant ratios. Defendants noted that the covenants would be tripped if WPG sought to borrow money, but reassured investors WPG had no need to:

> **DEFENDANT YALE**: Now, when considering the uncertainty, *we should note that the company did exceed the thresholds for several of the leverage bond covenants as at the end of the third quarter. However, since these are incurrence-based, they are only measured if the company actually incurs new incremental debt, which did not occur during the quarter, so they are not applicable. And finally, I should mention, the company has no current plans to incur additional debt.*

242.    Both Conforti and Yale were at pains to reassure investors that WPG had no significant debt problems:

> **DEFENDANT CONFORTI**: We ended third quarter – [Defendant Yale] will speak more obviously with respect to our financial metrics – *with $112 million on hand and we estimate year-end cash will be between $125 million and $135 million, and we're actively working on measures which will result in substantial [de]leveraging. It's important to note that this action – and I would like everybody to listen up – in no way shape or form has anything to od with the bankruptcy or a corporate restricting and if anything will serve as a testament to our operational abilities.*

> \*          \*          \*          \*          \*

> **DEFENDANT YALE**: Now, when considering the uncertainty associated with COVID, significant risks exist to any forecasting in the current environment. Notwithstanding, *based upon our current projections and the positive impact from the potential deleveraging measures described above, we believe the company should have the necessary flexibility that will allow us to navigate and maintain compliance with both our modified credit facilities and bond covenants for the foreseeable future.*

243.    In sum, Defendants admitted that they could not rely on corporate borrowings to reduce WPG's debt but claimed that they did not need to.

## VI.    LOSS CAUSATION

244.    On November 6, 2021, during trading, WPG held a call to discuss its Q3 2020 earnings. As alleged above, on the call, Defendants disclosed that WPG had already exceeded certain of its covenants, precluding it from raising any more funds.

49

245.    On November 6, 2021, the price of WPG's stock fell from its previous close of $5.72 to close at $5.04, down $0.68 (11.9%).

246.    As WPG told the judge in its bankruptcy proceeding, WPG's actions to respond to COVID-19 were not sufficient.[15] And by Thanksgiving 2020, Defendants had determined that WPG had to comprehensively restructure to address COVID-19.[16]

247.    Defendants had compelling reasons to avoid filing for bankruptcy if they could. Before the bankruptcy, WPG and WPG LP guaranteed very few of WPG's subsidiaries' mortgages. WPG always had the option to return properties that were worth less than their mortgage to the lender, thus saving itself money and deleveraging. WPG recognized substantial earnings from returning malls to lenders:

*Year ended December 31*

|  | 2017 | 2018 | 2019 |
|---|---|---|---|
| Gain from returning property to lenders | $90.6 million | $51.4 million | $63.7 million |
| Percentage of net income due to returning property to lenders | 39.1% | 47.3% | 2,308.0% |

248.    But substantially all of WPG's mortgages had so-called bad boy clauses. These clauses make parent companies guarantors of their subsidiaries' mortgages if they file for voluntary bankruptcy. By filing for bankruptcy, WPG became the proud guarantor of $1.7 billion in mortgage debt, some of which it might otherwise never have to pay. Thus, WPG had a strong incentive to avoid bankruptcy if at all possible.

---

[15] *In re Washington Prime Group, et al.*, 21-bk-31948, Dkt. # 103, at 16 (Bankr. S.D. Tex. 2021).
[16] *Id.*

249.    It was not possible. Because WPG's redevelopment projects had been unproductive, WPG had no assets to sell. It had no way to raise capital to survive the temporary harm from COVID *which was already receding*.

250.    WPG owed an interest payment of $23.2 million on the Bonds payable on February 15, 2021.

251.    On February 12, 2021, WPG announced that it had prepaid its executive compensation bonuses for 2021. Executives received a cash bonus equal to their total 2020 variable compensation.  WPG prepaid $11.6 million in bonuses. Defendants Conforti and Yale received, respectively, $3.48 million and $0.96 million.

252.    On February 15, 2021, WPG announced that it had not paid the $23.2 million it owed.

253.    On February 16, 2021, the price of WPG's stock fell from its previous close of $12.06 to close at $7.49, down $4.59 (38%). On February 17, it fell again to $6.09, down $1.40 (15%), damaging investors. In total, WPG's stock price fell $5.99 (49.7%) over the two days.

254.    On March 4, 2021, Bloomberg reported that WPG was securing bankruptcy financing. In response, the price of WPG's stock fell from its previous close of $6.58 to close at $2.51, down $3.77 (60%).

VII.    **DEFENDANTS' FALSE STATEMENTS**

A.      **False Statements Concerning Development**

255.    On a call to discuss Q4 2017 earnings taking place on February 22, 2018, Defendant Conforti stated in prepared remarks:

> We're also of the belief strategic actions can be organic as well as external in nature: such as redevelopment, which furthers our hybrid asset model. ***And things that we've accomplished during 2017 include, again, our current redevelopment of 37 projects ranging between $1 million and $60 million with an estimated return on***

51

***invested capital of 10%.*** And that is a direct return, not including any derivative positive impact to adjacent unproductive space.

256.     Defendant Conforti's statements were false or misleading because: (a) the yield figures WPG internally discussed and approved for these same projects were significantly lower that those they publicly reported; (b) Defendants made manual adjustments to project yields approved by the Investment Committee to generate more attractive yield numbers to report externally; (c) the manual adjustments Defendants caused the yield not to reflect the internally-discussed numbers; and (d) because the 10% figure relied on manual adjustments, WPG was not estimating return on invested capital of 10%.

257.     In  a discussion at the 2018 Citi Global Property CEO Conference taking place on March 7, 2018, Defendant Conforti stated:

> **Q -** So how do you balance that, looking at those types of opportunities versus buying back something that is possibly even more attractive, which is your own stock?
>
> **DEFENDANT CONFORTI:** It is the only -- and I've thought about it academically, practically – I don't have the answer. It's -- if you're in an efficient market, there is -- you look for the best return on invested capital. But you have to look at the second and third derivative impact of reducing float, of increasing leverage, of -- if I'm sitting in Hyde Park, I'm sure there are some professors that will think that, that would be buyback. We live in a much more kind of multifactor world. It's a great question. People buy -- having been on your side – people buy shares generally for the wrong reasons: to artificially buttress share price. And I've seen it time and time again. There becomes an inflection point where you got to -- you have to buy enough to be meaningful. I don't know, we evaluate it, we think about it. ***We think about the holistic. Are we doing something that might have only a 9.5% direct return? And that's direct, so we don't include adjacent space when we factor in or redevelop -- I'm sorry, for redevelopment, we get a 9.5% -- we've been getting 9.5's. Then there's the incremental benefit of getting better rents for unproductive space. Then there, you're going to get multiple expansion because you're doing the right thing, because you're moving -- so it's much more iterative than just that 9.5%*** versus 13%, 14% divi[dend]. But I don't have the answer.

258.     Defendant Conforti's statements were false or misleading because: (a) the yields WPG internally discussed and approved for these same projects were significantly lower than 10%;

(b) Defendants made manual adjustments to project yields approved by the Investment Committee to generate more attractive yield numbers; (c) the manual adjustments Defendants made caused the yield not to reflect the internally-reported numbers; (d) because the 9.5% figure relied on "manual adjustment", WPG was not estimating return on invested capital of 9.5%; (e) Defendants were including "adjacent space" in the yield; and (f) not only were Defendants including "getting better rents for unproductive space", most of the additional rent Defendants recognized in externally reported numbers was based on speculation that they might get better terms on their leases after redevelopment.

259.    On  a call to discuss Q1 2018 earnings taking place on April 26, 2018, Defendant Conforti stated in prepared remarks:

> Tenant-driven redevelopment – thank you Greg, Eric, and your team – remains one of our most intriguing value propositions. We allocated $84 million to redevelopment in 2017. And we've earmarked between $100 million or so and $125 million in '18. **Current redevelopment includes 34 projects ranging from between a $1 million and $60 million, with an estimated return on invested capital of 10%. And this is not including the benefit to adjacent unproductive space.**

260.    Defendant Conforti's statements were false or misleading because: (a) the yield figures WPG internally discussed and approved for these same projects were significantly lower; (b) Defendants made manual adjustments to project yields approved by the Investment Committee to generate more attractive yield numbers; (c) the manual adjustments Defendants caused the yield not to reflect the internally-reported numbers; (d) because the 10% figure relied on "manual adjustment", WPG was not estimating return on invested capital of 10%; and (e) not only did Defendants include "the benefit to adjacent unproductive space", most of the additional rent Defendants recognized in externally reported numbers was based on speculation that they might get better terms on their leases after redevelopment.

261.    At a presentation during the NaREIT REITweek conference on June 5, 2018, Conforti stated:

> Q: Okay, then I want to hearken back to my original questions, because a lot of these have 6-7%, or 7-8% cash returns on the leases with the redevelopment, but a lot of the leases now are 10 years, so the risk around the redevelopment and how do you look at tenant diversification and if the tenant doesn't renew, the ability to renew lease to a live tenant and how that sort of composition on the REIT investment and the risk on that?

> **DEFENDANT CONFORTI**: What we think about that hearkening back to – lease diversification is our primary focus and ***we're actually seeing quantified at about 9.5% return, that's a direct as [Defendant Yale] will point out, a direct return on invested capital. We don't kind of play around with the fluffiness of, okay, an unproductive space is going to pick up another 100 basis points or 200 basis points of return. It's numerator/denominator. When we embark upon the development, and that development is vastly leased, we're not in the speculative redevelopment business.***

262.    Defendant Conforti's statements were false or misleading because: (a) the yield figures WPG internally discussed and approved for these same projects were significantly lower than what Defendants reported externally; (b) Defendants made manual adjustments to project yields approved by the Investment Committee to generate more attractive yield numbers; (c) the manual adjustments Defendants caused the yield not to reflect the internally-reported numbers; (d) because the 9.5% figure relied on "manual adjustment", WPG was not estimating return on invested capital of 9.5%; (e) Defendants were including "unproductive space"; (g) because most of the rent from WPG's projects was speculative, WPG was very much "in the speculative redevelopment business"; and (h) WPG held regular meetings at which it "play[ed] around with the fluffiness of, okay, an unproductive space is going to pick up an extra 100 basis points or 200 basis points of return" by making manual adjustments to approved project yields.

263.    On a call to discuss Q3 2018 earnings, Defendant Conforti stated that:

**Q –** [Defendant Conforti], I know you said that it takes time to back sell the anchor spaces with the entitlements and zoning. And ideally, you guys want to spend that $300 million to $500 million over the next five years. However, in the event that

54

you have more scenarios where you have several Tier 1 malls with multiple anchor vacancies, how does your prioritization – in terms of capital and time – how does that change in regards to preventing some of those cotenancy clauses being triggered?

**DEFENDANT CONFORTI**: We -- I can answer that on an absolute basis as well as at a relative basis. So there's 2 components. One, every deal that is brought into Investment Committee competes against every other deal on a risk-adjusted basis. ***So this is -- we are extraordinarily rigorous pursuant to our investment methodology. And there is no wink and a nod. There is a no taking indirect adjacencies that we are going to pick up a x-% just because. It's very methodical, our approach***. So that's from a relativist standpoint, the deals have to compete against each other. I don't even know, I mean, realistically, there is capacity utilization of us. We think about kind of fixed variable expense. There is only so much – and I don't like Zimmerman sitting here right now when he should be developing stuff – But you know that 3 to five years and that few -- the $325-million-some-odd dollars… I don't know if I take the over and the under, but every single dollar that we're going – And every marginal unit of capital that we invest – is going to inure to the benefit of shareholders from a return on invested capital standpoint and from a holistic standpoint of what they do to our -- what it does to our asset.

**GREG ZIMMERMAN**: The other thing I would mention is -- it's Greg Zimmerman, Mark mentioned a minute ago, when we have multiple department store vacancies, we don't necessarily have to solve both at the same time to reduce substantially cotenancy. So I would use as an example our recently announced deal with the Mall at Fairfield Commons. We proactively terminated Sears. We'll replace them with the Room Place and Round 1. We hope that to open at the end of next year. We have a vacant Elder-Beerman, because of that ability to replace the Sears, we have some time now to do something with Elder-Beerman that's a little more creative. And we're actually working on that.

**DEFENDANT CONFORTI**: And guess what, you do a couple interesting deals, it feeds upon itself. We're not receiving...

**GREGORY ZIMMERMAN**:  Reverse inquiry.

**DEFENDANT CONFORTI -** Inquiry. And from national as well as regionals and locals. So it's an iterative process.

264.    Defendant Conforti's statements were false or misleading because: (a) Defendants made manual adjustments to project yields approved by the Investment Committee to generate more attractive yield numbers, which is not rigorous; (b) Defendants were not following a methodology but instead attempting to report project yields as close to 10% as possible; and (c)

Defendants recognized indirect adjacencies in reporting project yields, and most of the additional rent Defendants recognized in externally reported numbers was based on speculation that they might get better terms on their leases after redevelopment.

265.   On a call to discuss Q4 2018 earnings taking place on February 21, 2019, Defendants Conforti and Yale stated:

> Q: So if I look at your development yields, it's in the high single digits. And I think about the cost of equity and your CapEx needs and development needs. And there's a few ways to think about cost of equity but one simple way is dividend yield. It's about 17% today. I appreciate that there are gains from these asset givebacks or sales that you have to think about. But at this point, what keeps the dividend rate at this level?
>
> **DEFENDANT CONFORTI**: Well, yes. Let me kind of deconstruct those two questions. I think you asked two questions. I can answer the first simple – the first in a straightforward fashion. What keeps the dividend rate at its current level is surplus cash flow and our Board of Directors. As it relates to the – *in effect, the comparison between what our marginal return on invested capital is as pursuant to development and what our implied equity cost is, which is our dividend yield, if we did it – if we were – if it was univariate, if the idea of the only return we were ever going to get was 9% or so based upon our development, we would – we wouldn't develop.*
>
> **DEFENDANT YALE**: Yes. *And I think an important point is that's the direct yield on our investment so that is certainly the rents, maybe some cotenancy cure.* What's not factored in there is what's the cost of not moving forward with that redevelopment. Where do our cash flows go. You start looking at our multiple right now on AFFO. And clearly, there's a question regarding stability of the cash flows. So we certainly believe that our portfolio is viable. *We think we demonstrated stability but obviously, moving forward, addressing the lost rent, the cotenancy, having some organic growth. All of a sudden, you start looking at our multiple significantly differently.* And we think – *and that's why redevelopment is by far our best use of capital.* And as we stated in our remarks, we're very comfortable that we have the capital right now to fully commit to that redevelopment pipeline.

266.   Defendants' statements were false or misleading because: (a) the yield figures Defendants internally discussed and approved were significantly lower than the numbers Defendants reported externally; (b) Defendants made manual adjustments to project yields approved by the Investment Committee to generate more attractive yield numbers; (c) the manual

adjustments Defendants caused the yield not to reflect the internally-reported numbers; (d) because the 9% figure relied on "manual adjustment", WPG was not estimating "direct yield on our investment" of 9%; (e) in addition to "the rents and maybe some cotenancy", Defendants' reported numbers improperly included (i) double-counted cotenancy; (ii) speculative revenues, including percentage rents; (iii) benefits that were unrelated to the project; they improperly excluded (iv) costs of the project.

267.    At the June 4, 2019 NaREIT REITweek 2019 Investor Conference, Defendants Conforti and Yale stated:

> Q: You can go on and on and I'll provide context. How about that? So, we've been sort of focusing a little bit at this conference on – or a lot I should say – on capital allocation. You have a sort of macro backdrop where REITs have outperformed the broad market this year. So many REITs are trading, I'll leave malls out for a second, but many REITs are trading at higher multiples, have better cost of capital today. The debt markets are favorable in terms of debt cost of capital. But we're also – especially in the last week or two – it's been, I would say that the risk from an economic standpoint has increased at the margin. So how are -- and then you put in that the context of what's happening in retail today, and you know earnings were pretty bad the last couple of weeks and you have the sort of the overhang of the potential additional tariffs. So, in terms of how you're thinking about capital allocation today in the context of – are you – how much are you going on the offense versus how much do you sort of hang back and play defense, should we potentially go into a recession in the next year?
>
> **DEFENDANT CONFORTI**: Sure. And it's a combination thereof, if – we can think about how we allocate a marginal unit of capital maybe in three ways. One: we continue to embark upon prudent redevelopment. And I can even – we'll get a chance to talk a little bit more about how we're doing interesting beta test is to really deliver what again our demographic constituencies want. ***So, there is a direct return on invested capital of 8%, 9%, maybe 9.5%. If we didn't have any visibility with two other factors or high conviction – we would have a different capital allocation strategy, so when you buttress an asset we – and all the Party City some real relevant local and I'm speaking if probably fits into several of the efforts that we've just done. If those weren't the type of tenants that we were thinking – from an adaptive reuse standpoint – that were coming into our dominant town centers and again their capital allocation strategy would be different.***
>
> But there's also the unproductive, the current unproductive space that in years the benefit of the dynamism of these assets and three of these new tenants – pardon me. And three, if I didn't believe multiple expansion or cap rate compression was going to happen and we in effect prove it wrong when you traded a silly multiple every single year I get is that linear,

but we should lose 15%, 20% of NOI over the last four years, like-for-like we've actually picked up 90 basis points which we should probably talk about a little bit – we should wave that flag a little bit more – but we didn't think that there was multiple expansion, I'll be honest with you, I wouldn't be here.

And I don't want to speak for Mark and Lisa and Kim. But the incongruity in this space versus perception of reality is unlike anything I've ever seen and, it's interesting, folks from outside the business are beginning to give us phone calls saying "You know what. You have an operating infrastructure. That's interesting." So capital allocation obviously we want to maintain – we would love to continue to incrementally delever, but that's there's a delicate balance between that deleveraging and maintaining those financial metrics and delivering product that people want and use.

**DEFENDANT YALE**: *I was just going to add on the redevelopment, I think it's important to appreciate the fact that we're not building this on spec and have our fingers crossed. This is driven by signed leases. We have tenants, we move forward.* So we've identified we have 29 vacant department stores, or ultimately will be vacant within our Tier 1 and Open Air portfolio that we believe need to replace, should be replaced. There's an opportunity to take care of it. We've estimated the spend will be around $350 million. We're not going to spend that $350 million unless there's specific demand. *And I think the other part of that equation is when you start talking about 8%, 9% returning theoretically get into what our implied cost of capital is, but what happens if we don't spend those dollars to the cash flow that we have in place?*

So as [Defendant Conforti] mentioned, we're trading at such a low multiple right now. *And by far the best use of capital for us right now is proving out our portfolio, stabilizing cash flows and that's to redevelopment and not only replacing loss rents, addressing cotenancy, but simply making our properties better.*

268.    Defendant Conforti's statements were false or misleading because: (a) the yield figures WPG internally discussed and approved for these same projects were significantly lower; (b) Defendants made manual adjustments to project yields approved by the Investment Committee to generate more attractive yield numbers; (c) the manual adjustments Defendants caused the yield not to reflect the internally-reported numbers; (d) because the "8%, 9%, maybe 9.5%" figure relied on "manual adjustment", WPG was not estimating return on invested capital of even 8%; (e) Defendants' externally reported yields included revenues Defendants internally recognized were "speculative"; (f) *these speculative yields were even identified as "spec" in the spreadsheet Defendants employed to calculate what yields to report publicly, which FE 1 confirmed meant*

*"speculative"*; and (g) the returns were not driven by signed leases but by speculative and improperly included income.

269.     WPG publicly reported the yield and costs for the redevelopment project at the Mall at Fairfield Commons within Supplemental Information filings with the SEC on October 25, 2018, February 21, 2019, April 25, 2019, July 25, 2019, and October 24, 2019. The Supplemental Information filing reported that the yield for the Mall at Fairfield Commons redevelopment project was 9-11%.

270.     These statements were false because: (a) WPG's internal financial summary for the approved Mall at Fairfield Commons showed that the yield was only 6.6%; (b) Defendants made manual adjustments to project yields approved by the Investment Committee to generate more attractive yield numbers; (c) the manual adjustments Defendants caused the yield not to reflect the internally-reported numbers; (d) because the 9-11% figure relied on "manual adjustment", WPG was not estimating a return on invested capital of 9-11%.

271.     WPG publicly reported the yield and costs for the redevelopment project at Polaris Fashion Place within Supplemental Information filings with the SEC on February 27, 2020, May 8, 2020, August 11, 2020, and November 5, 2020. The Supplemental Information filing reported that the yield for the Polaris Fashion Place redevelopment project was 4-5%.

272.     These statements were false because: (a) WPG's internal financial summary for the approved Polaris Fashion Place showed that the yield was only 1.92% and that figure overstated the yield because it did not include $5.5 million in costs; (b) Defendants made manual adjustments to project yields approved by the Investment Committee to generate more attractive yield numbers; (c) the manual adjustments Defendants caused the yield not to reflect the internally-reported

numbers; (d) because the 4-5% figure relied on "manual adjustment", WPG was not estimating return on invested capital of 4-5%.

273.    WPG publicly reported the yield and costs for the redevelopment project at Southern Park Mall within Supplemental Information filings with the SEC on February 27, 2020, May 8, 2020, August 11, 2020, and November 5, 2020. The Supplemental Information filing reported that the yield for the Polaris Fashion Place redevelopment project was 8-9%.

274.    These statements were false because: (a) the yield on Southern Park mall was sub 4%; (b) Defendants made manual adjustments to project yields approved by the Investment Committee to generate more attractive yield numbers; (c) the manual adjustments Defendants caused the yield not to reflect the internally-reported numbers; (d) because the 8-9% figure relied on "manual adjustment", WPG was not estimating return on invested capital of 8-9%.

275.    WPG publicly reported the yield and costs for the redevelopment project at Town Center at Aurora within Supplemental Information filings with the SEC on February 27, 2020, May 8, 2020, August 11, 2020, November 5, 2020, March 16, 2021, May 10, 2021, and August 9, 2021. The Supplemental Information filing reported that the yield for the Town Center at Aurora redevelopment project was 5-6%.

276.    These statements were false because: (a) WPG's internal financial summary for the approved Town Center at Aurora showed that the yield was only 2.04%; (b) Defendants made manual adjustments to project yields approved by the Investment Committee to generate more attractive yield numbers; (c) the manual adjustments Defendants caused the yield not to reflect the internally-reported numbers; (d) because the 5-6% figure relied on "manual adjustment", WPG was not estimating return on invested capital of 5-6%.

### B. False Statements Concerning Bond Covenants

277. On the Q2 2020 Earnings Call, Defendant Yale stated in prepared remarks:

**DEFENDANT YALE:** Obviously, the significant news from a balance sheet perspective involves the pending credit facilities modification. Today, we've received the requisite lender consents for such modification and we expect to close by the end of the week on the revised facility. As [Conforti] mentioned, through the immediate waiver of certain financial covenants and less restrictive thresholds into next year, including a permanent increase to the limit for overall leverage to 65%, ***the modification should provide us with a bridge to the other side of the pandemic.***

        \*          \*          \*          \*          \*

We should also mention that we are in compliance with the bond covenants as of the second quarter of 2020 both prior to and proforma for the credit facilities modification. When considering the uncertainty associated with COVID, significant risks exist to any projections, [but] we believe the company should have the necessary flexibility that will allow us to navigate and maintain compliance with our ***modified credit facilities and bond covenants for the foreseeable future***.

278. Defendant Yale's statements were false because: (a) WPG had not received any changes to the bond covenants; (b) Defendants could no longer borrow any money; (c) borrowing money was one of only two principal ways through which WPG could obtain capital; and (d) the other way, asset sales, was not open to WPG, either, because WPG's redevelopment had not improved the quality of its malls.

279. On September 15, 2020, Defendants Conforti and Yale stated in a presentation at the Bank of America Merrill Lynch Tower Global Real Estate Conference:

Q: Okay. And maybe you could describe the modification of your $1.3 billion credit facility?

**DEFENDANT YALE:** Yes. So I mean, we're certainly pleased to be able to execute on that, have the support of our debt partners***, really a bridge to get through the other side of the pandemic. That was important to us, to make sure we got the flexibility that we believe we needed with our covenants. We also wanted to make sure that we had the flexibility to continue to run our business. And there's ample flexibility in the modification for us to continue to reinvest through our redevelopment, which is most critical***. And it did come at a cost in terms of pricing. We had to provide some temporary collateral, but not full security. And I think it demonstrates the fact that our banking partners believe there's clearly a path forward for us. And they're being supportive because if they didn't, they

61

probably would have taken a different tack with regard to the modification. So, simply put, it provides a bridge to the other side. And that's what we were looking for. []

**DEFENDANT CONFORTI**: *Yes. I mean, I'd just on just very quickly, they have our banking partners throughout the capital structure.* And I think it's a function of us focusing on operating infrastructure, tenant diversification, common area activation, adaptive reuse, that we are the logical aggregator in this business. *And our debt partners, and again, throughout the capital stack, have in effect, told us as such.* And we are incrementalists. We are doing things on a step-by-step basis and this was a very favorable outcome of every kind of modification. And they wouldn't have been – they wouldn't have evidenced this flexibility if not for their belief in us, and just stay tuned.

280.    Defendants Yale and Conforti's statements were false because: (a) WPG had not received any changes to the bond covenants, and therefore did not have confidence of banking partners throughout its capital structure; (b) Defendants could no longer borrow any money; (c) borrowing money was one of only two principal ways through which WPG could obtain capital; and (d) the other way, asset sales, was not open to WPG, either, because WPG's redevelopment had not improved the quality of its malls; (e) WPG had no financial flexibility to complete its redevelopment because it could not borrow money; and (f) WPG did not have the support of banking partners "*throughout* the capital structure", because they had no support from Bond holders; (g) for similar reasons, WPG had not received encouragement from debt partners "*throughout* the capital stack".

## CLASS ACTION ALLEGATIONS

281.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Washington Prime Group securities during the Class Period (the "Class") and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are (i) Defendants, (ii) officers and directors of Washington Prime Group, and any subsidiaries thereof, (iii) the family members, heirs, assigns, and legal representatives of all persons set out in (i) and (ii), and (iv) all entities controlled by the persons set out in (i)-(ii).

282. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Washington Prime Group common and preferred stock was actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Washington Prime Group or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

283. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

284. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

285. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

• whether the federal securities laws were violated by Defendants' acts as alleged herein;

• whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Washington Prime Group;

• whether the Individual Defendants caused Washington Prime Group to issue false and misleading financial statements during the Class Period;

• whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

• whether the prices of Washington Prime Group securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

• whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

286. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD ON THE MARKET)**

287. The market for Washington Prime Group's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Washington Prime Group's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Washington Prime Group's securities and market information relating to Washington Prime Group, and have been damaged thereby.

288. During the Class Period, the artificial inflation of Washington Prime Group's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint

causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Washington Prime Group's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Washington Prime Group and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

289.    At all relevant times, the market for Washington Prime Group's securities was an efficient market for the following reasons, among others:

a.    Washington Prime Group shares met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b.    As a regulated issuer, Washington Prime Group filed periodic public reports with the SEC and/or the NYSE;

c.    On average, 23.7% of Washington Prime Group's float traded every week, permitting a ***very strong*** presumption of efficiency;

d.    Washington Prime Group regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

e.      Washington Prime Group was followed by three securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace;

f.      At least 20 firms made a market in Washington Prime Group securities;

g.      New company-specific information was rapidly reflected in Washington Prime Group's stock price; and

h.      Washington Prime Group met the requirements for filing a Registration Statement on Form S-3.

290.    As a result of the foregoing, the market for Washington Prime Group's securities promptly digested current information regarding Washington Prime Group from all publicly available sources and reflected such information in Washington Prime Group's share price.  Under these circumstances, all purchasers of Washington Prime Group's securities during the Class Period suffered similar injury through their purchase of Washington Prime Group's securities at artificially inflated prices and a presumption of reliance applies.

291.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the

importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## CLAIMS FOR RELIEF

## FIRST CLAIM

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

292.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

293.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

294.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Washington Prime Group securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Washington Prime Group securities and options at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

295.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Washington Prime Group securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Washington Prime Group's finances and business prospects.

296.     By virtue of their positions at Washington Prime Group, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

297.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Washington Prime Group, the Individual Defendants had knowledge of the details of Washington Prime Group's internal affairs.

298.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual

Defendants were able to and did, directly or indirectly, control the content of the statements of Washington Prime Group.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Washington Prime Group's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Washington Prime Group securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Washington Prime Group's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Washington Prime Group securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

299.    During the Class Period, Washington Prime Group securities were traded on an active and efficient market.  Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Washington Prime Group securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Washington Prime Group securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Washington Prime Group securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

300.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

301.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented statements regarding its prospects to the investing public.

## SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

302.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

303.    During the Class Period, the Individual Defendants participated in the operation and management of Washington Prime Group, and conducted and participated, directly and indirectly, in the conduct of Washington Prime Group's business affairs.  Because of their senior positions, they knew the adverse non-public information about Washington Prime Group's misstatements regarding its business and operations.

304.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Washington Prime Group's operations, and to correct promptly any public statements issued by Washington Prime Group which had become materially false or misleading.

305.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and

public filings which Washington Prime Group disseminated in the marketplace during the Class Period concerning Washington Prime Group's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Washington Prime Group to engage in the wrongful acts complained of herein.  The Individual Defendants therefore, were "controlling persons" of Washington Prime Group within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Washington Prime Group securities.

306.    Each of the Individual Defendants, therefore, acted as a controlling person of Washington Prime Group.  By reason of their senior management positions and/or being directors of Washington Prime Group, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Washington Prime Group to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Washington Prime Group and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

307.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Washington Prime Group.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demand judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiffs hereby demand a trial by jury.

Dated: April 1, 2022                    Respectfully submitted,


                                        */s/ Daniel R. Karon*

                                        **KARON LLC**

                                        Daniel R. Karon, Esq.
                                        700 W. St. Clair Ave., Ste 200
                                        Cleveland, Ohio 44113
                                        Telephone: (216) 622-1851
                                        Email: dkaron@karonllc.com

                                        *Liaison Counsel for Plaintiffs and the putative
                                        Class*

                                        *-and-*


                                        **THE ROSEN LAW FIRM, P.A.**

                                        Jonathan Horne *(pro hac vice)*
                                        275 Madison Avenue, 40th Floor
                                        New York, New York 10016
                                        Telephone: (212) 686-1060
                                        Fax: (212) 202-3827
                                        Email: jhorne@rosenlegal.com
                                        Email: lrosen@rosenlegal.com

                                        *Lead Counsel for Plaintiffs and the putative Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 1, 2022, a true and correct copy of the foregoing document was served upon GPM's clients, the Plaintiffs, and served by CM/ECF to the parties registered to the Court's CM/ECF system.

<u>/s/ Daniel R. Karon</u>

DocuSign Envelope ID: 76E2A827-AC0A-45CB-8758-68C021D22D58

# CERTIFICATION

The individual or institution listed below (the "Plaintiff") authorizes the Rosen Law Firm, P.A. to file an action or amend a current action under the federal securities laws to recover damages and to seek other relief against Washington Prime Group, Inc. ("Washington Prime Group"), and their current and former officers, and others in connection with the purchase and sale of securities issued by Washington Prime Group.

Plaintiff declares, as to the claims asserted under the federal securities laws, that:

1.　　I have reviewed a complaint against Washington Prime Gorup and certain of their officers and directors and I authorize The Rosen Law Firm, PA to file a lead plaintiff motion on my behalf.

2.　　I did not engage in transactions in the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in this or any other litigation under the securities laws of the United States.

3.　　I am willing to serve as a lead plaintiff either individually or as part of a group. A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial.

4.　　The following is a list of all of the purchases and sales I have made in Washington Prime Group securities during the Class Period set forth in the complaint. I have made no transactions during the class period in the securities that are the subject of this lawsuit except those set forth below.

　　　　　　See Schedule A

5.　　I have not, within the three years preceding the date of this certification, sought to serve or served as a representative party on behalf of a class in an action involving alleged violations of the federal securities laws, except for the following company(ies):

6.　　I will not accept any payment for serving as a representative party beyond my pro rata share of any recovery, except reasonable costs and expenses, such as travel expenses and lost wages directly related to the class representation, as ordered or approved by the court pursuant to law.

I declare under penalty of perjury that the foregoing is true and correct. Executed this day _____.

4/1/2022

Signature: _____

**DocuSigned by:**

95E5120992DA4A1...

Name: Logan Koltz

## SCHEDULE A

## LOGAN KOLTZ

CLASS PERIOD TRANSACTIONS

### ACCOUNT 1 – Common Stock (WPG)

| PURCHASES | | | | SALES | | |
|---|---|---|---|---|---|---|
| **DATE** | **SHARES** | **PRICE** | | **DATE** | **SHARES** | **PRICE** |
| 1/28/2021 | 1 | ($14.9000) | | 2/18/2021 | 1300 | $7.0800 |
| 2/12/2021 | 99 | ($11.9587) | | 2/19/2021 | 2000 | $6.7645 |
| 2/16/2021 | 1,000 | ($8.1326) | | 2/19/2021 | 2095 | $6.7714 |
| 2/16/2021 | 3,000 | ($7.9200) | | 2/25/2021 | 60000 | $6.7873 |
| 2/16/2021 | 91 | ($8.0300) | | | | |
| 2/16/2021 | 909 | ($8.0600) | | | | |
| 2/16/2021 | 516 | ($8.0600) | | | | |
| 2/16/2021 | 325 | ($8.0700) | | | | |
| 2/16/2021 | 146 | ($8.1000) | | | | |
| 2/16/2021 | 513 | ($8.1100) | | | | |
| 2/16/2021 | 60 | ($7.7500) | | | | |
| 2/16/2021 | 145 | ($7.7500) | | | | |
| 2/16/2021 | 417 | ($7.7500) | | | | |
| 2/16/2021 | 20 | ($7.8000) | | | | |
| 2/16/2021 | 4 | ($7.8000) | | | | |
| 2/16/2021 | 1,000 | ($7.8200) | | | | |
| 2/16/2021 | 100 | ($7.8800) | | | | |
| 2/16/2021 | 466 | ($7.9500) | | | | |
| 2/16/2021 | 200 | ($7.9500) | | | | |
| 2/16/2021 | 100 | ($7.9900) | | | | |
| 2/16/2021 | 4,988 | ($8.0000) | | | | |
| 2/16/2021 | 50 | ($7.8900) | | | | |
| 2/16/2021 | 500 | ($7.9800) | | | | |
| 2/16/2021 | 286 | ($7.9800) | | | | |
| 2/16/2021 | 2,500 | ($7.9800) | | | | |
| 2/16/2021 | 1,260 | ($7.9900) | | | | |
| 2/16/2021 | 418 | ($7.9900) | | | | |
| 2/16/2021 | 50 | ($8.0000) | | | | |
| 2/16/2021 | 25 | ($8.0000) | | | | |
| 2/16/2021 | 25 | ($8.0000) | | | | |
| 2/16/2021 | 50 | ($8.0000) | | | | |
| 2/16/2021 | 50 | ($8.0000) | | | | |
| 2/16/2021 | 50 | ($8.0000) | | | | |
| 2/16/2021 | 50 | ($8.0000) | | | | |
| 2/16/2021 | 245 | ($8.0000) | | | | |
| 2/16/2021 | 248 | ($8.0000) | | | | |

DocuSign Envelope ID: 76E2A827-AC0A-45CB-8758-68C021D22D58

| | | |
|---|---|---|
| 2/16/2021 | 193 | ($8.0000) |
| 2/16/2021 | 3,769 | ($7.9900) |
| 2/16/2021 | 2,000 | ($8.0000) |
| 2/16/2021 | 500 | ($7.5900) |
| 2/16/2021 | 342 | ($7.5900) |
| 2/16/2021 | 10 | ($7.6000) |
| 2/16/2021 | 260 | ($7.6000) |
| 2/16/2021 | 150 | ($7.6000) |
| 2/16/2021 | 200 | ($7.6000) |
| 2/16/2021 | 38 | ($7.6000) |
| 2/16/2021 | 2,611 | ($7.9900) |
| 2/16/2021 | 5,000 | ($8.0000) |
| 2/16/2021 | 10 | ($7.7000) |
| 2/16/2021 | 150 | ($7.7000) |
| 2/16/2021 | 381 | ($7.7000) |
| 2/16/2021 | 593 | ($7.7000) |
| 2/16/2021 | 200 | ($7.7000) |
| 2/16/2021 | 435 | ($7.7000) |
| 2/16/2021 | 520 | ($7.7000) |
| 2/16/2021 | 250 | ($7.9400) |
| 2/16/2021 | 15 | ($7.9500) |
| 2/16/2021 | 537 | ($7.9600) |
| 2/16/2021 | 600 | ($7.9700) |
| 2/16/2021 | 29 | ($7.9700) |
| 2/16/2021 | 100 | ($7.9900) |
| 2/16/2021 | 200 | ($7.9900) |
| 2/16/2021 | 500 | ($7.9900) |
| 2/17/2021 | 2,650 | ($6.6250) |
| 2/17/2021 | 1,000 | ($6.6550) |
| 2/17/2021 | 500 | ($6.6760) |
| 2/17/2021 | 3,000 | ($6.6993) |
| 2/17/2021 | 200 | ($7.2069) |
| 2/17/2021 | 6,000 | ($6.7038) |
| 2/17/2021 | 1,250 | ($6.7180) |
| 2/17/2021 | 900 | ($6.6886) |
| 2/17/2021 | 3,000 | ($6.5831) |
| 2/17/2021 | 500 | ($6.5550) |
| 2/17/2021 | 1,000 | ($6.1550) |
| 2/17/2021 | 3,500 | ($6.1400) |
| 2/17/2021 | 600 | ($6.1400) |
| 2/17/2021 | 100 | ($6.2300) |
| 2/17/2021 | 200 | ($6.1360) |
| 2/17/2021 | 1,400 | ($6.5275) |
| 2/18/2021 | 95 | ($7.0700) |

### ACCOUNT 1 – 7.5% Series H Preferred Shares (WPG-H)

| | PURCHASES | | | SALES | |
|---|---|---|---|---|---|
| DATE | SHARES | PRICE | DATE | SHARES | PRICE |
| 2/16/2021 | 552 | ($8.0000) | 2/25/2021 | 1,000 | $7.2600 |
| 2/16/2021 | 100 | ($8.0000) | | | |
| 2/18/2021 | 1 | ($8.2000) | | | |
| 2/19/2021 | 2 | ($8.0050) | | | |
| 2/19/2021 | 250 | ($7.9650) | | | |
| 2/19/2021 | 95 | ($7.9600) | | | |

### ACCOUNT 1 – 6.785% Series I Preferred Shares (WPG-I)

| | PURCHASES | | | SALES | |
|---|---|---|---|---|---|
| DATE | SHARES | PRICE | DATE | SHARES | PRICE |
| 2/16/2021 | 1 | ($8.0000) | 2/25/2021 | 7,900 | $6.8800 |
| 2/16/2021 | 99 | ($8.0000) | | | |
| 2/16/2021 | 200 | ($8.0000) | | | |
| 2/16/2021 | 100 | ($8.0000) | | | |
| 2/16/2021 | 1,000 | ($8.0000) | | | |
| 2/16/2021 | 389 | ($8.0000) | | | |
| 2/16/2021 | 201 | ($8.4000) | | | |
| 2/16/2021 | 200 | ($8.4000) | | | |
| 2/16/2021 | 200 | ($8.4000) | | | |
| 2/18/2021 | 1,000 | ($7.2459) | | | |
| 2/18/2021 | 300 | ($7.2750) | | | |
| 2/19/2021 | 1,310 | ($7.3446) | | | |
| 2/19/2021 | 2,000 | ($7.3499) | | | |
| 2/19/2021 | 300 | ($7.3400) | | | |
| 2/22/2021 | 200 | ($6.9750) | | | |
| 2/23/2021 | 400 | ($6.7109) | | | |

### ACCOUNT 2 – Common Stock (WPG)

| | PURCHASES | | | SALES | |
|---|---|---|---|---|---|
| DATE | SHARES | PRICE | DATE | SHARES | PRICE |
| 1/5/2021 | 1 | ($6.9950) | 1/29/2021 | 100 | $14.0000 |
| 1/5/2021 | 99 | ($6.8000) | 2/1/2021 | 225 | $12.7501 |
| 1/7/2021 | 225 | ($7.6700) | 3/2/2021 | 50 | $6.2000 |
| 2/16/2021 | 500 | ($8.1100) | 3/2/2021 | 625 | $6.1850 |
| 2/19/2021 | 10 | ($6.7700) | | | |
| 2/24/2021 | 90 | ($6.8346) | | | |
| 2/25/2021 | 750 | ($6.5241) | | | |

| | | |
|---|---|---|
| 3/2/2021 | 25 | ($6.3100) |
| 3/4/2021 | 100 | ($2.7080) |
| 3/4/2021 | 100 | ($2.6900) |

### ACCOUNT 2 – 6.875% Series I Preferred Shares (WPG-I)

| | PURCHASES | | | SALES | |
|---|---|---|---|---|---|
| DATE | SHARES | PRICE | DATE | SHARES | PRICE |
| 2/24/2021 | 500 | ($6.7899) | 3/2/2021 | 25 | $6.7800 |
| 2/24/2021 | 150 | ($6.7350) | | | |

### ACCOUNT 2 – 7.5% Series H Preferred Shares (WPG-H)

| | PURCHASES | | | SALES | |
|---|---|---|---|---|---|
| DATE | SHARES | PRICE | DATE | SHARES | PRICE |
| 2/24/2021 | 200 | ($7.1953) | | N/A | |
| 2/25/2021 | 400 | ($7.3299) | | | |

### ACCOUNT 2 - Options

| DATE | DESCRIPTION | QUANTITY | SYMBOL | PRICE |
|---|---|---|---|---|
| 2/22/2021 | Bought 1 WPG Apr 16 2021 5 Call @ 2.6 | 1 | WPG Apr 16 2021 5 Call | ($2.6000) |

# CERTIFICATION

Michael Larney ("Plaintiff") authorizes The Rosen Law Firm, P.A. to file an action or amend a current action under the federal securities laws to recover damages and to seek other relief against Washington Prime Group Inc. ("WPG"), and its current and/or former officers.

Plaintiff declares, as to the claims asserted under the federal securities laws, that:

1.      Plaintiff has reviewed a complaint against WPG and retained The Rosen Law Firm, P.A.

2.      Plaintiff did not engage in transactions in the securities that are the subject of this action at the direction of Plaintiff's counsel or in order to participate in this or any other litigation under the securities laws of the United States.

3.      Plaintiff is willing to serve as a lead plaintiff either individually or as part of a group. A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial.

4.      The following is a list of all of the purchases and sales Plaintiff has made in WPG securities during the Class Period set forth in the complaint. Plaintiff has made no transactions during the Class Period in the securities that are the subject of this lawsuit except those set forth here:

See Schedule A

5.      Plaintiff has not, within the three years preceding the date of this certification, sought to serve or served as a representative party on behalf of a class in an action involving alleged violations of the federal securities laws, except: for the following company(ies):

6.      Plaintiff will not accept any payment for serving as a representative party beyond Plaintiff's pro rata share of any recovery, except reasonable costs and expenses, such as travel expenses and lost wages directly related to the class representation, as ordered or approved by the court pursuant to law.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on _____      4/1/2022

_____
Michael Larney

DocuSign Envelope ID: 65DAE18E-0B86-A5E5-9E2B-93AF55C77EDC

**SCHEDULE A**

**Michael Larney**

CLASS PERIOD TRANSACTIONS

**PURCHASES**

| DATE | SHARES | PRICE |
|------|--------|-------|
| 3/28/2018 | 300 | ($6.48) |
| 4/24/2018 | 83 | ($5.98) |
| 7/12/2019 | 135 | ($3.70) |
| 2/18/2020 | 71 | ($2.79) |
| 11/24/2020 | 300 | ($1.38) |

## CERTIFICATION

The individual or institution listed below (the "Plaintiff") authorizes the Rosen Law Firm, P.A. to file an action or amend a current action under the federal securities laws to recover damages and to seek other relief against Washington Prime Group, Inc. ("Washington Prime Group"), and their current and former officers, and others in connection with the purchase and sale of securities issued by Washington Prime Group.

Plaintiff declares, as to the claims asserted under the federal securities laws, that:

1.    I have reviewed a complaint against Washington Prime Gorup and certain of their officers and directors and I authorize The Rosen Law Firm, PA to file a lead plaintiff motion on my behalf.

2.    I did not engage in transactions in the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in this or any other litigation under the securities laws of the United States.

3.    I am willing to serve as a lead plaintiff either individually or as part of a group. A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial.

4.    The following is a list of all of the purchases and sales I have made in Washington Prime Group securities during the Class Period set forth in the complaint. I have made no transactions during the class period in the securities that are the subject of this lawsuit except those set forth below.

See Schedule A

5.    I have not, within the three years preceding the date of this certification, sought to serve or served as a representative party on behalf of a class in an action involving alleged violations of the federal securities laws, except for the following company(ies):

6.    I will not accept any payment for serving as a representative party beyond my pro rata share of any recovery, except reasonable costs and expenses, such as travel expenses and lost wages directly related to the class representation, as ordered or approved by the court pursuant to law.

I declare under penalty of perjury that the foregoing is true and correct. Executed this day _____4/1/2022_____.

**DocuSigned by:**

Signature: _____

8E8D2A4AC4C54F9...

Name: Erik H. Rorvik

## SCHEDULE A

## ERIK H. RORVIK

CLASS PERIOD TRANSACTIONS

### ACCOUNT 1 – Common Stock (WPG)

| PURCHASES | | | | SALES | | |
|-----------|--------|-----------|---|-----------|--------|----------|
| **DATE** | **SHARES** | **PRICE** | | **DATE** | **SHARES** | **PRICE** |
| 5/30/2018 | 3000 | ($5.0000) | | 3/2/2018 | 3000 | $6.3067 |
| 8/31/2018 | 10867 | ($7.6600) | | 6/28/2018 | 3000 | $8.1208 |
| 8/31/2018 | 133 | ($7.6590) | | 9/7/2018 | 3000 | $7.5677 |
| 6/25/2019 | 2,000 | ($3.6500) | | 10/10/2018 | 4000 | $6.5117 |
| 2/11/2020 | 1000 | ($2.9965) | | 10/11/2018 | 4000 | $6.5246 |
| 2/14/2020 | 500 | ($2.6745) | | 8/6/2019 | 1000 | $3.5103 |
| 3/2/2020 | 1000 | ($2.6154) | | 10/1/2019 | 1000 | $3.9600 |
| 7/2/2020 | 5000 | ($0.8501) | | 6/9/2020 | 2500 | $1.4800 |
| 7/14/2020 | 2000 | ($0.7110) | | 8/3/2020 | 1335 | $0.7131 |
| 7/16/2020 | 1900 | ($0.7808) | | 8/3/2020 | 7665 | $0.7130 |
| 7/16/2020 | 900 | ($0.7808) | | 9/8/2020 | 3000 | $0.6450 |
| 7/16/2020 | 200 | ($0.7805) | | 11/12/2020 | 5000 | $0.6301 |
| 8/10/2020 | 2000 | ($0.7400) | | 12/2/2020 | 2000 | $1.1000 |
| 11/6/2020 | 5000 | ($0.5947) | | | | |
| 12/1/2020 | 2000 | ($1.0799) | | | | |
| 2/18/2021 | 500 | ($6.35) | | | | |

### ACCOUNT 1 – 7.5% Series H Preferred Shares (WPG-H)

| PURCHASES | | | | SALES | | |
|-----------|--------|-----------|---|-----------|--------|----------|
| **DATE** | **SHARES** | **PRICE** | | **DATE** | **SHARES** | **PRICE** |
| 8/3/2020 | 500 | ($6.5000) | | 8/25/2020 | 6 | $11.5000 |
| 8/3/2020 | 900 | ($6.4500) | | 8/25/2020 | 400 | $11.2400 |
| 8/3/2020 | 100 | ($6.4450) | | 8/25/2020 | 594 | $11.1781 |
| 8/3/2020 | 1,000 | ($6.4000) | | 8/25/2020 | 3,000 | $11.1701 |
| 8/25/2020 | 3,000 | ($11.1500) | | 9/11/2020 | 100 | $11.1500 |
| 9/8/2020 | 10 | ($10.9700) | | 10/26/2020 | 400 | $9.8000 |
| 9/8/2020 | 500 | ($10.9999) | | 11/2/2020 | 1,500 | $9.2500 |
| 9/30/2020 | 2,000 | ($9.0700) | | 11/13/2020 | 28 | $10.2100 |
| 2/16/2021 | 500 | ($8.5000) | | 11/13/2020 | 1,100 | $10.2000 |
| 2/16/2021 | 500 | ($8.5000) | | 12/15/2020 | 1,380 | $14.9700 |
| 2/17/2021 | 1,000 | ($8.4500) | | 12/16/2020 | 1,000 | $15.0000 |
| 2/22/2021 | 500 | ($7.6000) | | 8/25/2020 | 6 | $11.5000 |

## ACCOUNT 1 – 6.785% Series I Preferred Shares (WPG-I)

| PURCHASES | | | | SALES | | |
|---|---|---|---|---|---|---|
| **DATE** | **SHARES** | **PRICE** | | **DATE** | **SHARES** | **PRICE** |
| 4/1/2020 | 500 | ($4.4982) | | 4/7/2020 | 200 | $5.8701 |
| 4/1/2020 | 500 | ($4.4950) | | 4/7/2020 | 100 | $5.8100 |
| 4/2/2020 | 500 | ($4.3000) | | 4/7/2020 | 700 | $5.8000 |
| 4/8/2020 | 500 | ($5.3500) | | 4/9/2020 | 1,000 | $7.1190 |
| 4/9/2020 | 5 | ($7.0000) | | 5/4/2020 | 681 | $7.6000 |
| 4/16/2020 | 1,000 | ($7.5500) | | 6/11/2020 | 320 | $11.0900 |
| 8/25/2020 | 1,000 | ($11.4000) | | 11/9/2020 | 500 | $10.9500 |
| 9/1/2020 | 500 | ($11.6999) | | 11/17/2020 | 500 | $10.8000 |
| 9/16/2020 | 445 | ($11.0999) | | 12/15/2020 | 1000 | $13.0000 |
| 9/16/2020 | 55 | ($11.0900) | | | | |
| 11/5/2020 | 100 | ($9.0000) | | | | |
| 2/16/2021 | 1,000 | ($8.7595) | | | | |
| 2/16/2021 | 1,000 | ($8.4500) | | | | |
| 2/18/2021 | 180 | ($7.0500) | | | | |

## ACCOUNT 1 - Options

| DATE | DESCRIPTION | QUANTITY | SYMBOL | PRICE |
|---|---|---|---|---|
| 2/17/2021 | Bought 10 WPG Mar 19 2021 7.5 Call @ 1 | 10 | WPG Mar 19 2021 7.5 Call | ($1.0000) |