# EXHIBIT 3

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**FORM 10-K**

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2019**

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

Commission file number **001-36252 (Washington Prime Group Inc.)**
**333-205859 (Washington Prime Group, L.P.)**

# WASHINGTON PRIME GROUP INC.
# Washington Prime Group, L.P.

(Exact name of Registrant as specified in its charter)

**Indiana (Both Registrants)** — (State of incorporation or organization)

**46-4323686 (Washington Prime Group Inc.)**
**46-4674640 (Washington Prime Group, L.P.)**
(I.R.S. Employer Identification No.)

**180 East Broad Street** **Columbus** **Ohio** **43215**
(Address of principal executive offices)

**(614) 621-9000**
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:
**Washington Prime Group Inc.:**

| Title of each class | Trading Symbols | Name of each exchange on which registered |
|---|---|---|
| Common Stock, $0.0001 par value per share | WPG | New York Stock Exchange |
| 7.5% Series H Cumulative Redeemable Preferred Stock, par value $0.0001 per share | WPGPRH | New York Stock Exchange |
| 6.875% Series I Cumulative Redeemable Preferred Stock, par value $0.0001 per share | WPGPRI | New York Stock Exchange |

**Washington Prime Group, L.P.: None**

Securities registered pursuant to Section 12(g) of the Act:
**Washington Prime Group Inc.: None**
**Washington Prime Group, L.P.: Units of limited partnership interest (34,506,965 units outstanding as of February 26, 2020)**

Indicate by check mark if the Registrant is a well-known seasoned issuer (as defined in Rule 405 of the Securities Act).
**Washington Prime Group Inc. Yes** ☒ **No** ☐ **Washington Prime Group, L.P. Yes** ☐ **No** ☒

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.
**Washington Prime Group Inc. Yes** ☐ **No** ☒ **Washington Prime Group, L.P. Yes** ☐ **No** ☒

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.
**Washington Prime Group Inc. Yes** ☒ **No** ☐ **Washington Prime Group, L.P. Yes** ☒ **No** ☐

Indicate by check mark whether the Registrant has submitted electronically and posted on its corporate web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the Registrant was required to submit and post such files).
**Washington Prime Group Inc. Yes** ☒ **No** ☐ **Washington Prime Group, L.P. Yes** ☒ **No** ☐

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | | | |
|---|---|---|---|---|---|
| **Washington Prime Group Inc.** (Check One): | **Large accelerated filer** | ☒ | Accelerated filer | ☐ | Emerging growth company ☐ |
| | Non-accelerated filer | | Smaller reporting company | ☐ | |
| **Washington Prime Group, L.P.** (Check One): | Large accelerated filer | | Accelerated filer | | Emerging growth company |
| | Non-accelerated filer | ☒ | Smaller reporting company | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.

**Washington Prime Group Inc.** ☐ **Washington Prime Group, L.P.** ☐

Indicate by check mark whether Registrant is a shell company (as defined by Rule 12b-2 of the Exchange Act).

**Washington Prime Group Inc. Yes** ☐ **No** ☒ **Washington Prime Group, L.P. Yes** ☐ **No** ☒

The aggregate market value of shares of common stock held by non-affiliates of Washington Prime Group Inc. was approximately $0.7 billion based on the closing sale price on the New York Stock Exchange for such stock on June 28, 2019.

As of February 26, 2020, Washington Prime Group Inc. had 186,884,276 shares of common stock outstanding. Washington Prime Group, L.P. has no publicly traded equity and no common stock outstanding.

**Documents Incorporated By Reference**

Portions of Washington Prime Group Inc.'s Proxy Statement in connection with its 2020 Annual Meeting of Stockholders are incorporated by reference in Part III.

## EXPLANATORY NOTE

This report combines the annual reports on Form 10-K for the fiscal year ended December 31, 2019 of Washington Prime Group® Inc. and Washington Prime Group®, L.P. Unless stated otherwise or the context requires otherwise, references to "WPG Inc." mean Washington Prime Group® Inc., an Indiana corporation, and references to "WPG L.P." mean Washington Prime Group®, L.P., an Indiana limited partnership, and its consolidated subsidiaries, in cases where it is important to distinguish between WPG Inc. and WPG L.P. We use the terms "WPG," the "Company," "we," "us," and "our," to refer to WPG Inc., WPG L.P., and entities in which WPG Inc. or WPG L.P. (or any affiliate) has a material interest on a consolidated basis, unless the context indicates otherwise.

WPG Inc. operates as a self-managed and self-administered real estate investment trust ("REIT"). WPG Inc. owns properties and conducts operations through WPG L.P., of which WPG Inc. is the sole general partner and of which it held approximately 84.5% of the partnership interests ("OP units") at December 31, 2019. The remaining OP units are owned by various limited partners. As the sole general partner of WPG L.P., WPG Inc. has the exclusive and complete responsibility for WPG L.P.'s day-to-day management and control. Management operates WPG Inc. and WPG L.P. as one enterprise. The management of WPG Inc. consists of the same persons who direct the management of WPG L.P. As general partner with control of WPG L.P., WPG Inc. consolidates WPG L.P. for financial reporting purposes, and WPG Inc. does not have significant assets other than its investment in WPG L.P. Therefore, the assets and liabilities of WPG Inc. and WPG L.P. are substantially the same on their respective consolidated financial statements and the disclosures of WPG Inc. and WPG L.P. also are substantially similar.

The Company believes, therefore, that the combination into a single report of the annual reports on Form 10-K of WPG Inc. and WPG L.P. provides the following benefits:

- enhances investors' understanding of the operations of WPG Inc. and WPG L.P. by enabling investors to view the business as a whole in the same manner as management views and operates the business;
- eliminates duplicative disclosure and provides a more streamlined and readable presentation since a substantial portion of the disclosure applies to both WPG Inc. and WPG L.P.; and
- creates time and cost efficiencies through the preparation of one set of disclosures instead of two separate sets of disclosures.

The substantive difference between WPG Inc.'s and WPG L.P.'s filings is the fact that WPG Inc. is a REIT with shares traded on a public stock exchange, while WPG L.P. is a limited partnership with no publicly traded equity. Moreover, the interests in WPG L.P. held by third parties are classified differently by the two entities (i.e., noncontrolling interests for WPG Inc. and partners' equity for WPG L.P.). In the consolidated financial statements, these differences are primarily reflected in the equity section of the consolidated balance sheets and in the consolidated statements of equity. Apart from the different equity presentation, the consolidated financial statements of WPG Inc. and WPG L.P. are nearly identical.

This combined Annual Report on Form 10-K for WPG Inc. and WPG L.P. includes, for each entity, separate financial statements (but combined footnotes), separate reports on disclosure controls and procedures and internal control over financial reporting, separate CEO/CFO certifications and, as appropriate and where necessary, separate applicable exhibits (combined in one Item 601 exhibit list). In addition, if there were any material differences between WPG Inc. and WPG L.P. with respect to any other financial and non-financial disclosure items required by Form 10-K, they would be discussed separately herein.

**WASHINGTON PRIME GROUP INC. AND WASHINGTON PRIME GROUP, L.P.**
**Annual Report on Form 10-K**
**December 31, 2019**

**TABLE OF CONTENTS**

| Item No. | | Page No. |
|---|---|---|
| **Part I** | | |
| 1. | Business | 5 |
| 1A. | Risk Factors | 10 |
| 1B. | Unresolved Staff Comments | 25 |
| 2. | Properties | 26 |
| 3. | Legal Proceedings | 38 |
| 4. | Mine Safety Disclosures | 38 |
| **Part II** | | |
| 5. | Market for the Registrant's Common Equity, Related Stockholder Matters, and Issuer Purchases of Equity Securities | 38 |
| 6. | Selected Financial Data | 40 |
| 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 42 |
| 7A. | Quantitative and Qualitative Disclosure About Market Risk | 70 |
| 8. | Financial Statements and Supplementary Data | 70 |
| 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 70 |
| 9A. | Controls and Procedures | 70 |
| 9B. | Other Information | 71 |
| **Part III** | | |
| 10. | Directors, Executive Officers and Corporate Governance | 72 |
| 11. | Executive Compensation | 72 |
| 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 72 |
| 13. | Certain Relationships and Related Transactions and Director Independence | 72 |
| 14. | Principal Accounting Fees and Services | 72 |
| **Part IV** | | |
| 15. | Exhibits and Financial Statement Schedules | 73 |
| 16. | Form 10-K Summary | 77 |
| **Signatures** | | 78 |

***An increase in market interest rates could increase our interest costs on existing and future debt and could adversely affect WPG Inc.'s common share price.***

An environment of rising interest rates could lead holders of our common shares to seek higher yields through other investments, which could adversely affect the market price of our common shares. One of the factors that may influence the price of our common shares in public markets is the annual distribution rate we pay as compared with the yields on alternative investments. Additionally, increases in market interest rates could result in increased borrowing costs for us, which may adversely affect our cash flow and the amounts available for distributions to our shareholders.

***We have significant indebtedness, which could adversely affect our business, including decreasing our business flexibility and increasing our interest expense.***

The consolidated indebtedness of our business as of December 31, 2019 was approximately $3.1 billion. We have and will continue to incur various costs and expenses associated with our transactions and executing our operational and fiscal strategy. Any future increased levels of indebtedness could also reduce access to capital and increase borrowing costs generally, thereby reducing funds available for working capital, capital expenditures, tenant improvements, acquisitions and other general corporate purposes and may create competitive disadvantages for us relative to other companies with lower debt levels. If we do not achieve our operational and growth goals or if the financial performance of the Company does not meet current expectations, then our ability to service our indebtedness may be adversely impacted. Lastly, if interest rates increase, the cost of capital and expenses of debt service requirements relating to our variable rate debt, which constitutes 11.9% of our consolidated indebtedness as of December 31, 2019, would increase which could adversely affect our cash flows.

***We may be adversely affected by changes in LIBOR reporting practices or the method in which LIBOR is determined.***

As of December 31, 2019, we had approximately $372.0 million (excluding debt issuance costs of $6.2 million) of our aggregate consolidated indebtedness that was indexed to the London Interbank Offered Rate ("LIBOR"). In addition, as of December 31, 2019, we had approximately $641.3 million of consolidated indebtedness swapped to LIBOR plus a fixed spread. Central banks around the world, including the Federal Reserve, have commissioned working groups of market participants and official sector representatives with the goal of finding suitable replacements for LIBOR based on observable market transactions. It is expected that a transition away from the widespread use of LIBOR to alternative rates will occur over the course of the next few years. The U.K. Financial Conduct Authority ("FCA"), which regulates LIBOR, has announced that it has commitments from panel banks to continue to contribute to LIBOR through the end of 2021, but that it will not use its powers to compel contributions beyond such date. Accordingly, there is considerable uncertainty regarding the publication of such rates beyond 2021. The Federal Reserve Bank of New York and various other authorities have commenced the publication of reforms and actions relating to alternatives to U.S. dollar LIBOR. Although the full impact of such reforms and actions, together with any transition away from LIBOR, including the potential or actual discontinuance of LIBOR publication, remains unclear, these changes may have a material adverse impact on the availability of financing, including LIBOR-based loans, and on our financing costs.

***We may not be able to generate sufficient cash to service and repay all of our debt and may be forced to take other actions to satisfy our obligations under our debt, which may not be successful.***

Our ability to make scheduled payments on, or to refinance, our debt will depend on our financial condition, liquidity and operating performance, which are subject to prevailing economic and competitive conditions and to certain financial, business, legislative, regulatory and other factors beyond our control. We may be unable to maintain a level of cash flows from operating activities sufficient to permit us both to fund our business purposes and to pay the principal of, or premium, if any, and interest on our debt.

If our cash flows and capital resources are insufficient to service and repay our debt and fund other cash requirements, we could face substantial liquidity problems and could be forced to reduce or delay investments and capital expenditures or to sell assets or operations, seek additional capital or restructure or refinance our debt. We may not be able to effect any such alternative measures, if necessary, on commercially reasonable terms or at all and, even if successful, such alternative actions may not allow us to meet all of our debt obligations. Our unsecured revolving credit facility (the "Revolver") and senior unsecured term loan (the "Term Loan" and collectively with the Revolver, the "Facility") restrict (i) our ability to dispose of assets and (ii) our ability to incur debt. We may not be able to consummate those dispositions or to obtain proceeds in an amount sufficient to meet any debt obligations then due.

In addition, we conduct our operations through our subsidiaries. Our subsidiaries may not be able to, or may not be permitted to, make cash available to us to enable us to make payments in respect of our debt. Each subsidiary is a distinct legal entity and, under certain circumstances, legal and contractual prohibitions or other restrictions may limit our ability to obtain cash from our subsidiaries. In the event that our subsidiaries do not make sufficient cash available to us, we may be unable to make required principal, premium, if any, and interest payments on our debt.

Our inability to obtain sufficient cash flows from our subsidiaries, whether as a result of their performance or otherwise, to satisfy our debt, or to refinance our indebtedness on commercially reasonable terms or at all, would materially and adversely affect our financial position, condition, liquidity and results of operations.

If we fail to make required payments in respect of our debt, (i) we will be in default thereunder and, as a result, the related debt holders and lenders, and potentially other debt holders and lenders, could declare all outstanding principal and interest to be due and payable, (ii) the lenders under the Revolver could terminate their commitments to loan money to us, (iii) our secured lenders could foreclose against the assets securing the related debt, (iv) could result in cross defaults on other financing obligations or defaults in other transactional arrangements we have; and (v) we could be forced into bankruptcy or liquidation.

***Despite current and anticipated debt levels, we may still be able to incur substantially more debt.***

We may be able to incur substantial additional debt in the future. Although the Facility and the WPG L.P. notes restrict the incurrence of additional debt, these restrictions are subject to a number of qualifications and exceptions and the additional debt incurred in compliance with these restrictions could be substantial. If new debt is added to our current debt levels, the related risks that we now face would increase.

***We depend on external financings for our growth and ongoing debt service requirements.***

We depend on external financings, principally debt financings, to fund our acquisitions, development and other capital expenditures and to ensure that we can meet our debt service requirements. Our long-term ability to grow through acquisitions or development, which is an important component of our strategy, will be limited if we cannot obtain additional debt financing. Our access to financings depends on our credit ratings, the willingness of banks to lend to us and conditions in the capital markets. Market conditions might make it difficult to obtain debt financing, and we cannot be certain that we will be able to obtain additional debt financing or that we will be able to obtain such financing on acceptable terms.

***The agreements that govern our indebtedness contain various covenants that impose restrictions on us and certain of our subsidiaries that might affect our or their ability to operate.***

We have a variety of debt, including the unsecured Facility, the unsecured WPG L.P. notes, and secured property-level debt. The agreements that govern such indebtedness contain various affirmative and negative covenants that could, subject to certain significant exceptions, restrict our ability and certain of our subsidiaries to, among other things, have liens on property, incur additional indebtedness, make loans, advances or other investments, make non-ordinary course asset sales, and/or merge or consolidate with any other entity or sell or convey certain assets to any one person or entity. Additionally, some of the agreements that govern the debt financing contain financial covenants that require us to maintain certain financial ratios. Our ability and the ability of our subsidiaries to comply with these provisions might be affected by events beyond our control. Failure to comply with these covenants could result in an event of default, which, if not cured or waived, could accelerate our repayment obligations.

***If we cannot obtain additional capital, our growth might be limited.***

In order to qualify and maintain our qualification as a REIT each year, we are required to distribute at least 90% of our REIT taxable income, excluding net capital gains, to our shareholders. As a result, our retained earnings available to fund acquisitions, development, innovation or other capital expenditures are nominal, and we rely upon the availability of additional debt or equity capital to fund these activities. Our long-term ability to grow through acquisitions, development, innovation or strategic partnerships which is an important component of our strategy, will be limited if we cannot obtain additional debt financing or equity capital. Market conditions might make it difficult to obtain debt financing or raise equity capital, and we cannot be certain that we will be able to obtain additional debt or equity financing or that we will be able to obtain such capital on favorable terms.

***We may enter into hedging interest rate protection arrangements that might not effectively limit our interest rate risk.***

We may seek to selectively manage any exposure that we might have to interest rate risk through interest rate protection agreements geared toward effectively fixing or capping a portion of our variable-rate debt. Additionally, we may refinance fixed-rate debt at times when we believe rates and terms are appropriate. Any such efforts to manage these exposures might not be successful.

Our potential use of interest rate hedging arrangements to manage risk associated with interest rate volatility might expose us to additional risks, including the risk that a counterparty to a hedging arrangement fails to honor its obligations. Developing an effective interest rate risk strategy is complex and no strategy can completely insulate us from risks associated with interest rate fluctuations. There can be no assurance that hedging activities will have the desired beneficial impact on our results of operations or financial condition. Termination of these hedging agreements typically involves costs, such as transaction fees or breakage costs.

***As owners of real estate, we might face liabilities or other significant costs related to environmental issues.***

Federal, state and local laws and regulations relating to the protection of the environment might require us, as a current or previous owner or operator of real property, to investigate and clean up hazardous or toxic substances or petroleum product releases at a property or at impacted neighboring properties. These laws and regulations might require us to abate or remove asbestos containing materials in the event of damage, demolition or renovation, reconstruction or expansion of a property and also govern emissions of and exposure to asbestos fibers in the air. These laws and regulations also govern the installation, maintenance and removal of underground storage tanks used to store waste oils or other petroleum products. Many of our properties contain, or at one time contained, asbestos containing materials or underground storage tanks (primarily related to auto service center establishments or emergency electrical generation equipment). The costs of investigation, removal or remediation of hazardous or toxic substances could be substantial and could adversely affect our results of operations or financial condition. The presence of contamination, or the failure to remediate contamination, might also adversely affect our ability to sell, lease or redevelop a property or to borrow using a property as collateral.

In addition, under various federal, state or local laws, ordinances and regulations, a current or previous owner or operator of real estate might be held liable to third parties for bodily injury or property damage incurred by the parties in connection with the contamination. These laws often impose liability without regard to whether the owner or operator knew of, or otherwise caused, the release of the hazardous or toxic substances. The presence of contamination at any of our properties, or the failure to remediate contamination discovered at such properties, could result in significant costs to us and/or materially adversely affect our ability to sell or lease such properties or to borrow using such properties as collateral.

For example, federal, state and local laws require abatement or removal of asbestos-containing materials in the event of demolition or certain renovations or remodeling, the cost of which might be substantial for certain re-developments. These regulations also govern emissions of, and exposure to, asbestos fibers in the air, which might necessitate implementation of site-specific maintenance practices. Certain laws also impose liability for the release of asbestos-containing materials into the air, and third parties might seek recovery from owners or operators of real property for personal injury or property damage associated with asbestos-containing materials. Asbestos-containing building materials are present at some of our properties and might be present at others. To minimize the risk of on-site asbestos being improperly disturbed, we have developed and implemented asbestos operations and maintenance programs to manage asbestos-containing materials and suspected asbestos-containing materials in accordance with applicable legal requirements, however we cannot be certain that our programs eliminate all risk of asbestos being improperly disturbed. Any liability, and the associated costs thereof, we might face for environmental matters could adversely impact our ability to operate our business and our financial condition.

Lastly, in connection with certain mortgages on our properties, our affiliate, Washington Prime Property, L.P., singly, or together with WPG L.P. and certain other affiliates, have executed environmental indemnification agreements to indemnify the respective lenders for those loans against losses or costs to remediate damage to the mortgaged property caused by the presence or release of hazardous materials.

***We are subject to various regulatory requirements, and any changes in such requirements could have a material adverse effect on our business, results of operations and financial condition.***

The laws, regulations and policies governing our business, or the regulatory or enforcement environment at the national level or in any of the states in which we operate, might change at any time and could have a material adverse effect on our business. We are unable to predict how any future legislative or regulatory proposals or programs will be administered or implemented, or whether any additional or similar changes to statutes or regulations, including the interpretation or implementation thereof, will occur in the future. Additionally, changes in tax laws might have a significant impact on our operating results. For more information regarding the impact of changing tax laws on our operating results, please refer to the risk factors section titled "Risks Related to WPG Inc.'s Status as a REIT."

Also, we may be required to expend significant sums of money to comply with the Americans with Disabilities Act of 1990, as amended ("ADA"), and other federal, state, and local laws in order for our properties and facilities (including those in and a part of cyberspace) to meet requirements related to access and use by physically challenged persons. Additionally, unanticipated costs and expenses may be incurred in connection with defending lawsuits relating to ADA compliance not covered by our liability insurance.

Our inability to remain in compliance with regulatory requirements could have a material adverse effect on our operations and on our reputation generally. We are unable to give any assurances that applicable laws or regulations will not be amended or construed differently, or that new laws and regulations will not be adopted, either of which could have a material adverse effect on our business, financial condition or results of operations.

At Scottsdale Quarter® in Scottsdale, Arizona, our most recent redevelopment effort involves the final phase of the significant expansion of our initial development of the project. The first part of the expansion has been completed and consists of buildings on the north and south parcels with tenancy including Design Within Reach, as well as luxury apartment homes and office space. The final component of the expansion will be comprised of approximately 300 new luxury apartment homes and 30,000 to 35,000 square feet of new street-level retail. The street-level retail and luxury apartment homes will have substantial amenities, such as new on-site parking and roof-top terraces overlooking Scottsdale Quarter® and the McDowell Mountains. On February 7, 2018, the rights to construct the luxury apartment homes on the land of this final component were sold to an unrelated third party for $12.5 million and construction has since commenced. The interest in the retail unit of the planned development was retained. We have addressed, through executed leases and signed LOI's, more than 90% of the retail space with some first-to-market and first-to-portfolio tenants. During 2019, more than 12,000 square feet of retailers opened, including Amazon Books, Paige, and Vineyard Vines.

At Dayton Mall in Dayton, Ohio, we have signed leases with Ross Dress for Less and The RoomPlace to enhance the retail offering at the property. Ross Dress for Less opened in October of 2019 and replaced a former hhgregg store and The RoomPlace will be located in a newly combined larger store from previous small shop space. The estimated investment in adding these two retailers to the property will be between $8 million and $10 million with an anticipated yield of approximately 10% - 12%. Additionally, during the fourth quarter of 2019, we purchased the former Elder-Beerman store from a third party in order to gain control of the redevelopment. Our plans involve adding new uses to the center to compliment the strong retail offerings at the property.

We continue to make progress replacing our former Toys R' Us locations. We have three recent openings, including the previously discussed Big Lots store at Grand Central Mall. At the Plaza at Buckland Hills in Manchester, Connecticut, a new K&G Superstore opened in September 2019 and Marshall's opened in October 2019 in the former Toys R' Us location at the center.

***Capital Expenditures***

The following table summarizes total consolidated capital expenditures on a cash basis for the year ended December 31, 2019 (in thousands):

| | 2019 |
|---|---|
| Redevelopments and expansions | $ 87,058 |
| Tenant allowances | 26,089 |
| Operational capital expenditures | 33,500 |
| Total[1] | $ 146,647 |

[1]Excludes capitalized interest, wages and real estate taxes, as well as expenditures for certain equipment and fixtures, commissions, and project costs, which are included in capital expenditures, net on the consolidated statement of cash flows.

**Forward-Looking Statements**

Certain statements made in this section or elsewhere in this report may be deemed "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Although we believe the expectations reflected in any forward-looking statements are based on reasonable assumptions, we can give no assurance that our expectations will be attained, and it is possible that our actual results may differ materially from those indicated by these forward-looking statements due to a variety of risks and uncertainties. Such factors include, but are not limited to: changes in asset quality and credit risk; ability to sustain revenue and earnings growth; changes in political, economic or market conditions generally and the real estate and capital markets specifically; the impact of increased competition; the availability of capital and financing; tenant or joint venture partner(s) bankruptcies; the failure to increase enclosed retail store occupancy and same-store operating income; risks associated with acquisitions, dispositions, development, expansion, leasing and management of properties; changes in market rental rates; trends in the retail industry; relationships with anchor tenants; risks relating to joint venture properties; costs of common area maintenance; competitive market forces; the level and volatility of interest rates (including LIBOR rates or the unavailability of LIBOR); the rate of revenue increases as compared to expense increases; the financial stability of tenants within the retail industry; the restrictions in current financing arrangements or the failure to comply with such arrangements; the liquidity of real estate investments; the impact of changes to tax legislation and our tax positions; failure to qualify as a real estate investment trust; the failure to refinance debt at favorable terms and conditions; loss of key personnel; material changes in the dividend rates on securities or the ability to pay dividends on common shares or other securities; possible restrictions on the ability to operate or dispose of any partially-owned properties; risks associated with climate change as well as the associated costs and burdens of not implementing reasonable sustainability measures to mitigate or avoid the adverse impact of such changes; the failure to achieve earnings/funds from operations targets or estimates; the failure to achieve projected returns or yields on development and investment properties (including joint ventures); expected gains on debt extinguishment; changes in generally accepted accounting principles or interpretations thereof; terrorist activities and international hostilities; the unfavorable resolution of legal or regulatory proceedings; the impact of future acquisitions and divestitures; assets that may be subject to impairment charges; and significant costs related to environmental issues. We discussed these and other risks and uncertainties under Part I, Item 1A. "Risk Factors" in this Annual Report on Form 10-K and other reports and statements filed by WPG Inc. and WPG L.P. with the SEC. We undertake no duty or obligation to update or revise these forward-looking statements, whether as a result of new information, future developments, or otherwise.

**Non-GAAP Financial Measures**

Industry practice is to evaluate real estate properties in part based on FFO, NOI and comparable NOI. We believe that these non-GAAP measures are helpful to investors because they are widely recognized measures of the performance of REITs and provide a relevant basis for our comparison among REITs. We also use these measures internally to measure the operating performance of our portfolio.

We determine FFO based on the definition set forth by the National Association of Real Estate Investment Trusts, or NAREIT, as net income computed in accordance with GAAP:

- excluding real estate related depreciation and amortization;
- excluding gains and losses from extraordinary items and cumulative effects of accounting changes;
- excluding gains and losses from the sales or disposals of previously depreciated retail operating properties;
- excluding gains and losses upon acquisition of controlling interests in properties;
- excluding impairment charges of depreciable real estate;
- plus the allocable portion of FFO of unconsolidated entities accounted for under the equity method of accounting based upon economic ownership interest.

We include in FFO gains and losses realized from the sale of land, marketable and non-marketable securities, and investment holdings of non-retail real estate.

You should understand that our computation of these non-GAAP measures might not be comparable to similar measures reported by other REITs and that these non-GAAP measures:

- do not represent cash flow from operations as defined by GAAP;
- should not be considered as alternatives to net income determined in accordance with GAAP as a measure of operating performance; and
- are not alternatives to cash flows as a measure of liquidity.

The following schedule reconciles total FFO to net income for the years ended December 31, 2019, 2018 and 2017 (in thousands, except share/unit and per share/unit amounts):

| | For the Year Ended December 31, | | |
|---|---|---|---|
| | 2019 | 2018 | 2017 |
| **Net income** | $ 2,760 | $ 108,655 | $ 231,593 |
| Less: Preferred dividends and distributions on preferred operating partnership units | (14,272) | (14,272) | (14,272) |
| **Adjustments to Arrive at FFO:** | | | |
| Real estate depreciation and amortization, including joint venture impact | 310,430 | 295,900 | 292,748 |
| Impairment loss, including (gain) on disposition of interests in properties, net | 26,586 | (3,353) | (57,846) |
| Net income attributable to noncontrolling interest holders in properties | (45) | (76) | (68) |
| Noncontrolling interests portion of depreciation and amortization | (67) | (35) | (27) |
| **FFO of the Operating Partnership (1)** | 325,392 | 386,819 | 452,128 |
| FFO allocable to limited partners | 50,670 | 60,062 | 70,837 |
| FFO allocable to common shareholders/unitholders | $ 274,722 | $ 326,757 | $ 381,291 |
| | | | |
| **Diluted (loss) earnings per share/unit** | $ (0.05) | $ 0.42 | $ 0.98 |
| **Adjustments to arrive at FFO per share/unit:** | | | |
| Depreciation and amortization from consolidated properties and our share of real estate depreciation and amortization from unconsolidated properties | 1.38 | 1.33 | 1.32 |
| Impairment loss, including (gain) on disposition of interests in properties, net | 0.12 | (0.02) | (0.26) |
| **Diluted FFO per share/unit** | $ 1.45 | $ 1.73 | $ 2.04 |
| | | | |
| Weighted average shares outstanding - basic | 188,445,434 | 187,696,339 | 186,829,385 |
| Weighted average limited partnership units outstanding | 34,730,014 | 34,703,770 | 34,808,890 |
| Weighted average additional dilutive securities outstanding | 635,859 | 603,674 | 337,508 |
| Weighted average shares/units outstanding - diluted | 223,811,307 | 223,003,783 | 221,975,783 |

(1) FFO of the operating partnership decreased $61.5 million for the year ended December 31, 2019 when compared to the year ended December 31, 2018. During the year ended December 31, 2019, we received $40.0 million less in operating income related to comparable properties, which can be primarily attributed to the Anchor Store Impact, 2019 bankruptcies, and the sale of certain outparcels. Additionally, general and administrative expenses increased $12.1 million, primarily related to the impact of the new lease accounting standard which prohibits the Company from capitalizing non-incremental internal leasing and legal efforts. Lastly, interest expense, net, increased $11.4 million, which was primarily attributable to corporate debt activity primarily related to higher interest rates due to the credit rating downgrade, certain mortgage loan financings and the Perennial transaction. Lastly, we recorded an additional $12.3 million in gain on the extinguishment of debt during the year ended December 31, 2019 when compared to the same period ending December 31, 2018.

We deem NOI and comparable NOI to be important measures for investors and management to use in assessing our operating performance, as these measures enable us to present the core operating results from our portfolio, excluding certain non-cash, corporate-level and nonrecurring items. Specifically, we exclude from operating income the following items in our calculations of comparable NOI:

- straight-line rents and fair value rent amortization;
- management fee allocation to promote comparability across periods; and
- termination income, out-parcel sales and material insurance proceeds, which are deemed to be outside of normal operating results.

The following schedule reconciles comparable NOI for our core portfolio to net income and presents comparable NOI percent change for the years ended December 31, 2019 and 2018 (in thousands):

| | For the Year Ended December 31, | |
|---|---|---|
| | 2019 | 2018 |
| **Net Income** | $ 2,760 | $ 108,655 |
| | | |
| Loss (income) from unconsolidated entities | 1,499 | (541) |
| Income and other taxes | 1,296 | 1,532 |
| Gain on extinguishment of debt, net | (63,660) | (51,395) |
| Gain on disposition of interests in properties, net | (38,373) | (24,602) |
| Interest expense, net | 153,382 | 141,987 |
| *Operating Income* | 56,904 | 175,636 |
| | | |
| Depreciation and amortization | 271,320 | 257,796 |
| Impairment loss | 35,256 | — |
| General and administrative | 51,187 | 39,090 |
| Fee income | (11,682) | (9,527) |
| Management fee allocation | 140 | 157 |
| Pro-rata share of unconsolidated joint ventures in comp NOI | 70,463 | 72,348 |
| Property allocated corporate expense | 16,870 | 14,591 |
| Non-comparable properties and other[(1)] | 423 | (5,512) |
| NOI from sold properties | (2,482) | (12,720) |
| Termination income | (1,630) | (3,457) |
| Straight-line rents | (4,695) | (3,629) |
| Ground lease adjustments for straight-line and fair market value | 20 | 50 |
| Fair market value and inducement adjustments to base rents | (6,194) | (8,952) |
| Less: Tier 2 and noncore properties [(2)] | (32,131) | (47,646) |
| | | |
| **Comparable NOI - Tier 1 and open air properties** | $ 443,769 | $ 468,225 |
| **Comparable NOI percentage change - Tier 1 and open air properties** | (5.2)% | |

(1) Represents an adjustment to remove the NOI amounts from properties not owned and operated in all periods presented, certain non-recurring expenses (such as hurricane related expenses), as well as material insurance proceeds and other non-recurring income received in the periods presented. This also includes adjustments related to the rents from the outparcels sold to Four Corners.

(2) NOI from the Tier 2 and noncore properties held in each period presented.

### Item 7A. Quantitative and Qualitative Disclosures About Market Risk

We are exposed to market risk from changes in interest rates, primarily LIBOR. We seek to limit the impact of interest rate changes on earnings and cash flows and to lower the overall borrowing costs by closely monitoring our variable rate debt and converting such debt to fixed rates when we deem such conversion advantageous. From time to time, we may enter into interest rate swap agreements or other interest rate hedging contracts. While these agreements are intended to lessen the impact of rising interest rates, they also expose us to the risks that the other parties to the agreements will not perform, we could incur significant costs associated with the settlement of the agreements, the agreements will be unenforceable and the underlying transactions will fail to qualify as highly effective cash flow hedges under GAAP guidance. As of December 31, 2019, $372.0 million (excluding debt issuance costs of $6.2 million) of our aggregate consolidated indebtedness (11.9% of total consolidated indebtedness) was subject to variable interest rates, excluding amounts outstanding under variable rate loans that have been hedged to fixed interest rates.

If LIBOR rates of interest on our variable rate debt fluctuated, our future earnings and cash flows would be impacted, depending upon the current LIBOR rates and the existence of any derivative contracts currently in effect. Based upon our variable rate debt balance as of December 31, 2019, a 50 basis point increase in LIBOR rates would result in a decrease in earnings and cash flow of $1.9 million annually and a 50 basis point decrease in LIBOR rates would result in an increase in earnings and cash flow of $1.9 million annually. This assumes that the amount outstanding under our variable rate debt remains at $372.0 million, the balance as of December 31, 2019. See the additional discussion of the LIBOR transition under "Liquidity and Capital Resources."

### Item 8. Financial Statements and Supplementary Data

The financial statements of the Company included in this report are listed in Part IV, Item 15 of this report.

### Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure

None.

### Item 9A. Controls and Procedures

***Controls and Procedures of Washington Prime Group Inc.***

***Evaluation of Disclosure Controls and Procedures.*** WPG Inc. maintains disclosure controls and procedures (as defined in Rules 13a-15(e) under the Securities Exchange Act of 1934 (the "Exchange Act")) that are designed to provide reasonable assurance that information required to be disclosed in the reports that WPG Inc. files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosures. Because of inherent limitations, disclosure controls and procedures, no matter how well designed and operated, can provide only reasonable, and not absolute, assurance that the objectives of disclosure controls and procedures are met.

Management of WPG Inc., with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of the design and operation of WPG Inc.'s disclosure controls and procedures. Based on that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of the end of the period covered by this report, the disclosure controls and procedures of WPG Inc. were effective at a reasonable assurance level.

***Management's Report on Internal Control Over Financial Reporting.*** Our management is responsible for establishing and maintaining adequate internal control over financial reporting to provide reasonable assurance regarding the reliability of our financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.

As of December 31, 2019, management assessed the effectiveness of WPG Inc.'s internal control over financial reporting based on the criteria for effective internal control over financial reporting established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

Based on this assessment, management has concluded that, as of December 31, 2019, WPG Inc.'s internal control over financial reporting was effective to provide reasonable assurance regarding the reliability of our financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**WASHINGTON PRIME GROUP INC.**
**WASHINGTON PRIME GROUP, L.P.**
by: Washington Prime Group Inc., its sole general partner

By: /s/ LOUIS G. CONFORTI
Louis G. Conforti
*Chief Executive Officer & Director*
*(Principal Executive Officer)*

Dated: February 27, 2020

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| Signature | Capacity | Date |
|---|---|---|
| /s/ ROBERT J. LAIKIN<br>Robert J. Laikin | Chairman of the Board of Directors | February 27, 2020 |
| /s/ LOUIS G. CONFORTI<br>Louis G. Conforti | Chief Executive Officer and Director (Principal Executive Officer) | February 27, 2020 |
| /s/ J. TAGGART BIRGE<br>J. Taggart Birge | Director | February 27, 2020 |
| /s/ JOHN J. DILLON III<br>John J. Dillon III | Director | February 27, 2020 |
| /s/ JOHN F. LEVY<br>John F. Levy | Director | February 27, 2020 |
| /s/ JACQUELYN R. SOFFER<br>Jacquelyn R. Soffer | Director | February 27, 2020 |
| /s/ SHERYL G. VON BLUCHER<br>Sheryl G. von Blucher | Director | February 27, 2020 |
| /s/ MARK E. YALE<br>Mark E. Yale | Executive Vice President and Chief Financial Officer (Principal Financial Officer) | February 27, 2020 |
| /s/ MELISSA A. INDEST<br>Melissa A. Indest | Executive Vice President, Finance and Chief Accounting Officer (Principal Accounting Officer) | February 27, 2020 |

**Washington Prime Group Inc. and Washington Prime Group, L.P.**
**Notes to Consolidated Financial Statements (Continued)**
**(dollars in thousands, except share, unit, per share and per unit amounts and where indicated as in millions or billions)**

During the year ended December 31, 2019, the Company retired $29.1 million outstanding principal on the Senior Notes due 2024 and recognized a gain of approximately $1.2 million, which is recorded in gain on extinguishment of debt, net in the accompanying consolidated statements of operations and comprehensive (loss) income for the period then ended.

On January 22, 2018, WPG L.P. amended the terms of the Facility to provide for borrowings of $1.0 billion. The Facility can be increased to $1.5 billion through currently uncommitted Facility commitments. Excluding the accordion feature, the Facility includes a $650.0 million Revolver and $350.0 million Term Loan. The $350.0 million Term Loan was fully funded at closing, and the Company used the proceeds to repay a $270.0 million outstanding term loan and to pay down the Revolver.

The following table presents the borrowings and paydowns on the Revolver during the years ended December 31, 2019 and December 31, 2018:

| | 2019 | 2018 |
|---|---|---|
| Beginning Balance | $290,000 | $155,000 |
| Borrowings | 267,000 | 332,000 |
| Paydowns | (350,000) | (197,000) |
| Ending Balance | $207,000 | $290,000 |

During 2019, borrowings under the Revolver were primarily used for ongoing redevelopment efforts and general corporate purposes. Paydowns of outstanding borrowings were funded using proceeds from property dispositions (see Note 4 - "Investment in Real Estate"), new mortgage activity as discussed above and cash flow from operations.

During 2018, borrowings under the Revolver were primarily used for general corporate purposes. Paydowns of outstanding borrowings were funded using proceeds from property dispositions (see Note 4 - "Investment in Real Estate"), new mortgage activity as discussed above and cash flow from operations.

***Other Indebtedness (Perennial)***

On October 10, 2019, WPG L.P. closed on the sale and leaseback of four assets (collectively, the "Properties") pursuant to the purchase and sale agreement executed on July 24, 2019 between WPG L.P. and Mall Ground Portfolio, LLC, an affiliate of Perennial Investment & Advisors, LLC and Kawa Capital Partners, LLC ("the Ground Lessor"). The Properties are: Edison Mall, located in Fort Myers, Florida; Great Lakes Mall, located in Mentor, Ohio; Irving Mall, located in Irving, Texas; and Jefferson Valley Mall, located in Yorktown Heights, New York. Under the agreement, the Ground Lessor acquired a fee interest in the land at the Properties for a price of approximately $98.9 million. Concurrently, WPG L.P. entered into a new 99-year master ground lease for the leasehold interest at the Properties. The master ground lease includes fixed annual payments to the Ground Lessor at an initial annualized rate of 7.4% and contains annual rent escalators over the aforementioned term. The agreement includes an option for WPG L.P. to repurchase the fee interest in the land at $109.3 million in year 30 of the master ground lease. If WPG L.P. does not exercise this option, then the Ground Lessor will retain the fee interest in the land, and the fee interest in the improvements and development rights will transfer to the Ground Lessor at the end of the 99-year ground lease term. WPG L.P. received approximately $42.3 million in proceeds upon closing, net of $55.0 million in bridge financing provided by WPG L.P. to the Ground Lessor and closing costs. The bridge financing has a maximum five-year balloon term, which can be pre-paid without penalty, and carries an interest rate of 4.0%. The bridge financing is included in "Deferred costs and other assets" on the accompanying consolidated balance sheet at December 31, 2019. The net proceeds were generally used to fund ongoing redevelopment efforts and for general corporate purposes. WPG L.P. continues to own a fee interest in the improvements and development rights through the term of the aforementioned master ground lease and continues to manage, lease and develop the Properties and maintains full control over the leasehold interest and in the land and fee interest in the improvements and development rights at the respective Properties.

For accounting purposes, the repurchase option precluded WPG L.P. from meeting the criteria for sales recognition. As such, the gross proceeds received have been accounted for as a financial liability, net of capitalized closing costs of $1.6 million, and subject to accretion over the relevant term. As of December 31, 2019, the net financial liability was approximately $97.6 million, including $0.3 million of accretion. Expense is being recognized utilizing an effective interest rate of 8.56% during the repurchase period. During the year ended December 31, 2019, we recognized expense of $1.9 million, which is included in interest expense, net in the accompanying consolidated statements of operations and comprehensive (loss) income.

Inline XBRL Viewer

**Washington Prime Group Inc. and Washington Prime Group, L.P.**
**Notes to Consolidated Financial Statements (Continued)**
**(dollars in thousands, except share, unit, per share and per unit amounts and where indicated as in millions or billions)**

***Covenants***

Our unsecured debt agreements contain financial and other covenants. If we were to fail to comply with these covenants, after the expiration of the applicable cure periods, the debt maturity could be accelerated or other remedies could be sought by the lender including adjustments to the applicable interest rate. As of December 31, 2019, management believes the Company is in compliance with all covenants of its unsecured debt.

The total balance of mortgages was approximately $1.1 billion as of December 31, 2019. At December 31, 2019, certain of our consolidated subsidiaries were the borrowers under 20 non-recourse loans and two full-recourse loans secured by mortgages encumbering 24 properties, including one separate pool of cross-defaulted and cross-collateralized mortgages encumbering a total of four properties. Under these cross-default provisions, a default under any mortgage included in the cross-defaulted pool may constitute a default under all mortgages within that pool and may lead to acceleration of the indebtedness due on each property within the pool. Certain of our secured debt instruments contain financial and other non-financial covenants which are specific to the properties which serve as collateral for that debt. Our existing non-recourse mortgage loans generally prohibit our subsidiaries that are borrowers thereunder from incurring additional indebtedness, subject to certain customary and limited exceptions. In addition, certain of these instruments limit the ability of the applicable borrower's parent entity from incurring mezzanine indebtedness unless certain conditions are satisfied, including compliance with maximum loan to value ratio and minimum debt service coverage ratio tests. Further, under certain of these existing agreements, if certain cash flow levels in respect of the applicable mortgaged property (as described in the applicable agreement) are not maintained for at least two consecutive quarters, the lender could accelerate the debt and enforce its right against its collateral. If the borrower fails to comply with these covenants, the lender could accelerate the debt and enforce its right against their collateral.

On November 5, 2019, we received a letter, dated October 30, 2019, from the lender notifying the borrower, a consolidated subsidiary of WPG L.P., that the $45.1 million mortgage loan secured by Charlottesville Fashion Square was transferred to special servicing because the borrower notified the lender that future projected cash flows will be insufficient to ensure future compliance with the mortgage loan due to the loss of certain tenants. The borrower has initiated discussions with the special servicer regarding this non-recourse loan and is considering various options. The Company continues to manage and lease the property.

On November 19, 2018, we received a notice of default letter, dated November 15, 2018, from the special servicer to the borrower, a consolidated subsidiary of WPG L.P., concerning the $49.5 million mortgage loan secured by West Ridge. The notice was issued by the special servicer because the borrower did not make certain reserve payments or deposits as required by the loan agreement for the aforementioned loan. On December 18, 2019, an affiliate of the Company transitioned the property to the lender.

On May 29, 2018, we received a notice of default letter, dated May 25, 2018, from the special servicer to the borrower, a consolidated subsidiary of WPG L.P., concerning the $94.0 million mortgage loan secured by Rushmore Mall ("Rushmore"). The notice was issued by the special servicer because the borrower notified the lender that there were insufficient funds to ensure future compliance with the mortgage loan due to the loss of certain tenants at Rushmore. On October 23, 2018, an affiliate of the Company transitioned the property to the lender.

On April 11, 2018, we received a notice of default letter, dated April 6, 2018, from the special servicer to the borrower, a consolidated subsidiary of WPG L.P., concerning the $45.2 million mortgage loan secured by Towne West Square. The notice was issued by the special servicer because the borrower did not make certain reserve payments or deposits as required by the loan agreement for the aforementioned loan. On July 1, 2019, an affiliate of the Company transitioned the property to the lender.

On March 30, 2017, the Company transferred the $40.0 million mortgage loan secured by Valle Vista Mall to the special servicer at the request of the borrower, a consolidated subsidiary of the Company. On May 18, 2017, we received a notice of default letter, dated that same date, from the special servicer because the borrower did not repay the loan in full by its May 10, 2017 maturity date. On October 3, 2017, an affiliate of WPG Inc. transitioned the property to the lender.

On June 6, 2016, we received a notice of default letter, dated June 3, 2016, from the special servicer to the borrower of the $99.7 million mortgage loan secured by Southern Hills Mall. The letter was sent because the borrower, a consolidated subsidiary of the Company, did not repay the loan in full by its June 1, 2016 maturity date. On October 27, 2016, we received notification that a receiver has been appointed to manage and lease the property. On October 17, 2017, an affiliate of WPG Inc. completed a discounted payoff of the mortgage loan for $55.0 million and retained ownership and management of the property.

On June 30, 2016, we received a notice, dated that same date, that the $87.3 million mortgage loan secured by Mesa Mall, located in Grand Junction, Colorado, had been transferred to the special servicer due to the payment default that occurred when the borrower, a consolidated subsidiary of the Company, did not repay the loan in full by its June 1, 2016 maturity date. On April 25, 2017, the Company completed a discounted payoff of the mortgage loan for $63.0 million and retained ownership and management of the property.

F-37

**Washington Prime Group Inc. and Washington Prime Group, L.P.**
**Notes to Consolidated Financial Statements (Continued)**
**(dollars in thousands, except share, unit, per share and per unit amounts and where indicated as in millions or billions)**

At December 31, 2019, management believes the applicable borrowers under our other non-recourse mortgage loans were in compliance with all covenants where non-compliance could individually, or giving effect to applicable cross-default provisions in the aggregate, have a material adverse effect on our financial condition, results of operations or cash flows. The Company has assessed each of the defaulted properties, for which the Company still holds title, for impairment indicators as part of our quarterly assessment. Refer to Note 4 - "Investment in Real Estate" for further details.

***Gain on Extinguishment of Debt, Net***

During the year ended December 31, 2019, the Company recognized a net gain of $62.5 million related to the $94.7 million mortgage debt cancellation and ownership transfer of West Ridge and Towne West Square, which is included in gain on extinguishment of debt, net in the consolidated statements of operations and comprehensive (loss) income for the year then ended.

During the year ended December 31, 2018, the Company recognized a net gain of $51.4 million related to the $94.0 million mortgage debt cancellation and ownership transfer of Rushmore, which is included in gain on extinguishment of debt, net in the consolidated statements of operations and comprehensive (loss) income for the year then ended.

During the year ended December 31, 2017, the Company recognized a net gain of $90.6 million based on the cancellation of mortgage debt of $108.9 million related to discounted payoff of the mortgage note payable secured by Southern Hills Mall, ownership transfer of Valle Vista Mall, and discounted payoff of the mortgage note payable secured by Mesa Mall, which is included in gain on extinguishment of debt, net in the consolidated statements of operations and comprehensive (loss) income for the year then ended.

***Debt Maturity and Cash Paid for Interest***

Scheduled principal repayments on indebtedness (including extension options) as of December 31, 2019 are as follows:

| | |
|---|---|
| 2020 | $ 346,176 |
| 2021 | 276,910 |
| 2022 | 690,649 |
| 2023 | 406,006 |
| 2024 | 984,553 |
| Thereafter | 390,133 |
| Total principal maturities | 3,094,427 |
| Bond discount | (7,864) |
| Fair value adjustments, net | 3,463 |
| Debt issuance costs, net | (18,341) |
| Future accretion of other indebtedness | (10,123) |
| Total mortgages and corporate indebtedness | $ 3,061,562 |

Cash paid for interest for the years ended December 31, 2019, 2018 and 2017 was $149,775, $141,641 and $107,609, respectively.

***Fair Value of Debt***

The carrying values of our variable-rate loans approximate their fair values. We estimate the fair values of fixed-rate mortgages and fixed-rate corporate debt (including variable-rate unsecured debt swapped to fixed-rate and our other indebtedness, as discussed in Note 6 - "Indebtedness") using cash flows discounted at current borrowing rates or Level 2 inputs. We estimate the fair values of consolidated fixed-rate unsecured notes payable using Level 1 quoted market prices, or, if no quoted market prices are available, we use quoted market prices for securities with similar terms and maturities or Level 2 inputs.