# EXHIBIT 16

10-K 1 wpg201610-k.htm FORM 10-K

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

## FORM 10-K

**ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF
THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2016**

## Washington Prime Group Inc.
## Washington Prime Group, L.P.
(Exact name of Registrant as specified in its charter)

**Indiana (Both Registrants)**
(State or other jurisdiction of incorporation or organization)

| | |
|---|---|
| **001-36252 (Washington Prime Group Inc.)** | **180 East Broad Street** |
| **333-205859 (Washington Prime Group, L.P.)** | **Columbus, Ohio 43215** |
| (Commission File No.) | (Address of principal executive offices) |
| **46-4323686 (Washington Prime Group Inc.)** | **(614) 621-9000** |
| **46-4674640 (Washington Prime Group, L.P.)** | (Registrants' telephone number, including area |
| (I.R.S. Employer Identification No.) | code) |

Securities registered pursuant to Section 12(b) of the Act:
**Washington Prime Group Inc.:**

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, $0.0001 par value (185,427,411 shares outstanding as of February 22, 2017) | New York Stock Exchange |
| 7.5% Series H Cumulative Redeemable Preferred Stock, par value $0.0001 per share | New York Stock Exchange |
| 6.875% Series I Cumulative Redeemable Preferred Stock, par value $0.0001 per share | New York Stock Exchange |

**Washington Prime Group, L.P.: None**

Securities registered pursuant to Section 12(g) of the Act:
**Washington Prime Group Inc.: None**
**Washington Prime Group, L.P.: Units of limited partnership interest (35,127,735 units outstanding as of February 22, 2017)**

Indicate by check mark if the Registrant is a well-known seasoned issuer (as defined in Rule 405 of the Securities Act).
**Washington Prime Group Inc. Yes ☒ No ☐     Washington Prime Group, L.P. Yes ☐ No ☒**

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.
**Washington Prime Group Inc. Yes ☐ No ☒     Washington Prime Group, L.P. Yes ☐ No ☒**

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.
**Washington Prime Group Inc. Yes ☒ No ☐     Washington Prime Group, L.P. Yes ☐ No ☒**

Indicate by check mark whether the Registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the Registrant was required to submit and post such files).
**Washington Prime Group Inc. Yes ☒ No ☐     Washington Prime Group, L.P. Yes ☒ No ☐**

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§229.405 of this chapter) is not contained herein, and will not be contained, to the best of Registrant's knowledge, in the definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.
**Washington Prime Group Inc.  ☐     Washington Prime Group, L.P. ☐**

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer," and "smaller reporting company" in Rule 12b-2 of the Exchange Act.
**Washington Prime Group Inc.** (Check One):   Large accelerated filer ☒     Accelerated filer ☐
                                          Non-accelerated filer ☐    Smaller reporting company ☐
                                          (Do not check if a smaller reporting company)
**Washington Prime Group, L.P.** (Check One):   Large accelerated filer ☐     Accelerated filer ☐
                                          Non-accelerated filer ☒    Smaller reporting company ☐
                                          (Do not check if a smaller reporting company)

Indicate by check mark whether Registrant is a shell company (as defined by Rule 12b-2 of the Exchange Act).
**Washington Prime Group Inc. Yes ☐ No ☒     Washington Prime Group, L.P. Yes ☐ No ☒**

The aggregate market value of shares of common stock held by non-affiliates of Washington Prime Group Inc. was approximately $2,069 million based on the closing sale price on the New York Stock Exchange for such stock on June 30, 2016.

**Documents Incorporated By Reference**

Portions of Washington Prime Group Inc.'s Proxy Statement in connection with its 2017 Annual Meeting of Stockholders are incorporated by reference in Part III.

1

**EXPLANATORY NOTE**

This report combines the annual reports on Form 10-K for the fiscal year ended December 31, 2016 of Washington Prime Group Inc. (formerly WP Glimcher Inc. - see Note 1 "Organization") and Washington Prime Group, L.P. Unless stated otherwise or the context requires otherwise, references to "WPG Inc." mean Washington Prime Group Inc., an Indiana corporation, and references to "WPG L.P." mean Washington Prime Group, L.P., an Indiana limited partnership, and its consolidated subsidiaries, in cases where it is important to distinguish between WPG Inc. and WPG L.P. We use the terms "WPG," the "Company," "we," "us," and "our," to refer to WPG Inc., WPG L.P., and entities in which WPG Inc. or WPG L.P. (or an affiliate) has a material interest on a consolidated and combined basis, unless the context indicates otherwise.

WPG Inc. operates as a self-managed and self-administered real estate investment trust ("REIT"). WPG Inc. owns properties and conducts operations through WPG L.P., of which WPG Inc. is the sole general partner and of which it held approximately 84.1% of the partnership interests ("OP units") at December 31, 2016. The remaining OP units are owned by various limited partners. As the sole general partner of WPG L.P., WPG Inc. has the exclusive and complete responsibility for WPG L.P.'s day-to-day management and control. Management operates WPG Inc. and WPG L.P. as one enterprise. The management of WPG Inc. consists of the same persons who direct the management of WPG L.P. As general partner with control of WPG L.P., WPG Inc. consolidates WPG L.P. for financial reporting purposes, and WPG Inc. does not have significant assets other than its investment in WPG L.P. Therefore, the assets and liabilities of WPG Inc. and WPG L.P. are substantially the same on their respective consolidated and combined financial statements and the disclosures of WPG Inc. and WPG L.P. also are substantially similar.

The Company believes, therefore, that the combination into a single report of the annual reports on Form 10-K of WPG Inc. and WPG L.P. provides the following benefits:

- enhances investors' understanding of the operations of WPG Inc. and WPG L.P. by enabling investors to view the business as a whole in the same manner as management views and operates the business;

- eliminates duplicative disclosure and provides a more streamlined and readable presentation since a substantial portion of the disclosure applies to both WPG Inc. and WPG L.P.; and

- creates time and cost efficiencies through the preparation of one set of disclosures instead of two separate sets of disclosures.

The substantive difference between WPG Inc.'s and WPG L.P.'s filings is the fact that WPG Inc. is a REIT with shares traded on a public stock exchange, while WPG L.P. is a limited partnership with no publicly traded equity. Moreover, the interests in WPG L.P. held by third parties are classified differently by the two entities (i.e. noncontrolling interests for WPG Inc. and partners' equity for WPG L.P.). In the consolidated and combined financial statements, these differences are primarily reflected in the equity section of the consolidated balance sheets and in the consolidated statements of equity. Apart from the different equity presentation, the consolidated and combined financial statements of WPG Inc. and WPG L.P. are nearly identical.

This combined Annual Report on Form 10-K for WPG Inc. and WPG L.P. includes, for each entity, separate financial statements (but combined footnotes), separate reports on disclosure controls and procedures and internal control over financial reporting, and separate CEO/CFO certifications. In addition, if there were any material differences between WPG Inc. and WPG L.P. with respect to any other financial and non-financial disclosure items required by Form 10-K, they would be discussed separately herein.

WPG L.P. is a voluntary filer. We are evaluating whether or not WPG L.P. will continue to voluntarily file reports under the Securities Exchange Act of 1934, as amended (the "Exchange Act").

**WASHINGTON PRIME GROUP INC. AND WASHINGTON PRIME GROUP, L.P.**
**Annual Report on Form 10-K**
**December 31, 2016**

## TABLE OF CONTENTS

| Item No. | | Page No. |
|---|---|---|
| **Part I** | | |
| 1. | Business | 4 |
| 1A. | Risk Factors | 8 |
| 1B. | Unresolved Staff Comments | 24 |
| 2. | Properties | 24 |
| 3. | Legal Proceedings | 37 |
| 4. | Mine Safety Disclosures | 37 |
| **Part II** | | |
| 5. | Market for the Registrant's Common Equity, Related Stockholder Matters, and Issuer Purchases of Equity Securities | 37 |
| 6. | Selected Financial Data | 39 |
| 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 42 |
| 7A. | Quantitative and Qualitative Disclosure About Market Risk | 69 |
| 8. | Financial Statements and Supplementary Data | 69 |
| 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 69 |
| 9A. | Controls and Procedures | 69 |
| 9B. | Other Information | 70 |
| **Part III** | | |
| 10. | Directors, Executive Officers and Corporate Governance | 71 |
| 11. | Executive Compensation | 71 |
| 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 71 |
| 13. | Certain Relationships and Related Transactions and Director Independence | 71 |
| 14. | Principal Accounting Fees and Services | 71 |
| **Part IV** | | |
| 15. | Exhibits and Financial Statement Schedules | 72 |
| **Signatures** | | 77 |

3

**Financing and Debt**

*Mortgage Debt*

Total mortgage indebtedness at December 31, 2016 and 2015 was as follows (in thousands):

|  | December 31, 2016 | December 31, 2015 |
|---|---|---|
| Face amount of mortgage loans | $ 1,610,429 | $ 1,782,103 |
| Fair value adjustments, net | 12,661 | 17,683 |
| Debt issuance cost, net | (5,010) | (6,347) |
| Carrying value of mortgage loans | $ 1,618,080 | $ 1,793,439 |

A roll forward of mortgage indebtedness from December 31, 2015 to December 31, 2016 is summarized as follows (in thousands):

|  |  |
|---|---|
| Balance at December 31, 2015 | $ 1,793,439 |
| Debt amortization payments | (16,526) |
| Debt borrowings, net | 4,530 |
| Debt cancelled upon lender foreclosures, net of debt issuance costs of $0.3 million | (159,828) |
| Amortization of fair value and other adjustments | (5,022) |
| Amortization of debt issuance costs | 1,487 |
| Balance at December 31, 2016 | $ 1,618,080 |

On October 1, 2016, the Company exercised the second of two options to extend the maturity date of the principal amount of the mortgage loan on WestShore Plaza, located in Tampa, Florida, for one year. The extended maturity date is October 1, 2017.

On June 8, 2016, the Company borrowed $65.0 million under a term loan secured by ownership interests in Weberstown Mall, located in Stockton, California (the "June 2016 Secured Loan"). The June 2016 Secured Loan bears interest at one-month LIBOR plus 1.75% and will initially mature on June 8, 2018, subject to three one-year extensions available at our option subject to compliance with the terms of the underlying loan agreement and payment of customary extension fees. The interest rate on the June 2016 Secured Loan may vary in the future based on the Company's credit rating. The Company used the proceeds from the June 2016 Secured Loan to repay the $60.0 million mortgage loan secured by Weberstown Mall and for other general corporate purposes. As of December 31, 2016, the balance was $64.6 million, net of $0.4 million of debt issuance costs, and the applicable interest rate was 2.5%.

The aggregate principal amount of mortgage loans secured by Chesapeake Square, Merritt Square Mall, and River Valley Mall were extinguished upon the properties transitioning to the lenders on April 28, 2016, June 9, 2016, and December 29, 2016, respectively (see below for further discussion).

*Highly-levered Assets*

We have identified three mortgage loans that have leverage levels in excess of our targeted leverage and have worked with, or have plans to work with, the special servicers on these non-recourse mortgages. We received notices of default for the mortgage notes relating to Mesa Mall in Grand Junction, Colorado, and Southern Hills Mall in Sioux City, Iowa. See "Covenants" below for further discussion on these notices of default. We have also identified Valle Vista Mall in Harlingen, Texas as over-levered and expect to commence discussions with the special servicer on this loan as well. As of December 31, 2016, the mortgages on the highly-levered properties totaled $228.8 million and we expect to improve our leverage once all, or a portion of them, are transitioned to the lenders, with minimal impact to net cash flows.

*Unsecured Debt*

*The Facility*

On May 15, 2014, we closed on the Revolver, and a senior unsecured term loan, or "Term Loan" (collectively referred to as the "Facility"). The Revolver provides borrowings on a revolving basis up to $900 million, bears interest at one-month LIBOR plus 1.25%, and will initially mature on May 30, 2018, subject to two, six-month extensions available at our option subject to compliance with the terms of the Facility and payment of a customary extension fee. The Term Loan provides borrowings in an aggregate principal amount up to $500 million, bears interest at one-month LIBOR plus 1.45%, and will initially mature on May 30, 2017, subject to two, 12-month extensions available at our option subject to compliance with the terms of the Facility and payment of a customary extension fee. Our intent is to exercise the first extension. On July 6, 2016, the Company executed interest rate swap agreements totaling $200.0 million, which effectively fixed the interest rate on a portion of the Term Loan at 2.04% through August 1, 2018. The interest rate on the Facility may vary in the future based on the Company's credit rating.

At December 31, 2016, borrowings under the Facility consisted of $308.0 million outstanding under the Revolver (before debt issuance costs, net of $1.8 million) and $500.0 million outstanding under the Term Loan. On December 31, 2016, we had an aggregate available borrowing capacity of $591.7 million under the Facility, net of $0.3 million reserved for outstanding letters of credit. At December 31, 2016, the applicable interest rate on the Revolver was one-month LIBOR plus 1.25%, or 2.02%, and the applicable interest rate on the unhedged portion of the Term Loan was one-month LIBOR plus 1.45%, or 2.22%.

*Term Loans*

On December 10, 2015, the Company borrowed $340.0 million under an additional new term loan (the "December 2015 Term Loan"), pursuant to a commitment received from bank lenders. The December 2015 Term Loan bears interest at one-month LIBOR plus 1.80% and will mature in January 2023. On December 11, 2015, the Company executed interest rate swap agreements totaling $340.0 million which effectively fixed the interest rate on the December 2015 Term Loan at 3.51% through January 2023. The interest rate on the December 2015 Term Loan may vary in the future based on the Company's credit rating. The Company used the proceeds from the December 2015 Term Loan to repay outstanding amounts on the Revolver and for other general corporate purposes. As of December 31, 2016, the balance was $336.9 million, net of $3.1 million of debt issuance costs.

On June 4, 2015, the Company borrowed $500.0 million under a new term loan (the "June 2015 Term Loan"), pursuant to a commitment received from bank lenders. The June 2015 Term Loan bears interest at one-month LIBOR plus 1.45% and will mature in March 2020. On June 19, 2015, the Company executed interest rate swap agreements totaling $500.0 million, with an effective date of July 6, 2015, which effectively fixed the interest rate on the June 2015 Term Loan at 2.56% through June 2018. The interest rate on the June 2015 Term Loan may vary in the future based on the Company's credit rating. The Company used the proceeds from the June 2015 Term Loan to repay the remaining outstanding balance on the Bridge Loan (defined below). As of December 31, 2016, the balance was $497.6 million, net of $2.4 million of debt issuance costs.

*Bridge Loan*

On September 16, 2014, in connection with the execution of the Merger Agreement, WPG entered into a debt commitment letter, which was amended and restated on September 23, 2014 pursuant to which parties agreed to provide up to $1.25 billion in a senior unsecured bridge loan facility (the "Bridge Loan"). The Bridge Loan had a maturity date of January 14, 2016, the date that was 364 days following the closing date of the Merger.

On January 15, 2015, the Company borrowed $1.19 billion under the Bridge Loan in connection with the closing of the Merger, which balance was repaid in full during 2015.

The Company incurred $10.4 million of Bridge Loan commitment, structuring and funding fees. Upon full repayment of the Bridge Loan, the Company accelerated amortization of the deferred loan costs, resulting in total amortization of $10.4 million included in interest expense in the consolidated and combined statements of operations and comprehensive income (loss) for the year ended December 31, 2015.

*Notes Payable*

On March 24, 2015, WPG L.P. closed on a private placement of $250.0 million of 3.850% senior unsecured notes (the "Notes Payable") at a 0.028% discount due April 1, 2020. WPG L.P. received net proceeds from the offering of $248.4 million, which it used to repay a portion of outstanding borrowings under the Bridge Loan. The Notes Payable contain certain customary covenants and events of default which, if any such event of default occurs, would permit or require the principal, premium, if any, and accrued and unpaid interest on all of the then-outstanding Notes Payable to be declared immediately due and payable (subject in certain cases to customary grace and cure periods).

On October 21, 2015, WPG L.P. completed an offer to exchange (the "Exchange Offer") up to $250.0 million aggregate principal amount of the Notes Payable for a like principal amount of its 3.850% senior unsecured notes that have been registered under the Securities Act of 1933 (the "Exchange Notes").  On October 21, 2015, $250.0 million of Exchange Notes were issued in exchange for $250.0 million aggregate principal amount of the Notes Payable that were tendered in the Exchange Offer.

As of December 31, 2016, the balance outstanding under the Exchange Notes was $247.6 million, net of $2.4 million of debt discount and issuance costs.

*Covenants*

Our unsecured debt agreements contain financial and other covenants. If we were to fail to comply with these covenants, after the expiration of the applicable cure periods, the debt maturity could be accelerated or other remedies could be sought by one or more of the respective lenders including adjustments to the applicable interest rate. As of December 31, 2016, management believes the Company is in compliance with all covenants of its unsecured debt.

The total balance of mortgages was approximately $1.6 billion as of December 31, 2016. At December 31, 2016, certain of our consolidated subsidiaries were the borrowers under 30 non-recourse loans, one full-recourse loan and one partial-recourse loan secured by mortgages encumbering 36 properties, including two separate pools of cross-defaulted and cross-collateralized mortgages encumbering a total of six properties. Under these cross-default provisions, a default under any mortgage included in the cross-defaulted pool may constitute a default under all mortgages within that pool and may lead to acceleration of the indebtedness due on each property within the pool. Certain of our secured debt instruments contain financial and other non-financial covenants which are specific to the properties which serve as collateral for that debt. Our existing non-recourse mortgage loans generally prohibit our subsidiaries that are borrowers thereunder from incurring additional indebtedness, subject to certain customary and limited exceptions. In addition, certain of these instruments limit the ability of the applicable borrower's parent entity from incurring mezzanine indebtedness unless certain conditions are satisfied, including compliance with maximum loan to value ratio and minimum debt service coverage ratio tests. Further, under certain of these existing agreements, if certain cash flow levels in respect of the applicable mortgaged property (as described in the applicable agreement) are not maintained for at least two consecutive quarters, the lender could accelerate the debt and enforce its right against its collateral. If the borrower fails to comply with these covenants, the lenders could accelerate the debt and enforce its right against their collateral.

On June 30, 2016, we received a notice, dated that same date, that the $87.3 million mortgage loan secured by Mesa Mall had been transferred to the special servicer due to the payment default that occurred when the borrower, a consolidated subsidiary of the Company, did not repay the loan in full by its June 1, 2016 maturity date.  The borrower has initiated discussions with the special servicer regarding this non-recourse loan and is considering various options including restructuring, extending and other options, including transitioning the property to the lender.

On June 6, 2016, we received a notice of default letter, dated June 3, 2016, from the special servicer to the borrower of the $101.5 million mortgage loan secured by Southern Hills Mall.  The letter was sent because the borrower, a consolidated subsidiary of the Company, did not repay the loan in full by its June 1, 2016 maturity date.  On October 27, 2016, we received notification that a receiver has been appointed to manage and lease the property.

On August 8, 2016, we received a notice of default letter, dated August 4, 2016, from the special servicer to the borrower concerning the $44.9 million mortgage loan secured by River Valley Mall. The letter was sent because the borrower, a consolidated subsidiary of the Company, did not repay the loan in full by its January 11, 2016 maturity date. On December 29, 2016, we transferred title of the property to the mortgage lender pursuant to the terms of a deed-in-lieu of foreclosure agreement entered into by the Company's affiliate and the mortgage lender.

On October 8, 2015, we received a notice of default letter, dated October 5, 2015, from the special servicer to the borrower of the $52.9 million mortgage loan secured by Merritt Square Mall.  The letter was sent because the borrower, a consolidated subsidiary of the Company, did not repay the loan in full by its September 1, 2015 maturity date. On May 25, 2016, the trustee on behalf of the mortgage lender conducted a non-judicial foreclosure sale of Merritt Square Mall, in which the Company's affiliate previously held a 100% ownership interest. The mortgage lender was the successful bidder at the sale and ownership transferred on June 9, 2016. The Company managed the property through and including July 31, 2016.

On October 30, 2015, we received a notice of default letter, dated that same date, from the special servicer to the borrower concerning the $62.4 million mortgage loan that matures on February 1, 2017 and was secured by Chesapeake Square.  The default resulted from an operating cash flow shortfall at the property in October 2015 that the borrower, a consolidated subsidiary of the Company, did not cure. On April 21, 2016, the trustee on behalf of the mortgage lender conducted a non-judicial foreclosure of Chesapeake Square, in which the Company's affiliate previously held majority ownership interest. The mortgage lender was the successful bidder at the sale and ownership transferred on April 28, 2016.

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**WASHINGTON PRIME GROUP INC.**

**WASHINGTON PRIME GROUP, L.P.**

by:    Washington Prime Group Inc., its sole general partner

By:    /s/ LOUIS G. CONFORTI

Louis G. Conforti

*Chief Executive Officer & Director*

*(Principal Executive Officer)*

Dated:    February 24, 2017

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| Signature | Capacity | Date |
|---|---|---|
| /s/ ROBERT J. LAIKIN<br>Robert J. Laikin | Chairman of the Board of Directors | February 24, 2017 |
| /s/ LOUIS G. CONFORTI<br>Louis G. Conforti | Chief Executive Officer and Director (Principal Executive Officer) | February 24, 2017 |
| /s/ MARK S. ORDAN<br>Mark S. Ordan | Director | February 24, 2017 |
| /s/ JOHN J. DILLON III<br>John J. Dillon III | Director | February 24, 2017 |
| /s/ JOHN F. LEVY<br>John F. Levy | Director | February 24, 2017 |
| /s/ JACQUELYN R. SOFFER<br>Jacquelyn R. Soffer | Director | February 24, 2017 |
| /s/ SHERYL G. VON BLUCHER<br>Sheryl G. von Blucher | Director | February 24, 2017 |
| /s/ MARK E. YALE<br>Mark E. Yale | Executive Vice President and Chief Financial Officer (Principal Financial Officer) | February 24, 2017 |
| /s/ MELISSA A. INDEST<br>Melissa A. Indest | Senior Vice President, Finance and Chief Accounting Officer (Principal Accounting Officer) | February 24, 2017 |