**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**

|  |  |
|---|---|
| IN RE: WASHINGTON PRIME GROUP, INC. SECURITIES LITIGATION | Master File No.: 2:21-cv-2757 |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

I.   INTRODUCTION....................................................................................................... 1

II.  FACTS ....................................................................................................................... 5

    A.  Parties................................................................................................................. 5

    B.  REIT Investors Prioritize Dividends and the REIT's Ability to Sustain Them ........... 5

    C.  The Retail Apocalypse Has Investors Raising Questions About Mall Operators' Business Plans.................................................................................................... 5

    D.  WPG Purportedly Flourishes in the Retail Apocalypse..................................... 6

    E.  WPG Spends Hundreds of Millions of Dollars on Redevelopment................... 6

    F.  Defendants Measure the Success of WPG's Redevelopment Projects by their Yield ... 7

    G.  WPG Overstates Yields ...................................................................................... 8

    H.  WPG Files for Bankruptcy Because It Can Neither Take On Debt Nor Sell Its Redeveloped Malls ........................................................................................... 9

III. ARGUMENT............................................................................................................ 11

    A.  Standard On A Motion to Dismiss .................................................................. 11

    B.  The Complaint Sufficient Alleges That Defendants Made False Statements In Violation of SEC Rule 10b-5(b) ...................................................................... 11

        *1.*  *That Defendants Deliberately Manipulated Yields Shows Their Statements Were False .................................................................................................. 12*

        *2.*  *Because Defendants Represented That Yield Calculations Were Objective, their Yield Disclosures Were False Statements of Fact......................................... 14*

            *i.*  *Defendants' Statements Were Statements of Fact ......................................... 14*

            *ii.*  *Defendants' Use of Tricks Made Their Yields Statements False and Misleading......... 16*

               (a) Defendants Double Counted Co-Tenancy Benefits.................................... 16

               (b) Defendants Could Not Include Speculative Income Because They Told Investors That They Did Not ................................................................... 17

               (c) Defendants Were Required To Take A Vacancy Provision ....................... 18

i

(d) Defendants Understated Project Costs.......................................................................... 19

3. *The Complaint's Allegations Suffice To Show Defendants Overstated Yields* ................. 21

4. *Yield estimates are not forward-looking statements* .......................................................... 24

5. *Defendants' Cautionary Statements Were Not Meaningful* ............................................... 26

6. *Even If Defendants' Statements Had Been Opinions, They Are Subjectively False and Objectively Misleading* ....................................................................................................... 27

7. *None of Defendants' Statements Are Puffery* ..................................................................... 28

8. *FE 1 is reliable* ................................................................................................................... 30

9. *Defendant' Statements About Covenants Are False and Misleading* ................................ 33

C. **The Complaint Alleges that Defendants Engaged In a Scheme To Defraud In Violation of SEC Rules 10b-5(a) and 10b5-(c)** .................................................................... 36

D. **The Complaint Sufficiently Alleges Scienter** ...................................................................... 38

E. **The Complaint Sufficiently Alleges that Indest Made False Statements and Participated in a Scheme to Defraud** ................................................................................... 42

F. **The Complaint Sufficiently Alleges Loss Causation** ........................................................... 43

1. *The Complaint Sufficiently Alleges a Materialization of the Risk Theory As to the Yield Statements* ............................................................................................................................ 43

2. *The Complaint Sufficiently Alleges A Corrective Disclosure Theory As To the Bond Statements* ............................................................................................................................ 47

IV. **THE COMPLAINT SUFFICIENTLY ALLEGES SECTION 20(a) CLAIM** ................. 48

V. **PLAINTIFFS MAY SUE WPG NOMINALLY TO RECOVER FROM ITS INSURERS** ......................................................................................................................... 49

VI. **CONCLUSION** ...................................................................................................................... 50

ii

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abrams v. Van Kampen Funds, Inc.*,
  2002 WL 1160171 (N.D. Ill. May 30, 2002) .......................................................... 14

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) .................................................................................................. 11

*Bond v. Clover Health Invs., Corp.*,
  2022 WL 602432 (M.D. Tenn. Feb. 28, 2022) ................................................... 30, 41

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
  750 F.3d 227 (2d Cir. 2014) ...................................................................................... 46

*Chamberlain v. Reddy Ice Holdings, Inc.*,
  757 F. Supp. 2d 683 (E.D. Mich. 2010) ............................................................... 30, 31

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
  399 F.3d 651 (6th Cir. 2005) .......................................................................... 3, 28, 33

*City of Omaha v. CBS Corp.*,
  2011 WL 2119734 (S.D.N.Y. May 24, 2011) ........................................................... 32

*City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*,
  875 F. Supp. 2d 359 (S.D.N.Y. 2012) ....................................................................... 33

*City of Taylor Gen. Emps. Ret. Sys. v. Astec Indus., Inc.*,
  29 F.4th 802 (6th Cir. 2022) ............................................................................... 11, 40

*City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*,
  129 F. Supp. 3d 48 (S.D.N.Y. 2015) ......................................................................... 30

*Craighead v. E.F. Hutton & Co.*,
  899 F.2d 485 (6th Cir. 1990) ..................................................................................... 16

*D.E.&J. Ltd. P'ship v. Conaway*,
  133 F. App'x 994 (6th Cir. 2005) .............................................................................. 47

*Doshi v. Gen. Cable Corp.*,
  823 F.3d 1032 (6th Cir. 2016) ................................................................................... 30

*Dougherty v. Esperion Therapeutics, Inc.*,
  905 F.3d 971 (6th Cir. 2018) ............................................................................... passim

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005) ................................................................................................ 43

*Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
  794 F.3d 297 (2d Cir. 2015) .................................................................................. 21

*Frank v. Dana Corp.*,
  646 F.3d 954 (6th Cir. 2011) ................................................................ 4, 38, 39, 40

*Furher v. Ericsson LM Tel. Co.*,
  363 F. App'x 763 (2d Cir. 2009) ........................................................................... 35

*Gissin v. Endres*,
  739 F. Supp. 2d 488 (S.D.N.Y. 2010) ................................................................... 35

*Glassman v. Computervision Corp.*,
  90 F.3d 617 (1st Cir. 1996) ................................................................................... 23

*Gordon Partners v. Blumenthal*,
  293 F. App'x 815 (2d Cir. 2008) ........................................................................... 48

*Gormley v. Magicjack Vocaltec Ltd.*,
  220 F. Supp. 3d 510 (S.D.N.Y. 2016) ................................................................... 26

*Grae v. Corr. Corp. of Am.*,
  2021 WL 1100799 (M.D. Tenn. Mar. 23, 2021) ................................................... 43

*Halford v. AtriCure, Inc.*,
  2010 WL 8973625 (S.D. Ohio Mar. 29, 2010) ..................................................... 31

*Harris v. Ivax Corp.*,
  182 F.3d 799 (11th Cir. 1999) ............................................................................... 25

*Helwig v. Vencor, Inc.*,
  251 F.3d 540 (6th Cir. 2001) ........................................................................... passim

*Hoffman v. UBS-AG*,
  591 F. Supp. 2d 522 (S.D.N.Y. 2008) ................................................................... 23

*In re Almost Fam., Inc. Sec. Litig.*,
  2012 WL 443461 (W.D. Ky. Feb. 10, 2012) ......................................................... 47

*In re AT&T/DirecTV Now Sec. Litig.*,
  2020 WL 4909718 (S.D.N.Y. Aug. 18, 2020) ....................................................... 32

*In re Axis Cap. Holdings Ltd. Sec. Litig.*,
  456 F. Supp. 2d 576 (S.D.N.Y. 2006) ................................................................. 15

*In re Cabletron Sys., Inc.*,
  311 F.3d 11 (1st Cir. 2002) .................................................................... 21, 24

*In re Cardinal Health, Inc. Sec. Litig.*,
  426 F. Supp. 2d 688 (S.D. Ohio 2006) ............................................................ 11, 39

*In re China Educ. All., Inc. Sec. Litig.*,
  2012 WL 1155860 (C.D. Cal. Apr. 6, 2012) ......................................................... 12

*In re Comshare Inc. Sec. Litig.*,
  183 F.3d 542 (6th Cir. 1999) ......................................................................... 41

*In re Coty Inc. Sec. Litig.*,
  2016 WL 1271065 (S.D.N.Y. Mar. 29, 2016) ......................................................... 32

*In re Daou Sys., Inc.*,
  411 F.3d 1006 (9th Cir. 2005) .................................................................... 21, 23

*In re Diebold Sec. Litig.*,
  2008 WL 3927467 (N.D. Ohio Aug. 22, 2008) ....................................................... 32

*In re EveryWare Glob., Inc. Sec. Litig.*,
  175 F. Supp. 3d 837 (S.D. Ohio 2016) ............................................................ 25, 32

*In re FirstEnergy Corp. Sec. Litig.*,
  316 F. Supp. 2d 581 (N.D. Ohio 2004) ............................................................... 26

*In re Firstenergy Corp.*,
  2022 WL 681320 (S.D. Ohio Mar. 7, 2022) .................................................... 21, 36, 42

*In re Galena Biopharma, Inc. Sec. Litig.*,
  117 F. Supp. 3d 1145 (D. Or. 2015) .................................................................. 37

*In re Harman Int'l Indus., Inc. Sec. Litig.*,
  791 F.3d 90 (D.C. Cir. 2015) ........................................................................ 26

*In re HEXO Corp. Sec. Litig.*,
  524 F. Supp. 3d 283 (S.D.N.Y. 2021) ................................................................. 12

*In re Initial Pub. Offering Sec. Litig.*,
  399 F. Supp. 2d 261 (S.D.N.Y. 2005) ................................................................. 48

v

*In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*,
   2020 WL 1479128 (E.D. Pa. Mar. 25, 2020) ................................................................ 26

*In re Isaacs*,
   895 F.3d 904 (6th Cir. 2018) ........................................................................................ 49

*In re KBC Asset Mgmt. N.V.*,
   572 F. App'x 356 (6th Cir. 2014), ................................................................................ 48

*In re Keithley Instruments, Inc. Sec. Litig.*,
   268 F. Supp. 2d 887 (N.D. Ohio 2002) ........................................................................ 32

*In re Kindred Healthcare, Inc. Sec. Litig.*,
   299 F. Supp. 2d 724 (W.D. Ky. 2004) .......................................................................... 25

*In re Merrill Lynch & Co. Rsch. Reps. Sec. Litig.*,
   568 F. Supp. 2d 349 (S.D.N.Y. 2008) .......................................................................... 20

*In re Metris Companies, Inc. Sec. Litig.*,
   428 F. Supp. 2d 1004 (D. Minn. 2006) ........................................................................ 30

*In re Morris*,
   430 B.R. 824 (Bankr. W.D. Tenn. 2010) ................................................................. 49, 50

*In re Nat'l Century Fin. Enterprises, Inc.*,
   504 F. Supp. 2d 287 (S.D. Ohio 2007) ........................................................................ 42

*In re Nat'l Century Fin. Enterprises, Inc., Inv. Litig.*,
   2006 WL 469468 (S.D. Ohio Feb. 27, 2006) ................................................................ 42

*In re Nat'l Century Fin. Enterprises, Inc., Inv. Litig.*,
   541 F. Supp. 2d 986 (S.D. Ohio 2007) ..................................................................... 27, 41

*In re Omnicare, Inc. Sec. Litig.*,
   769 F.3d 455 (6th Cir. 2014) ........................................................................................ 28

*In re Reliance Sec. Litig.*,
   91 F. Supp. 2d 706 (D. Del. 2000) ................................................................................ 24

*In re Rodgers*,
   266 B.R. 834 (Bankr. W.D. Tenn. 2001) ...................................................................... 49

*In re SCB Computer Tech., Inc. Sec. Litig.*,
   149 F. Supp. 2d 334 (W.D. Tenn. 2001) ....................................................................... 41

*In re Segue Software, Inc. Sec. Litig.*,
106 F. Supp. 2d 161 (D. Mass. 2000) ................................................................. 23

*In re Sona Nanotech, Inc. Sec. Litig.*,
562 F. Supp. 3d 715 (C.D. Cal. 2021).................................................................. 35

*In re Symbol Techs., Inc. Sec. Litig.*,
2013 WL 6330665 (E.D.N.Y. Dec. 5, 2013) ........................................................ 16

*In re TransDigm Grp., Inc. Sec. Litig.*,
440 F. Supp. 3d 740 (N.D. Ohio 2020)................................................................ 48

*In re Vivendi, S.A. Sec. Litig.*,
838 F.3d 223 (2d Cir. 2016)................................................................... 4, 43, 44

*In re Weight Watchers Int'l Inc. Sec. Litig.*,
504 F. Supp. 3d 224 (S.D.N.Y. 2020).................................................................. 12

*In re White Motor Credit Corp.*,
37 B.R. 631 (N.D. Ohio 1984)............................................................................ 49

*In re White Motor Credit*,
761 F.2d 270 (6th Cir. 1985).............................................................................. 49

*Indiana Pub. Ret. Sys. v. AAC Hol,*
*dings, In*c., 2021 WL 1316705 (M.D. Tenn. Apr. 8, 2021) .............................. 27, 36

*Indiana State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare,*
*Inc.*,
583 F.3d 935 (6th Cir. 2009)....................................................................... 35, 46, 47

*Jackson Cnty. Employees' Ret. Sys. v. Ghosn*,
510 F. Supp. 3d 583 (M.D. Tenn. 2020) .......................................................... 28, 29

*Janus Cap. Grp., Inc. v. First Derivative Traders*,
564 U.S. 135 (2011) ......................................................................................... 42

*Katyle v. Penn Nat. Gaming, Inc.*,
637 F.3d 462 (4th Cir. 2011)............................................................................. 48

*Konkol v. Diebold, Inc.*,
590 F.3d 390 (6th Cir. 2009).......................................................................... 21, 38

*La. Sheriffs' Pension & Relief Fund v. Cardinal Health, Inc.*,
2021 WL 4397946 (S.D. Ohio Sept. 27, 2021)................................................. 25, 28

*Lentell v. Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005).......................................................................................... 20, 47

*Loc. 295/Loc. 851 IBT Emp. Grp. Pension Tr. & Welfare Fund v. Fifth Third Bancorp.*,
  731 F. Supp. 2d 689 (S.D. Ohio 2010)................................................................................ 38

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
  797 F.3d 160 (2d Cir. 2015).......................................................................................... 43, 44

*Lorenzo v. Sec. & Exch. Comm'n*,
  139 S. Ct. 1094 (2019) ................................................................................................. 36, 37

*Mandalevy v. Bofi Holding, Inc.*,
  2021 WL 794275 (S.D. Cal. Mar. 2, 2021).......................................................................... 33

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) .................................................................................................. 11, 24, 29

*Matter of Edgeworth*,
  993 F.2d 51 (5th Cir. 1993)................................................................................................ 50

*Miller v. Champion Enterprises Inc.*,
  346 F.3d 660 (6th Cir. 2003)........................................................................................ 16, 25

*Milman v. Box Hill Sys. Corp.*,
  72 F. Supp. 2d 220 (S.D.N.Y. 1999)................................................................................... 27

*Noto v. 22nd Century Grp., Inc.*,
  35 F.4th 95 (2d Cir. 2022)................................................................................. 3, 13, 20, 24

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000).............................................................................................. 40

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
  830 F.3d 376 (6th Cir. 2016)..................................................................................... 4, 43, 46

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015) ..................................................................................................... 14, 27

*Operating Loc. 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*,
  595 F.3d 86 (2d Cir. 2010)................................................................................................ 33

*Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*,
  153 F. Supp. 3d 628 (S.D.N.Y. 2015)................................................................................. 35

*Pension Fund Grp. v. Tempur-Pedic Int'l, Inc.*,
    614 F. App'x 237 (6th Cir. 2015) ............................................................ 25, 26

*Picard Chem. Inc. Profit Sharing Plan v. Perrigo Co.*,
    940 F. Supp. 1101 (W.D. Mich. 1996) .......................................................... 30

*Pirraglia v. Novell, Inc.*,
    339 F.3d 1182 (10th Cir. 2003) ..................................................................... 21

*Plumbers' & Pipefitters' Loc. No. 562 Supplemental Plan & Tr. V. J.P. Morgan Acceptance Corp. I*,
    2012 WL 601448 (E.D.N.Y. Feb. 23, 2012) ................................................. 14

*Puddu v. 6D Glob. Techs., Inc.*,
    2021 WL 1198566 (S.D.N.Y. Mar. 30, 2021) .............................................. 42

*Raab v. Gen. Physics Corp.*,
    4 F.3d 286 (4th Cir. 1993) ............................................................................. 30

*S.E.C. v. City of Miami, Fla.*,
    988 F. Supp. 2d 1343 (S.D. Fla. 2013) ......................................................... 38

*S.E.C. v. Hopper*,
    2006 WL 778640 (S.D. Tex. Mar. 24, 2006) ................................................ 38

*Salvani v. ADVFN PLC*,
    50 F. Supp. 3d 459 (S.D.N.Y. 2014) ............................................................. 47

*Schleicher v. Wendt*,
    529 F. Supp. 2d 959 (S.D. Ind. 2007) ..................................................... 44, 46

*Setzer v. Omega Healthcare Invs., Inc.*,
    968 F.3d 204 (2d Cir. 2020) ........................................................................... 20

*Silvercreek Mgmt., Inc. v. Citigroup, Inc.*,
    346 F. Supp. 3d 473 (S.D.N.Y. 2018) ........................................................... 24

*Smith v. Railworks Corp.*,
    2012 WL 752048 (S.D.N.Y. Mar. 6, 2012) .................................................. 50

*Strougo v. Tivity Health, Inc.*,
    2022 WL 2037966 (M.D. Tenn. June 7, 2022) ....................................... 36, 37

*Strougo v. Tivity Health, Inc.*,
    551 F. Supp. 3d 839 (M.D. Tenn. 2021) ....................................................... 25

*Suez Equity Invs., L.P. v. Toronto-Dominion Bank*,
250 F.3d 87 (2d Cir. 2001) ......................................................................................... 12

*Swack v. Credit Suisse First Bos.*,
383 F. Supp. 2d 223 (D. Mass. 2004) ......................................................................... 37

*Teamsters Loc. 237 Welfare Fund v. ServiceMaster Glob. Holdings, Inc.*,
2022 WL 989240 (W.D. Tenn. Mar. 31, 2022) ........................................................... 37

*Tellabs, Inc.*,
551 U.S. ........................................................................................................................ 38

*U.S. ex rel. Marlar v. BWXT Y-12, L.L.C.*,
525 F.3d 439 (6th Cir. 2008) ...................................................................................... 21

*U.S. ex rel. SNAPP, Inc. v. Ford Motor Co.*,
532 F.3d 496 (6th Cir. 2008) ...................................................................................... 11

*W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*,
2015 WL 3755218 (E.D. Pa. June 16, 2015) .............................................................. 25

*Wandel v. Gao*,
2022 WL 768975 (S.D.N.Y. Mar. 14, 2022) ............................................................... 47

*Weiner v. Tivity Health, Inc.*,
365 F. Supp. 3d 900 (M.D. Tenn. 2019) ..................................................................... 26

*Weiner v. Tivity Health, Inc.*,
528 F. Supp. 3d 795 (M.D. Tenn. 2021) ..................................................................... 23

*Winslow v. BancorpSouth, Inc.*,
2011 WL 7090820 (M.D. Tenn. Apr. 26, 2011) ..................................................... 25, 33

## Statutes

11 U.S.C. § 524(a)(2) ................................................................................................... 49

11 U.S.C.A. § 524(e) .................................................................................................... 49

## Rules

Fed. R. Civ. P. 5(b) ...................................................................................................... 49

Fed. R. Civ. P. 12(b)(6) ............................................................................................... 11

x

**<u>Regulations</u>**

17 C.F.R. § 240.10b-5.................................................................................................... 36

**<u>Other Authorities</u>**

*Staff Acct. Bull. No. 99*,
    Release No. 99 (Aug. 12, 1999) ................................................................................. 24

Lead Plaintiff Randy Slipher and Named Plaintiffs Erik. H. Rorvik, Logan Koltz, Josef Jonathan, and Michael Larney, submit their Memorandum Of Law in opposition to the motion of Defendants Washington Prime Group, Inc. ("WPG"), Louis G. Conforti, Mark E. Yale, and Melissa Indest to dismiss Plaintiffs' Amended Complaint ("Complaint").

## I.  INTRODUCTION[1]

For years, WPG, a mall operator, and the other Defendants, its officers, deceived investors by overstating the profitability of WPG's critical redevelopment projects. The scheme materially inflated the projects' revenues while materially understating their costs, thereby overstating their yield and making the projects seem about twice as profitable as Defendants' own internal estimates. Defendants concocted the materially false yields they disclosed to investors in meetings they held after project approval meetings at which they learned the true yields. At least two Defendants admitted that the purpose of the manipulation was to mislead investors. Defendants thereby concealed that WPG's supposed prize assets were just mediocre malls which could not be sold to raise cash to weather temporary financial hardships. When a hardship came, WPG collapsed, and its investors lost nearly their entire investment.

The 2010s pummeled the middlebrow stores that had been malls' bread and butter. With investors skeptical of the entire mall sector, Defendants needed to explain why WPG would survive when other mall operators were failing. Their answer: through redevelopment, WPG revitalized its malls, which now offered brew pubs, event spaces, contemporary stores, and even dog runs, that made them attractive to shoppers and tenants.

---

[1] Citations to "¶_" or "Ex. _" are to paragraphs of or exhibits to the Complaint. Citations to "Horne Dec. Ex. _" are to exhibits to the Declaration of Jonathan Horne In Opposition to Defendants' Motion to Dismiss, filed herewith. Citations to "Def.Br. _" are to pages of Defendants' Memorandum of Law in support of their motion to dismiss. Unless otherwise noted, all ***bold italic*** emphases are added, while all **bold** emphases are in original.

To show their efforts were succeeding, Defendants directed investors' attention to the redevelopment projects' yield. Yield is the additional annual income the project would generate divided by its costs. According to Defendants, yield was a hard-numbers based calculation. There was no "fluff". Yield did not include benefits to "unproductive adjacent space". It was "numerator/denominator". Yield included only returns that were locked in.

In truth, Defendants manipulated the publicly-disclosed yields. WPG approved projects, including their yield and costs, at meetings of its Investment Committee. All three Defendants' signatures were necessary for approval. Then, soon after each project was approved, Defendants Yale and Indest met with other WPG employees to manipulate the yields. At the meeting, WPG employees used a variety of tricks to artificially inflate the returns and deflate the costs for the projects they had just themselves approved.  Defendants then publicly reported the projects and their supposed costs and yields, but reported the manipulated yields, not the true ones. Defendants deliberately misled investors. Yale admitted in February 2020 that if WPG accurately disclosed its yields, investors would realize that it could not create profitable redevelopment projects. And Indest began a February 2020 meeting at which WPG inflated its yields by admitting "we can't disclose this level [of yield]."

***The Complaint sufficiently alleges that Defendants made false and misleading statements (Section III.B. herein, pages 11 through 35)***

When a company chooses to speak to the market, it must ensure that its statements are true and not misleading. *Helwig v. Vencor, Inc.*, 251 F.3d 540, 560 (6th Cir. 2001) (en banc), *abrogated on other grounds by Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308 (2007). Defendants had no obligation to disclose either yields or how they were calculated, but because they did, they were obliged to truthfully describe the method they employed and to disclose accurate yields.

Defendants did neither and the Complaint reports that both Yale and Indest admitted as much. Defendants' motion to dismiss knocks down a strawman. They conflate the Investment Committee meetings at which they approved projects with the later meetings at which they manually adjusted yields, artificially inflating project revenue and deflating project costs. They go further: contradicting the Complaint, they assert that the February 2020 meeting at which Indest admitted that she was manipulating yields was instead an Investment Committee Meeting at which she chided WPG employees for failing to present her with profitable projects. That Yale and Indest misstated yields ***because they wanted to mislead investors*** establishes that their statements were materially false. *Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 105 (2d Cir. 2022).

Nor are Defendants' yield statements forward-looking. That a statement "concerns an event in the future [] alone does not automatically make [it] forward-looking". *Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 983 (6th Cir. 2018). Because Defendants told investors that they were calculating yield based on locked in leases, the veracity of Defendants' yield disclosures could be measured at the time Defendants made them. Each yield estimate is thus a "backward-looking statement concerning a future event." *Id.*

Defendants misled investors about WPG's borrowing capacity. The Sixth Circuit recognizes that statements can become misleading because of the context in which they are made. *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 672 (6th Cir. 2005). Defendants argue that the Complaint does not show that Defendants promised they could survive temporary liquidity emergency, another strawman because that is not what the Complaint alleges. Rather, Defendants made statements that, in context, gave the materially misleading impression that WPG had renegotiated its debt covenants to permit additional borrowing. In fact, WPG had

3

not succeeded in renegotiating its bond covenants and so could not borrow any more funds. Defendants' statements were materially misleading.

### The Complaint sufficiently alleges that Defendants made their statements with scienter (Section III.D. herein, pages 38 through 41)

A complaint sufficiently alleges scienter when, as here, reading its allegations holistically permits an inference of scienter that is at least as strong as any competing non-culpable inference. *Frank v. Dana Corp.*, 646 F.3d 954, 961 (6th Cir. 2011). Redevelopment was Defendants' answer to investors' questions of how WPG could survive. Defendants held rigorous Investment Committee meetings at which they approved projects at given yields, and then reported materially higher yields to the public. The inference that they did so fraudulently is stronger than any competing inference. Indeed, the Court need not infer Yale and Indest's scienter because they admitted that they intended to mislead investors. And Defendants' competing inference relies on the same strawman they knocked down attempting to show the Complaint does not allege falsity: they conflate Investment Committee meetings with the later meetings at which Yale, Indest and other WPG employees manipulated yields.

### The Complaint sufficiently alleges loss causation (Section III.F. herein, pages 42 through 47)

Plaintiffs can allege loss causation by showing that the false statements concealed a risk which caused the company's stock price to fall when it materialized. *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 384 (6th Cir. 2016) ("*Freddie Mac*"). A paradigmatic example is a cash overstatement that materializes in a liquidity crisis. *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 261 (2d Cir. 2016). REITs rely on asset sales and debt to survive temporary emergencies, not cash on hand. By overstating WPG's projects' yields, Defendants gave

the misleading impression that WPG had revitalized malls which it could sell to meet a temporary financial emergency. The risk materialized upon revelations that WPG was nearing a bankruptcy that could have been avoided if it had redeveloped malls to sell. Defendants do not respond to Plaintiffs' allegations of loss causation, either; instead, they declare in a footnote that the Complaint does not allege a materialization of the risk theory.

Defendants' motion to dismiss attacks strawman after strawman without ever acknowledging the Complaint's allegations. The Court should deny it.

## II.     FACTS

### A.  Parties

This is a securities class action brought on behalf of persons who purchased WPG securities from February 22, 2018, through March 3, 2021 ("Class Period"). ¶1. The Defendants are WPG's Class Period-CEO Conforti, -CFO Yale, and -Chief Accounting Officer Indest. ¶¶37-39. Nominal Defendant WPG is sued solely to recover from its insurance policies. ¶36.

### B.  REIT Investors Prioritize Dividends and the REIT's Ability to Sustain Them

WPG is a real estate investment trust, or REIT, that owns and operates enclosed and strip malls. ¶36. REITs must distribute 90% of their income as dividends, so investors predominantly buy REIT shares to generate income. ¶¶40-41. To attract investors, REITs must show they will be able to sustain their dividend by making profitable investments. ¶41. Return on invested capital, or ROIC, measures the profitability of the REIT's investments. ¶44.  It is net annual income minus dividends divided by total costs. *Id.* ROIC resembles Return on investment, or ROI. *Id.*

### C.     The Retail Apocalypse Has Investors Raising Questions About Mall Operators' Business Plans

In the 2010s, retailers experienced a disaster dubbed the "retail apocalypse". ¶51. The share of online sales as a percentage of total U.S. retail sales grew steadily throughout the decade from about 4% in Q1 2010 to about 13% in Q1 2020. ¶52. The change in consumer behavior devastated

5

middlebrow stores like Sears. ¶53. Before online shopping, customers who wanted either premium or value-priced goods might be forced to purchase the middlebrow goods available at Sears. ¶53. But now, customers could get exactly what they want, whether it is cachet or value. ¶54. Unable to cater to customers' new habits, the Sears of the world—including Bon-Ton, Forever 21, Payless, Toys R' Us, American Apparel, Aeropostale, RadioShack, and others—filed for bankruptcy, leaving the big boxes they had once occupied empty. ¶55.

The change in consumers' preferences towards online sales took a particular toll on malls. ¶56. Malls' bread-and-butter is the very middlebrow stores that were failing. ¶53. Mall attendance stagnated and, in some cases, collapsed. ¶54. As this disaster unfolded, investors had one question for mall executives: how will you survive the retail apocalypse? ¶57.

**D.      WPG Purportedly Flourishes in the Retail Apocalypse**

Defendants had an answer. WPG's competitors were "lazy and reactive [] rent collectors". ¶61. WPG, instead, had revitalized its malls through a series of redevelopment projects. ¶¶70-72. WPG drove traffic to its malls by recruiting tenants like gyms, pubs, dog runs, or higher-end food options. ¶59. The mall common areas, both open-air and enclosed, hosted concerts and product demonstrations. *Id.* WPG also purportedly updated its old middlebrow tenants with more modern offerings like Dick's Sporting Goods or ALDI's. ¶65. By providing sports, entertainment, modern shopping, and events, WPG's malls purportedly served as town centers. ¶75-78. Indeed, by eliminating "insipid" stores like Sears, the retail apocalypse had purportedly created an opportunity for an operator like WPG that, Defendants asserted, better understood local shoppers at each of its malls and used more sophisticated analyses than its competitors.  ¶¶61-67, 69, 75-78.

**E.      WPG Spends Hundreds of Millions of Dollars on Redevelopment**

WPG came to its business model early. Beginning Q4 2016—the second full quarter after he became CEO—Conforti emphasized that redevelopment is "our best return on invested capital

6

proposition" on which WPG would be "spending a heck of a lot of time." ¶70. On the Q1 2017 earnings call, Conforti told investors that "[r]edevelopment is crucial—is also crucial, as you guys are all aware, as we promote our hybrid asset model of combining Enclosed and Open Air [strip mall] formats into vibrant town centers." ¶71. Defendant Yale added that WPG was "fully commit[ted]" to its redevelopment pipeline. ¶72. As Conforti made clear, that pipeline was massive: "We currently have 45 projects ranging between $1 million and $60 million, which substantiates our $125 million to $150 million of annual capital spend." ¶71.

The substantial majority of WPG's redevelopment consisted of replacing the middlebrow stores that had filled WPG's malls until their actual or anticipated bankruptcies. ¶80.  On the Q2 2018 earnings call, Defendants disclosed that WPG was negotiating with tenants to replace 23 of these 28 anchor locations. ¶81. Replacing all 28 stores would cost approximately $300-350 million over 3-5 years, or the majority of WPG's $100 million annual redevelopment budget. ¶81. Two years later, the job was nearly done. In a March 3, 2020 presentation at the Citi Global Property CEO Conference, Conforti stated that "[w]e've now resolved 75% of all of our department store vacancies and have several other underway." ¶87. In the years ended December 31, 2018, 2019, and 2020, WPG spent $117 million, $103 million, and $131 million on redevelopment—enormous sums for a company of WPG's size. ¶91.

**F.    Defendants Measure the Success of WPG's Redevelopment Projects by their Yield**

Defendants asked investors to judge WPG based on the yield of its redevelopment projects. In a pre-Class Period call, Defendant Yale stated that WPG's capital "is precious" and allocating it "is probably our most important process we have." ¶94. Defendants measured the profitability of their redevelopment through a metric they called "yield", a measure of the additional annual income generated by an investment divided by its costs. ¶92. Defendants told investors that by

yield, they did *not* mean the projects' anticipated return. Indeed, Defendants said that WPG would never redevelop if all it could expect was the 9.5% yield they disclosed. ¶97. Rather, the yields were the output of a formula where the denominator was project costs and the numerator was additional revenues based solely on existing facts. ¶96. Defendants claimed their yield calculations were "extraordinarily rigorous" and that they did not include "fluff" in the measurement. ¶¶97, 263. While Defendants stated that the projects would attract new tenant, these "indirect adjacencies" were not included in the 9-10% yields they reported. ¶¶259, 261, 263, 265.

### G.    WPG Overstates Yields

WPG maintained two sets of materially inconsistent yield measurements, one for all internal decisions, the other for external disclosure. The first set of measurements were set out in the memoranda that summarized redevelopment projects, including itemized project costs, assumed and signed leases, and the resulting yield. ¶103. These memoranda were submitted to the Investment Committee, the internal WPG committee that considered and approved all projects, on which all Defendants sat. *Id.*

After approving the projects, Yale, Indest, and other WPG employees held separate meetings to generate the second set of books. ¶110. The purpose of these meetings was to "manual[ly] adjust[]" the correct and reliable yields that the Investment Committee had considered in approving the project. ¶117.  At these meetings, Defendants were "solving to an answer": they were attempting to artificially inflate the yields to as close as 10% as possible. ¶112.  Yale admitted in or around February 2020 that WPG needed to inflate yields or investors would realize its redevelopment projects were not profitable. *Id.* Indest began a February 2020 meeting to prepare the second set of books by stating ***"[w]e can't disclose this level [of yield], we need to find a way to enhance returns."*** ¶118.

8

Defendants artificially lowered project costs by removing actual expenses from the project costs that were presented at the Investment Committee Meeting, or offsetting costs with unrelated speculative benefits. ¶182. As an example of the former, Defendants excluded the $5.5 million cost of purchasing land used in a redevelopment project. *Id.* An example of the latter is offsetting project costs by $1.5 million for the purported value of adjacent undeveloped lands that WPG had no plans to sell and that the project had not made more valuable. ¶¶187, 189-90.

At the same time, Defendants artificially increased yield by adding to revenues the very leases Investment Committee memoranda had acknowledged were merely "speculative". These included revenues from hypothetical restaurants that would lease out new buildings WPG would construct on adjacent real estate. ¶¶151, 160. WPG also double-counted certain rent provisions. ¶129. Defendants offered certain tenants nearly interest-free loans to sign leases and made equity investments in another to allow the tenants to temporarily pay their rent. ¶168. WPG then included the tenant's anticipated rent as project-related revenues in calculating publicly-disclosed yields even though they were paying WPG with its own money and would fold up when WPG's money ran out. *Id.* Because they removed costs from the denominator and added revenues to the numerator, Defendants' second set of yield measures artificially inflated yields.

The total impact was immense. According to FE 1, who was the "Master of Ceremonies" for Investment Committee Meetings and attended the subsequent meetings with Yale and Indest, in calculating yields, WPG inflated projected revenues for projects approved in any 2-year period by between $20 million and $50 million, while also understating the projects' costs. ¶120.

**H.    WPG Files for Bankruptcy Because It Can Neither Take On Debt Nor Sell Its Redeveloped Malls**

COVID hit the mall industry hard. Governors and mayors issued shelter in place orders that closed malls. Even in states and cities there were no such orders, COVID made in-person

shopping a hazard rather than a hobby. ¶20. Mall operators' profits fell. But COVID's impact was self-evidently temporary. ¶21. At some point, COVID's impact on malls would fade. All WPG needed to do was limp along until then. *Id.*

WPG did not need enormous sums. While WPG's cash flows from operations fell by $130.7 million from 2019 to 2020, WPG saved $195.2 million by cutting its dividend. ¶¶202-03. WPG could make up the gap either by taking on debt or selling assets.

WPG's debt was subject to covenants limiting total and secured indebtedness. ¶223. In May 2020, Defendants previewed, and in August 2020 they announced, that WPG had renegotiated the covenants to increase allowable leverage. ¶¶228-30. Defendant Yale said that WPG now had "flexibility that will allow us to navigate and maintain compliance with our ***modified credit facilities and bond covenants*** for the foreseeable future." ¶234. Yet WPG had not obtained relief from its ***bond*** covenants and would trip them if it tried to borrow money, which would make all WPG's debt due immediately. ¶238.

Notwithstanding WPG's inability to borrow additional capital, COVID should not have been a fatal blow. WPG's recently redeveloped malls purportedly collectively held billions of dollars in value. ¶25. WPG should have been able to sell some of the malls to clear a path through COVID. ¶26. Having overstated both the direct and indirect returns of its redevelopment projects, WPG's malls were not the powerhouses Defendants reported. *Id.* No one wanted to buy them. *Id.*

On November 6, 2020, during trading hours, Defendants revealed that WPG had exceeded the covenants on its bonds and that it could not borrow any additional funds. ¶244. That day, WPG's stock price fell $0.68 (11.9%). ¶245. On February 12, 2021, WPG paid the Individual Defendants their 2021 annual bonuses. ¶251. Defendant Conforti received $3.48 million. *Id.* On February 15, 2021, after close of trading, WPG disclosed that it failed to make a payment on its

10

bonds. ¶252. Over the next two days, WPG's stock price fell by $5.99 (49.7%). ¶253. Then, on March 4, Bloomberg reported that WPG was seeking debtor-in-possession financing. ¶254. That day, WPG's stock price fell by $2.51 (60%), damaging investors. *Id.*

## III. ARGUMENT

### A. Standard On A Motion to Dismiss

On a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must "accept the truth of plaintiffs' well-pleaded factual allegations [] construe the complaint in the light most favorable to plaintiffs and draw all reasonable inferences in plaintiffs' favor." *City of Taylor Gen. Emps. Ret. Sys. v. Astec Indus., Inc.*, 29 F.4th 802, 809 (6th Cir. 2022). The complaint must "state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). Those elements of Plaintiffs' claims that Defendants contest are (1) a material misrepresentation or omission ("falsity"); (2) scienter; and (3) loss causation. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011). The Complaint adequately alleges all these elements.

### B. The Complaint Sufficient Alleges That Defendants Made False Statements In Violation of SEC Rule 10b-5(b)

A plaintiff must plead falsity with particularity, "specify[ing] each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. §78u4(b)(1)(B). If a plaintiff pleads "sufficient detail—in terms of time, place and content, the nature of a defendant's fraudulent scheme, and the injury resulting from the fraud—to allow the defendant to prepare a responsive pleading, the requirements of Rule 9(b) will generally be met." *U.S. ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 504 (6th Cir. 2008). The Complaint amply alleges the "who, what, when, where and how" of Defendants' misrepresentations and omissions. *In re Cardinal Health, Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 742 (S.D. Ohio 2006).

11

1.     *That Defendants Deliberately Manipulated Yields Shows Their Statements Were False*

When a company speaks, it must ensure that its statements are true and not misleading. *Helwig*, 251 F.3d at 560. Companies may not "selective[ly] disclos[e] information known exclusively to defendants and essential to complete a picture they had only partially revealed." *Id.*

Defendants deliberately overstated yields and willfully misstated the methodology they used for calculating yields in an intentional effort to mislead investors. At Investment Committee Meetings, Conforti, Yale, and Indest approved redevelopment projects based on detailed memoranda that set out the projected costs and expected yields to the hundredth of a percent. These were the true yields. After the Investment Committee Meetings, Yale and Indest met to "manual[ly] adjust" the yields. ¶110. Defendants' own statements establish that by manipulating yields, they intended to deceive investors. Yale stated in February 2020 that WPG could not disclose the true yield numbers because they would show that WPG was not capable of creating profitable projects. ¶112. Indest admitted at a February 10, 2020 meeting convened to manipulate yields for projects that had already been approved that "[w]e can't disclose this level [of yield], we need to find a way to enhance returns." ¶118. Defendants reported the artificially inflated yields. ¶110. In other words, Defendants "fraudulently maintained two sets of [] books in violation of securities laws[.]" *In re China Educ. All., Inc. Sec. Litig.*, 2012 WL 1155860, at *1 (C.D. Cal. Apr. 6, 2012).[2] Thus, the externally-reported yields were false and misleading.

---

[2]  The cases defendants cite involve mismanagement, not false statements. In *In re HEXO Corp. Sec. Litig.*, 524 F. Supp. 3d 283, 309 (S.D.N.Y. 2021), the plaintiff did not allege that the defendant had made a misstatement, but only that the defendant had decided not to enforce a contractual provision that they had accurately described. In *In re Weight Watchers Int'l Inc. Sec. Litig.*, 504 F. Supp. 3d 224, 250 (S.D.N.Y. 2020), the plaintiffs did not point to false statements but instead alleged that the company had made a poor strategic decision. Here, the Complaint does not charge Defendants with failing to meet yield estimates by mismanaging projects but with affirmatively misrepresenting project yields, which is actionable. *Suez Equity Invs., L.P. v. Toronto-Dominion*

Defendants contradict the Complaint's well pled allegations and assert that Indest made her statement at an Investment Committee Meeting. Def.Br. 38, 45. The Complaint alleges that Yale and Indest met with other employees to manipulate the yields for public disclosure, ¶¶16, 117, including at the February 2020 Meeting to manipulate yields at which Indest made her statement, ¶¶18, 116-18. At that meeting, the four projects discussed at the February 2020 Meeting had already been approved; the Complaint even pleads the dates on which three were approved. ¶¶149, 154, 158.

The difference between the context in which Indest made her statements and the context Defendants supply is material. "We need to find a way to enhance returns", at an Investment Committee Meeting, could mean "we need to find better projects". At a meeting to discuss what yields to report for already-approved projects, it meant Indest wanted WPG to use tricks to manipulate yields before public disclosure.

The context the Complaint provides—including the Investment Committee Meetings, the subsequent meetings to manipulate yields, and Yale's and Indest's admissions—establishes that the yields the Defendants disclosed to the public were materially misleading. Moreover, Yale and Indest made the misstatements ***because they wanted to mislead investors***, so they sure thought their statements were materially misleading. *Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 106 (2d Cir. 2022) ("[D]efendants' false public denial of any knowledge of the SEC investigation amounts to an admission of the materiality of its nondisclosure. Otherwise, the Company would not have tried to hide it.").[3]

---

*Bank*, 250 F.3d 87, 94, 98-99 (2d Cir. 2001)(statements misleadingly concealing defendant's history of mismanagement were securities fraud).

[3] Defendants' statements in ¶¶257 and 261 referred to yields from projects that were being disclosed at the time, rather than the yields Defendants actually achieved on invested capital. For one thing, Defendants refer to additional benefits WPG is "going to get" from completion, but

Yale and Indest were right. Investors and analysts asked Defendants how *their* malls would prosper while others perished. ¶57. Defendants' answer was redevelopment. ¶¶70-75. Disclosing that redevelopment was not profitable would sour investors on WPG.

This context shows that Defendants were not exercising their business judgment in estimating yields. Defendants used their business judgment at the Investment Committee Meetings when they approved projects. The subsequent meetings' manually adjusted numbers were used only to mislead investors.

2.      *Because Defendants Represented That Yield Calculations Were Objective, their Yield Disclosures Were False Statements of Fact*

i.      *Defendants' Statements Were Statements of Fact*

When companies describe exactly how they calculated certain financial metrics and those descriptions are false, their statements are false statements of *fact*. *Abrams v. Van Kampen Funds, Inc.*, 2002 WL 1160171, at *10 (N.D. Ill. May 30, 2002) ("the representations as to valuation policy were false because the Fund did not actually follow the stated policy."); *Plumbers' & Pipefitters' Loc. No. 562 Supplemental Plan & Tr. V. J.P. Morgan Acceptance Corp. I*, 2012 WL 601448, at *13 (E.D.N.Y. Feb. 23, 2012) (denying, in part, defendants' motion to dismiss, ruling that company's material departure from appraisals standards it disclosed was actionable). Defendants' use of manipulative tricks rendered these statements misleading.

Courts and investors look to statements' specific wording in determining whether they are opinions. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 183 (2015). Defendants did not preface their yield estimates with words like "I think" or "I believe" or, indeed, convey any uncertainty. They did the opposite. To reassure investors that the projects

---

these benefits would already have been realized if the construction were complete. In addition, the yields disclosed in ¶¶257 and 261 (9.5%) are the same as those disclosed in contemporaneous statements (10%, ¶259).

would certainly achieve the yields—and more—Defendants told investors how they were calculated. For example, in describing yield estimates, Defendants repeatedly stated that WPG did not include benefits to adjacent unproductive space. ¶¶259, 261. In fact, Defendants claimed, "there is no taking indirect adjacencies that we are going to pick up a x% just because." ¶263. They told investors "[w]e don't kind of play around with the fluffiness of, okay, an unproductive space is going to pick up another 100 basis points or 200 basis points of return." ¶261.[4] WPG was "not in the speculative redevelopment business" because development was "vastly leased." *Id.*[5] Calculating yield was just math based on current commitments: "[i]t's numerator/denominator." *Id.* Indeed, the Supplemental Reports provided that "[t]he project yield excludes any NOI benefit to the property that is indirectly related to the redevelopment *other than near-term renewals*, although each project does benefit other aspects of the property." Ex. 1 at PAGEID# 912. In sum, Defendants said they calculated yields from returns that were already, in effect, locked in.[6] Defendants' assertions were misrepresentations: they used tricks to manipulate yields.

---

[4] Defendants claim that it is relevant that Conforti's statement that WPG did not include the effect on "adjacent space when we factor in or [sic—our] redevelopment" which returns "9.5%", came in response to a question about why WPG was redeveloping. Def.Br. at 30. Yet Conforti was justifying the decision to redevelop rather than buy back WPG's stock *by claiming* the 9.5% disclosed yield was not an all-in return. Thus, Conforti's statements were about the yield. Indeed, "we don't include adjacencies" and "9.5%" were running themes in Defendants' statements about redevelopment.

[5] The court in *In re Axis Cap. Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 590 (S.D.N.Y. 2006) merely held that there was no independent duty to break out one particular line item on financial statements if, unlike here, the defendants' description of the facts was not otherwise misleading.

[6] Defendants claim that Conforti must have believed that the projects had 10% yield because he said WPG had a "thesis", made "admirable" progress, and faced an opportunity "unlike [] anything I've ever seen." Def.Br. 37. All Defendants show is that Conforti was relatively consistent in his false statements. In any case, had Plaintiffs alleged that these additional statements were actionable, Defendants would have argued that they were puffery.

15

Because Defendants' statements were specific, this case is nothing like *Miller v. Champion Enterprises Inc.*, 346 F.3d 660 (6th Cir. 2003). In the portions Defendants cite, Def.Br. at 34, the Sixth Circuit found that a defendant did not need to disclose a customer's bankruptcy solely because it disclosed financial results. *Id.* at 682-83. In the portions Defendants ignore, the Sixth Circuit called the defendants' more specific statements "somewhat disingenuous" and "somewhat misleading", showing it would have found the specific statements misleading had it not found they were not made with scienter. *Id.* at 682, 684. The statements at issue here  are even more specific.

  ii.  *Defendants' Use of Tricks Made Their Yields Statements False and Misleading*

   (a)  Defendants Double Counted Co-Tenancy Benefits

When determining how much additional revenue a given tenant might generate, WPG double-counted co-tenancy cures[7] by including both the tenant's lease and the avoided co-tenancy. As a result, Defendants might report project-related increases in revenues that were even higher than the tenants' rents. ¶129.

Defendants argue that there is nothing improper about counting co-tenancy cures because Plaintiffs must show that WPG's yield was "excessive", which is "inherently comparative". Def.Br. 28 (citing *Craighead v. E.F. Hutton & Co.*, 899 F.2d 485 (6th Cir. 1990) (broker's commissions were not "excessive")). *Id.* at 491. But the Complaint alleges that Defendants "double" counted co-tenancy cures. There is no "appropriate" level of double-counting for the same reason that there is no "appropriate" amounts of revenues to recognize from fictitious transactions. Indeed, even if Defendants' yield statements had been forward-looking, it is misleading to double count any revenues even when making statements about the future. *In re*

---

[7] Co-tenancy provisions lower a tenant's rent if there is no anchor tenant of a certain type, such as if an anchor tenant files for bankruptcy and stops operating. Operators cure co-tenancy by replacing the empty box with a new anchor tenant of the right type. ¶¶123-25.

*Symbol Techs., Inc. Sec. Litig.*, 2013 WL 6330665, at *5 (E.D.N.Y. Dec. 5, 2013) (double counted future sales made future earnings estimate misleading).

The Defendants point to Yale's assertion that WPG "counted" co-tenancy cures. Def.Br. 27-28. He did not admit that WPG "double" counted them.

> (b)     Defendants Could Not Include Speculative Income Because They Told Investors That They Did Not

Defendants assert that including speculative income reflected their business judgment about what revenues a project might achieve. Def.Br. 25-27. Defendants' argument does nothing to undermine the Complaint's allegations. At Investment Committee meetings, Defendants distinguished between true revenues and revenues from leasing unproductive stores. They labeled the latter "Spec" or "Speculative". The costs would typically not be included in the yields Defendants approved. *E.g.* ¶¶149-50. The public yield disclosures reflected income from these phantom tenants, though the Investment Committee Memoranda did not. *E.g.* ¶¶149-50. Thus, Defendants did not believe that WPG would achieve its speculative revenue.

Yet even if Defendants believed they might achieve the revenue, they still misled investors by including it in yields. Yield, as WPG used the term in public filings, is not an estimate of project returns. It is the output of the specific yield formula they disclosed. Indeed, according to Conforti, if WPG's projects only returned the disclosed yield, "we wouldn't develop."

The impact was significant. Defendants' thesis was WPG had revitalized decrepit malls with many empty stores. ¶138. Indeed, as Defendant Conforti noted, it was a "basic reality" that

"[m]any of our assets have been neglected for years." ¶89. As a result, portions of the malls Defendants proposed to redevelop included substantial "adjacent unproductive space."[8]

Though Defendants assured investors that the yields included only locked-in returns, they included speculative income. Defendants approved the Town Center at Aurora project at a yield of 2.04%. ¶149. By assuming that all the vacant stores would be filled and that WPG could somehow lease three additional vacant land parcels for restaurants, Defendants increased projected revenues by more than $1 million. ¶150. After this adjustment, Defendants reported to the public a more acceptable 5-6%. ¶149. Likewise, Defendants approved Polaris at a yield of 1.92%, but reported a yield of 4-5% to the public, largely by recognizing revenue from undeveloped adjacent land they thought they might be able to build a restaurant on at some point if redevelopment increased foot traffic—the epitome of recognizing revenues from "unproductive space". ¶160.

In other words, Defendants told investors that the yield estimates showed WPG's business plan *was working*. To arrive at the yield estimates, Defendants *presumed* that the business plan *would* work. Including speculative revenue made Defendants' statements materially misleading.

(c)     Defendants Were Required To Take A Vacancy Provision

In calculating yield, Defendants presumed that 100% of the stores in the new malls would be occupied 100% of the time. Non-credit tenants, including not only small mom-and-pop stores but also large chains with poor credit, frequently file for bankruptcy. ¶¶164, 166. When that happens, the mall owner is left with an empty store it needs to fill. To account for these bankruptcies, industry standards call for companies to take a vacancy provision of 1-5% of revenues when modeling future revenues. ¶167.

---

[8] Defendants' argument that "it makes sense" that non-anchor tenants would not sign leases until anchors are installed is a fact question not suitable for resolution on a motion to dismiss. It is also inconsistent with Conforti's statement that WPG did not develop "on spec".

As the Complaint's allegations are unambiguous, Defendants try to manufacture confusion. They claim the Complaint does not distinguish between accounting charges and yield projections. Def.Br. 28-29. In fact, the Complaint alleges that according to FE 1, WPG "fail[ed] to take a provision for non-credit tenants", which "caused ***externally reported yields to exceed internally considered yields*** by $4 million to $5 million."[9] ¶171.

Thus, the Complaint pleads with particularity that WPG applied no vacancy provision to its projected rents on which it based yields, and thereby misled investors.[10]

(d)      Defendants Understated Project Costs

Defendants did not simply overstate rents, they also understated costs by excluding project-related costs and offsetting costs with unrelated benefits. Defendants identify four such allegations in the Complaint. They contest one but say nothing about the other three. Def.Br. 29-30.

The Complaint alleges that the trick was improper. The Supplemental Reports stated that yield is derived from "Estimated ***Total*** Costs", Ex. 1 at PAGEID# 912, which a reasonable investor would understand to mean all and only project-related costs. The Complaint then explains how costs were inappropriately excluded or benefits inappropriately included in each example. ¶¶180-83 (excluding costs of acquiring land for project and assuming WPG would be able to sell additional land, overstating costs by a total of $8-13 million, from Polaris); ¶184 (excluding land

---

[9] See also Daniel B. Kohlhepp & Lin Mao, Converting Income Into Value: A Handbook for Real Estate Investors, at 19 (2014) (Horne Dec. Ex. 1).

[10] Defendants' response also claims the Complaint improperly uses the term "provision" to describe the adjustments companies make to models to account for bankruptcies. While that is one use of the word provision, in real estate investing, one meaning of "vacancy provision" (or "vacancy allowance") is a reduction in projected revenues to account for vacancies. *E.g.* HomeUnion Frequently Asked Questions ("Vacancy provision – Our projections include a 6% vacancy provision, as we prefer to project returns conservatively.") (available at https://www.homeunion.com/faq/); Horne Dec. Ex. 1 at 16. In any case, nothing hinges on the use of these specific words; what matters is that Defendants inappropriately did not reduce revenues to take tenant bankruptcies into account.

19

acquisition costs of $5.2 million from Aurora). The Complaint also identifies the specific statements rendered misleading by the omissions Defendants cite. They are: ¶¶271-72 (Polaris, first bullet point on Def.Br. at 29) and ¶¶275-76 (Aurora, second and third bullet points). Thus, the Complaint pleads particularized facts showing that Defendants improperly understated costs by removing project expenses.

Defendants are also incorrect in stating that the Southern Park mall manipulation was disclosed. A statement is misleading, not curative, if it discloses the existence of a problem but conceals its scope. *Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 214 (2d Cir. 2020); *Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 105 (2d Cir. 2022) (the defendant's literally true disclosure of internal control deficiencies was misleading because they did not reveal that the deficiencies were under SEC investigation.). For example, in *Omega*, the defendants disclosed that one of their tenants was past due but asserted that it had made partial payments. *Setzer*, 968 F.3d at 214. The statements were misleading because the tenant was able to pay its debts because it had received a loan from the defendant, so it was paying the defendant back with the defendant's own money. *Id.*

Defendants' literally true statements that interior renovations were excluded from the "total estimated costs" gave the misleading impression that the renovations were a different project. ¶178 n.8. If not, there would be no reason to exclude the costs. So the renovations would provide WPG with additional returns, or WPG would not be undertaking them. But the renovations are part of the Southern Park project, so they would not provide additional returns.[11]

---

[11] Though Defendants rely on *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005) and *In re Merrill Lynch & Co. Rsch. Reps. Sec. Litig.*, 568 F. Supp. 2d 349, 360 (S.D.N.Y. 2008), both relate to loss causation, not falsity.

As to tax abatement, the Complaint alleges that there were two appropriate methods to calculate the value of the tax abatement but that by lowering project costs by the abatement's *undiscounted* value, WPG used neither, understating costs by at least $1.3 million. ¶¶194-99.

### 3. The Complaint's Allegations Suffice To Show Defendants Overstated Yields

A company that chooses to divulge uncertain estimates "must also inform the shareholders as to the basis for and limitations on the projected realizable values." *Helwig*, 251 F.3d at 561. In alleging that Defendants reported inflated yields, the Complaint need not account for every penny of overstatement. Instead, it need only allege "representative samples" of the scheme. *In re Firstenergy Corp.*, 2022 WL 681320, at \*14 (S.D. Ohio Mar. 7, 2022) (quoting *U.S. ex rel. Marlar v. BWXT Y-12, L.L.C.*, 525 F.3d 439, 444 (6th Cir. 2008)). In fact, cases alleging false financial metrics are commonly pled through examples of misconduct. *Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015)(focusing on one transaction to find defendants' broader statements false); *In re Daou Sys., Inc.*, 411 F.3d 1006, 1019 (9th Cir. 2005)(allegations sufficient when they set out "dates of *some* of the related transactions and the identities of the customers and the company employees involved in the transactions."); *Pirraglia v. Novell, Inc.*, 339 F.3d 1182, 1193 (10th Cir. 2003) (similar); *In re Cabletron Sys., Inc.*, 311 F.3d 11, 24 (1st Cir. 2002) (relying on global estimates of misstated revenues coupled with a few specific examples). Indeed, one of Defendants' cases suggest the same: "the exact amount of money reflected [] *is not relevant* [as] what is relevant *is the role of these reports in perpetuating the alleged wrongdoing and the role of these reports in the Defendants' decision-making process*." *Konkol v. Diebold, Inc.*, 590 F.3d 390, 400 (6th Cir. 2009).

The Complaint does the same. Relying on FE 1, the Complaint alleges that but for the manipulations, WPG would report on average that yields were only 50% of what they disclosed. ¶120. %. FE 1 gives more particulars. FE 1 reports that in calculating yields, WPG improperly

included  $20-50 million for projects approved in any given two-year period. *Id.* The Complaint specifies the impact each trick had in inflating the revenues that were reflected in yield disclosures. For example, for projects approved in any two-year period, the yields reflected inflated annual revenues of:  $5-10 million by double-counting co-tenancy cures (¶136); up to $10 million from speculative tenants (¶162); $4-5 million by failing to take a provision for non-credit tenants. (¶171). The Complaint then provides representative examples (¶119) of instances in which Defendants used the tricks to inflate revenues or understate costs:

- Defendants reported that the total cost of redeveloping Southern Park was $16-18 million with a project yield of 7-8%, though the total costs neared $30 million and yields were "sub 4%". ¶131.

- Defendants reported the Town Center at Aurora's project's total costs and yield were $21-23 million and 5-6% while internally estimating they were $24.9 million and 2.04%. ¶149.

- Defendants reported the Polaris project's yield was 4-5%; internally, they admitted it was only 1.92%. ¶158.

The Complaint also explains how even the Investment Committee yield numbers failed to include certain costs and revenues that were relevant to the project but not relevant to the Investment Committee's decision to approve it. WPG did not consider the $5.5 million it had already spent purchasing the Polaris project land because they were sunk costs. ¶¶180-82. But the publicly disclosed costs and yields purportedly "total estimated project costs", even if they had already been incurred. Defendants asserted the Mall at Johnson City would cost $14-16 million with returns of 5-6%, but 39% of revenues were identified as "Revenue – Speculative". ¶¶153, 155. While Defendants might consider these additional revenues in approving the project, they

22

told investors yields did not include such indirect adjacencies. Had Defendants followed the formula they professed, they would have reported yields of 3-4%.[12]

Defendants claim the misstatements are immaterial because the projects were immaterial to WPG's overall finances, Def.Br. 19, but they ignore that the projects are representative examples. In *Daou*, the plaintiffs alleged that the defendants had engaged in a scheme to recognize revenues in violation of accounting standards. 411 F.3d at 1019. The plaintiffs provided examples of transactions showing a few quarterly reports during the year-and-a-half class period were materially misstated. *Id.* at 1019-20. Because the complaint "indicate[d] that these practices allegedly occurred systematically throughout the class period", the court found that the defendants had made false statements even in quarters where the plaintiffs could not point to specific facts showing financial results were overstated. *Id.* at 1120.[13] Thus, just as in *Daou*, the FE 1's global statements support an inference that the projects Plaintiffs cite are material ***because they are representative of Defendants' misstatements.***[14]

Further, "[m]ateriality has both a quantitative and a qualitative component, and it is error to rely exclusively on a single numerical or percentage benchmark to determine materiality." *Weiner v. Tivity Health, Inc.*, 528 F. Supp. 3d 795, 808 (M.D. Tenn. 2021). The Supreme Court has similarly held that bright-line rules like those Defendants suggest "'artificially exclud[e]"

---

[12] With these details, Defendants' assertion that "Plaintiffs simply guess as to how much [] WPG purportedly overstated yield for the" projects (Def.Br. 42-43) is baffling

[13] In *Hoffman v. UBS-AG*, 591 F. Supp. 2d 522, 535 (S.D.N.Y. 2008), the reference to "1%" was to the size of the broker's commission; it had nothing to do with whether the misstatement was material.

[14] In *In re Segue Software, Inc. Sec. Litig.*, 106 F. Supp. 2d 161, 171 (D. Mass. 2000), the misstatements were "nonsystemic" and there was no reason to think they were anything other than mistakes. In *Glassman v. Computervision Corp.*, 90 F.3d 617, 633-34 (1st Cir. 1996), the company did not have to disclose a small underperformance in its ongoing quarter. It is irrelevant.

23

information that 'would otherwise be considered significant to the trading decision of a reasonable investor.'" *Matrixx*, 563 U.S. at 40 (declining to adopt rule requiring statistical significance). For example, a misstatement is more likely to be qualitatively material if, as here, it "arises from an item capable of precise measurement." *Staff Acct. Bull. No. 99*, Release No. 99 (Aug. 12, 1999). In internal documents, WPG measured yield to the hundredth of a percent. Further, the misstatements "concern[ed] a segment or other portion of the registrant's business that has been identified as playing a significant role." *Id.* To investors, Defendants staked WPG's future on successfully and profitably redeveloping its malls. ¶¶88-95. Finally, misstatements that result from management's deliberate systematic fraud are especially concerning to investors. *In re Cabletron Sys., Inc.*, 311 F.3d 11, 35 (1st Cir. 2002).

In any case, as further set out above, that Yale and Indest made misstatements ***because they wanted to mislead investors*** shows they were material. *Noto*, 35 F.4th at 106.

4.      *Yield estimates are not forward-looking statements*

That a statement "concerns an event in the future [] alone does not automatically make [it] forward-looking". *Dougherty*, 905 F.3d at 983. "The critical inquiry in determining whether a statement is forward-looking is whether its veracity can be determined at the time the statement is made[.]" *Id.* A statement that a company will not need to complete a particular trial for FDA approval was not forward-looking because the company attributed the claim to "FDA feedback." *Id.* at 976. Rather, it was a "backward-looking statement concerning a future event." *Id. See also Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 346 F. Supp. 3d 473, 506 (S.D.N.Y. 2018) (though only time will tell whether a debtor will default, a statement about that debtor's creditworthiness is a statement of present fact); *In re Reliance Sec. Litig.*, 91 F. Supp. 2d 706, 721 (D. Del. 2000) (though a company must wait until loan losses are actually incurred before it can determine

24

whether its loan loss provision was sufficient, its reserves "are directed to the then-present state of the Company's financial condition.").

In asserting the statements are forward-looking, Defendants conflate the yield with WPG's ability to achieve it. Yields are not estimates of projects' returns. If they were, WPG "wouldn't develop." ¶97. They are, as Conforti put it, "numerator/denominator" calculated from current data. ¶261.[15] Whether WPG later achieves the yield is a different question,[16] just as a company's statement that it is "on track" in pursuing a business plan is a statement of present fact, regardless of whether the company ever achieves it. *La. Sheriffs' Pension & Relief Fund v. Cardinal Health, Inc.*, 2021 WL 4397946, at *12 (S.D. Ohio Sept. 27, 2021); *Strougo v. Tivity Health, Inc.*, 551 F. Supp. 3d 839, 848 (M.D. Tenn. 2021). Even Defendants' case *In re EveryWare Glob., Inc. Sec. Litig.*, 175 F. Supp. 3d 837 (S.D. Ohio 2016), *aff'd sub nom.* 849 F.3d 325 (6th Cir. 2017) holds as much. *Id.* at 855. Thus, yield, as Defendants used the term, is a "backward-looking statement concerning a future event." *Dougherty*, 905 F.3d at 983.

---

[15] Indeed, Defendants' statements were even phrased in the present or past tense. ¶255 ("things that we've accomplished during 2017 include [projects] with an estimated return on invested capital of 10%"); ¶259 ("[c]urrent redevelopment [has] an estimated return on invested capital of 10%").

[16] Both *Pension Fund Grp. v. Tempur-Pedic Int'l, Inc.*, 614 F. App'x 237, 243 (6th Cir. 2015) and *In re Kindred Healthcare, Inc. Sec. Litig.*, 299 F. Supp. 2d 724, 735 (W.D. Ky. 2004) concern metrics for which there is no formula (earnings guidance in *Tempur-Pedic*, accounting reserves in *Kindred*), because the metrics are therefore pure predictions about the future. Further, *Kindred* conflates estimates with whether the company achieves them, contradicting the majority of cases. *W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, 2015 WL 3755218, at *18 (E.D. Pa. June 16, 2015)("Statements about loss reserves and their adequacy are not per se forward-looking."); *Winslow v. BancorpSouth, Inc.*, 2011 WL 7090820, at *18 (M.D. Tenn. Apr. 26, 2011), *report and recommendation approved*, 2012 WL 214635 (M.D. Tenn. Jan. 24, 2012)(same). And the Sixth Circuit recognized in a case Defendants cite "the court in [*Harris v. Ivax Corp.*, 182 F.3d 799, 805-06 (11th Cir. 1999)] conclude that a list must be treated as a whole when the allegation was that the list itself misled investors by omitting certain relevant factors [and is inapplicable when] [t]he statement at issue is not a list." *Miller*, 346 F.3d at 679.

5.      *Defendants' Cautionary Statements Were Not Meaningful*

Even if Defendants' statements had been forward-looking, the cautionary language they employed was not meaningful. "[C]autionary statements must be substantive and tailored to the specific future projections, estimates, or opinions [] which the plaintiffs challenge." *Helwig*, 251 F.3d at 559. They must describe the actual risks the company faces. *In re FirstEnergy Corp. Sec. Litig.*, 316 F. Supp. 2d 581, 596 (N.D. Ohio 2004). A blanket statement that the company might be affected by legislation was not meaningful. *Helwig*, 251 F.3d at 559.

Defendants point to cautionary language that warned generically that WPG might not "achieve" the yields it disclosed or that yields might "change". Def.Br. 36. That is true of literally every project:  the safest-seeming project might fail to achieve its goals. Because it is inherently true that WPG's redevelopment projects might not achieve their goals, the warning is no more concrete than *Helwig*'s, 251 F.3d at 559. Indeed, the warnings in *Tempur-Pedic*, 614 Fed. App'x at 243-44, which Defendants cite, only highlight the inadequacies of Defendants' cautionary statements: there, the defendants identified the precise product and competitor that ultimately led to the company's poor performance.

Moreover, "[i]f the language has not changed over time to 'reflect new information and new risks,' the language 'may be boilerplate.'" *Gormley v. Magicjack Vocaltec Ltd.*, 220 F. Supp. 3d 510, 515 (S.D.N.Y. 2016); *accord In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*, 2020 WL 1479128, at *17 (E.D. Pa. Mar. 25, 2020). Quarter after quarter for the three-year Class Period, even through COVID, WPG issued the same boilerplate "warnings".

Third, "cautionary language cannot be "meaningful" if it is "misleading in light of historical fact[s]". *In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 102 (D.C. Cir. 2015); *accord Weiner v. Tivity Health, Inc.*, 365 F. Supp. 3d 900, 912 (M.D. Tenn. 2019). "[N]o degree of cautionary language will protect material misrepresentations or omissions where defendants

26

knew their statements were false when made." *Milman v. Box Hill Sys. Corp.*, 72 F. Supp. 2d 220, 231 (S.D.N.Y. 1999); *Indiana Pub. Ret. Sys. v. AAC Holdings, Inc.*, 2021 WL 1316705, at *14 (M.D. Tenn. Apr. 8, 2021) (no forward-looking statement protection "because Defendants were aware, at the time the statements were made, that the facts stated were, at best deceptive and misleading.").

Here, Defendants knew the yield estimates they disclosed were misrepresentations because Defendants had manipulated them. As this Court has held, "it would defeat the securities laws if parties could escape liability for their own deliberate misrepresentations by inserting boilerplate disclaimers" like those Defendants use to excuse their fraud. *In re Nat'l Century Fin. Enterprises, Inc., Inv. Litig.*, 541 F. Supp. 2d 986, 1005 (S.D. Ohio 2007).[17]

> 6. *Even If Defendants' Statements Had Been Opinions, They Are Subjectively False and Objectively Misleading*

Opinions are actionable if, as relevant here, the speaker does not hold them or if it "conveys facts about how the speaker has formed the opinion" that are materially incorrect. *Omnicare*, 575 U.S. at 188. Taken as opinions, Defendants' statements were subjectively false because Defendants did not believe them. Instead, Defendants deliberately manipulated internal yield reports to generate the yields they disclosed to the public. And even if Defendants had convinced themselves that the yields they manipulated were accurate, their reporting would still be misleading because they did not disclose how they had been calculated and that WPG's internal numbers were materially lower.

---

[17] The statements are not even identified as forward-looking. Rather, the introduction to the 24-page supplemental report informed the reader that "[s]ome of the information contained in this presentation includes forward-looking statements." Which information? Which statements? What does it mean for information to "include" forward-looking statements? Defendants provided no answers. Ex. 1 at PAGEID # 910.

### 7.    *None of Defendants' Statements Are Puffery*

Puffery refers to loosely optimistic statements that are immaterial because they are too vague to induce a reasonable investor's reliance. *Jackson Cnty. Employees' Ret. Sys. v. Ghosn*, 510 F. Supp. 3d 583, 613 (M.D. Tenn. 2020). Puffery "includes predictions and matters of opinion not capable of objective verification". *Louisiana Sheriffs*, 2021 WL 4397946, at *5. The Sixth Circuit has cautioned that "the federal judiciary has a limited understanding of investor behavior and the actual economic consequences of certain statements[.]" *Ghosn*, 510 F. Supp. 3d at 613 (quoting *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 472 (6th Cir. 2014)). So courts rarely grant motions to dismiss on grounds that statements are immaterial, "generally reserv[ing] such questions for the trier of fact." *Helwig*, 251 F.3d at 563.

Courts determine whether statements are puffery through their context, not by examining individual words or phrases. "What might be innocuous 'puffery' or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation." *Louisiana Sheriffs*, 2021 WL 4397946, at *5 (quoting *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 672 (6th Cir. 2005)). "Novel" might be puffery in a car commercial, but not in a patent application.

Yet Defendants sever statements from their context. They argue that individual sentences and phrases are puffery, but these are actually fragments of longer statements.  Def.Br. 40-41. For example, the statement Defendants cut into their second through fourth bullet points (with the language omitted from the bullet points bolded) is:

> [W]e are extraordinarily rigorous pursuant to our investment methodology. And there is no wink and a nod. ***There is a [sic] no taking indirect adjacencies that we are going to pick up a x-% just because.*** It's very methodical, our approach.

¶263.

28

As the sentence Defendants omit makes clear, the statement makes concrete representations that yields do not include speculative revenues. They are "extraordinarily rigorous" (i.e. restrained) in what they include, and they apply their approach "methodical[ly]". Thus, Defendants are telling investors they can be confident that yield is a conservative figure that does not include any speculation. All of Defendants' other cut and paste jobs similarly transform the meaning of the statements they seek to dismiss.[18]

Nor are Defendants' yield estimates puffery. Statements "that can be proven or disproven using standard tools of evidence" are not puffery. *Ghosn*, 510 F. Supp. 3d at 613. Moreover, even puffing statements can become material if they are knowingly false or misleading. *Helwig*, 251 F.3d at 560 ("[T]he protections for soft information end where speech begins.").  Put differently, "[c]ompanies can control what they have to disclose under [the securities laws' anti-fraud provisions] by controlling what they say to the market." *Matrixx*, 563 U.S. at 45.

By providing misleading yield estimates, Defendants violated their obligation to ensure that the statements they did make were true and not misleading. There was nothing vague about the statements. They had specific dollar values and percentages attached.[19] And the "tools of

---

[18] Defendants cut ¶261 (highlighting the language Defendants omitted from their brief): "***We're actually seeing quantified at about 9.5% return, that's a direct as [Defendant Yale] will point out, a direct return on invested capital.*** We don't kind of play around with the fluffiness ***of, okay, an unproductive space is going to pick up another 100 basis points or 200 basis points of return. It's numerator/denominator. When we embark upon the development and that development is vastly leased,*** we're not in the speculative redevelopment business." The portions of the statements Defendants assert are puffery describe the portions they cut from the statement. In ¶265, Defendant Yale was responding to Defendant Conforti's statement that "if it was univariate, if the idea of the only return we were ever going to get was 9% or so based upon our development, we would—we wouldn't develop." In ¶267, Defendants Yale and Conforti were claiming that redevelopment was "by far the best use of capital for us right now" ***because*** WPG got 8-9% of direct returns. *Id.*

[19] The cases Defendants cite merely show that not all statements about the future are actionable. A statement that a market will grow between 10-30% "over the next few years" shows great uncertainty because the speaker describes the market and not the company, is vague as to time (it makes a difference whether it is two years or five) and uses a 20% range on an estimate whose

29

evidence", will suffice to show that Defendants did not follow their publicly-disclosed formula in estimating yield and costs, did not believe them (Indest and Yale admitted as much), and arrived at them in a way materially different than what a reasonable investor would have assumed. Thus, the statements are not puffery.

       8.     *FE 1 is reliable*

"[P]laintiffs may rely on confidential witnesses if they plead facts with sufficient particularity to support the probability that a person in the confidential witness's position would possess the information alleged." *Bond v. Clover Health Invs., Corp.*, 2022 WL 602432, at *17 (M.D. Tenn. Feb. 28, 2022) (quoting *Doshi v. Gen. Cable Corp.*, 823 F.3d 1032, 1037 n.2 (6th Cir. 2016)). As Defendants acknowledge, "confidential witness testimony [is] helpful" if it is specific. Def.Br. 29. In evaluating witness's reports, courts consider the "position(s) held, the proximity to the offending conduct and the relevant time frame." *Chamberlain v. Reddy Ice Holdings, Inc.*, 757 F. Supp. 2d 683, 704 (E.D. Mich. 2010). Courts also consider, among other things, "the level of detail provided by the confidential witnesses [and] the corroborative nature of the other facts alleged." *Id.* The FE 1 allegations are extraordinary on all these metrics.

---

midpoint is 20%. *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 289 (4th Cir. 1993). *Picard Chem. Inc. Profit Sharing Plan v. Perrigo Co.*, 940 F. Supp. 1101 (W.D. Mich. 1996) is worthless as persuasive authority because it does not quote or summarize the statements, *id.* at 1122, or even suggest what topic they pertained to. *Id.* at 1113 (excluding puffery paragraphs from summary of false statements). And *In re Metris Companies, Inc. Sec. Litig.*, 428 F. Supp. 2d 1004, 1011 (D. Minn. 2006), which Defendants cite, held that earnings guidance—a paradigmatic forward-looking statement—was material. *City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 129 F. Supp. 3d 48 (S.D.N.Y. 2015) does not hold that statements of opinions are inactionable—which would be inconsistent with *Omnicare*—but instead that the plaintiffs did not identify any facts either showing that the defendants' did not believe their opinions or presenting a materially misleading picture as to their bases. *Id.* at 75-77. For example, the plaintiffs did not allege that the defendants' practices were contrary to those of the industry or their own statements, both of which Plaintiffs do here. *Id.* at 76-77.

Former employee allegations are usually strong evidence of scienter if they report a few discussions with the defendants about the facts underlying the fraud. *Id.* at 705; *Halford v. AtriCure, Inc.*, 2010 WL 8973625, at *16 (S.D. Ohio Mar. 29, 2010). FE 1 attended all the relevant meetings and was involved in both the Investment Committee and manipulation meetings. He had a eagle's eye-view of the fraudulent scheme and every Defendant's role therein.

Second, the facts FE 1 relate give a minute account of Defendants' misconduct. FE 1 reports specific line items on specific projects, how those line items were treated, how they should have been treated, the dollar and yield percentage value of the impact, and the process by which these line items became misstated. FE 1 reports statements made to him or in his presence.

Finally, WPG's own documents corroborate FE 1's statements. The Complaint cites internal emails and spreadsheets (¶¶133, 180), Investment Committee Minutes (¶¶139, 151, 155, 158) and a contract with a specific tenant (¶168) that all back up FE 1's claims.[20]

Defendants' attacks on FE 1 are desultory. Defendants maintain that FE 1's account is not reliable because FE 1 is purportedly not sufficiently sophisticated "to opine on the facts [FE 1] espouses," or "guesses" or "speculates" about certain numbers. Def.Br. 28, 33, 39, 42. But FE 1 does not "opine", "guess", or "speculate": FE 1 reports specific practices and the impact those practices had on project yields. FE 1 had access to all the information needed to calculate the overstatement: FE 1 orchestrated the Investment Committee Meetings and attended the manipulation meetings at which approved projects' yields were overstated. Thus, FE 1's estimate is a summary of FE 1's experience. In contrast, nearly all the cases Defendants cite involved

---

[20] Defendants take issue with the introduction's reference to a "participant" to the February 2020 manipulation because FE 1 had not yet been introduced. Whatever the merits of Defendants' literary criticism, the Complaint makes clear that the "participant" is FE 1. ¶116.

witnesses whose positions offered them only a small view of the scheme,[21] or who offered only vague information,[22] or both. For example, in *Everyware*, 175 F. Supp. 3d at 852, the former employee related that the sales projections he suggested were "significantly" lower than those the company adopted. *EveryWare* found that the plaintiffs could have provided specific facts, such as why the witness's projection was lower and by how much, and how the witness who was also only in charge of a narrow segment of the company's operations knew anything about the company's global operations. *Id.* The Complaint does not merely do better, it provides **all** the information *EveryWare* suggested, with specific dollar figures, percentages, projects, and meetings.

With little to attack in FE 1's extraordinarily specific account, Defendants assert that the allegations that Yale told FE 1 that WPG was deliberately inflating yields to maintain investor confidence, including in or around February 2020, is not sufficiently particularized. Def.Br. 39.

---

[21] *In re AT&T/DirecTV Now Sec. Litig.*, 2020 WL 4909718 (S.D.N.Y. Aug. 18, 2020)(plaintiffs relied on the accounts of a few low-level sales associates who could not possibly know whether their own improper sales practices were systematic, given that AT&T had 260,000 employees); *City of Omaha v. CBS Corp.*, 2011 WL 2119734, at *9 (S.D.N.Y. May 24, 2011), *aff'd sub nom.* 679 F.3d 64 (2d Cir. 2012) (similar); *In re Diebold Sec. Litig.*, 2008 WL 3927467, at *7 (N.D. Ohio Aug. 22, 2008), *aff'd sub nom.* 590 F.3d 390 (6th Cir. 2009) ("Most of the statements from the CWs do not appear to be based on personal knowledge."); *In re Coty Inc. Sec. Litig.*, 2016 WL 1271065, at *10 (S.D.N.Y. Mar. 29, 2016) (second-hand statement from witness not in relevant area of company's business insufficient); *In re Keithley Instruments, Inc. Sec. Litig.*, 268 F. Supp. 2d 887, 898 (N.D. Ohio 2002)("[T]he [plaintiffs] identify their sources merely as 'former employees,' without even hinting whether they are managers, secretaries, or production line worker.")

[22] *Diebold*, 2008 WL 3927467, at *5 (witness does not explain the contents of meetings that supposedly gave defendants information contradicting their statements); *Coty*, 2016 WL 1271065, at *6 ("Generic allegations" that company was "struggling" insufficiently particular). *Keithley*, 268 F. Supp. 2d at 899 ("[T]here are no particularized allegations explaining *how* or *to what degree* any of the alleged problems at [defendant] caused a decrease in sales or earnings.")

But complaints need not allege every detail. So long as nothing rides on the specific date on which the defendant made the admission, it is sufficient for a witness to report the month on which the admission was made. *City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 369 (S.D.N.Y. 2012) (sufficient to allege statements made "in or around February 2009"); *Mandalevy v. Bofi Holding, Inc.*, 2021 WL 794275, at *7 (S.D. Cal. Mar. 2, 2021) ("in or around March 2016"). Whether Yale told FE 1 that disclosing true yields would cause investors to lose confidence in WPG on February 1 or February 28, or even March 30 or January 1, he still said it during the Class Period concerning practices he and the other Defendants had been engaging in since long before.

9.      *Defendant' Statements About Covenants Are False and Misleading*

"[T]he veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers." *Winslow*, 2011 WL 7090820, at *16 (quoting *Operating Loc. 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92 (2d Cir. 2010)). In determining whether a statement is misleading, its "context [] is often telling". *Bridgestone*, 399 F.3d at 672.

In *Bridgestone*, the defendants stated that "objective data" supported their "belief that [tires it sold] are high-quality, safe tires." *Id.* In the same opinion, the Sixth Circuit dismissed similar statements as puffery, and the addition of "objective data", in itself, was vague. *Id.* at 670-72. What made the statement actionable was that it came on the heels of product liability lawsuits and a safety groups' request that a manufacturer recall vehicles containing the tires at issue. *Id.* at 672. Because of that context, the reference to "objective data" could be interpreted as a statement that the objective data did not support liability or a recall. *Id.*

COVID drew investors' attention to mall operators' liquidity. At that time, WPG had covenants limiting leverage on all of its debt, including its bonds. ¶223. Defendants had told

33

investors they were renegotiating their debt to loosen all indebtedness covenants. ¶224. Defendants renegotiated the covenants on most of WPG's debt, but not its bonds. ¶238. As a result, WPG could not raise the money it needed to weather the pandemic. *Id.*

Yet in August 2020, they disclosed amendments to WPG's debt that "should provide us with a bridge to the other side of the pandemic" because it could now "maintain compliance with our *modified credit facilities and bond covenants* for the foreseeable future." ¶277. Yale's statement was misleading because it implied WPG had modified its bond covenants. Then, on September 15, Defendant Conforti added that relief came from "our banking partners *throughout the capital structure*", a fact so important he immediately repeated it. ¶279. Conforti's statements are misleading not because he claimed WPG's bankers and debt partners had expressed "confidence", but because he claimed the confidence came from *all* WPG's bankers and debt partners. Just as the clamor for recalls meant the *Bridgestone* defendant's statement was a response that no recall was necessary, by linking the bankers' and debt partners' confidence to covenant relief, Conforti misleadingly suggested that WPG had obtained covenant relief for all of its debt. Thus, Defendants' statements were "backward-looking statement[s] concerning a future event." *Dougherty*, 905 F.3d at 983.

Indeed, one of Defendants' arguments reinforces the point. They argue that WPG could have succeeded in renegotiating the bond covenants, and in fact tried to. Def.Br. at 32-33. For exactly this reason, when Defendants suggested that WPG had obtained covenant relief from all its bankers and creditors, reasonable investors could have assumed it obtained relief on its bond covenants.

Defendants' remaining arguments lack merit because they ignore the Complaint's allegations. They claim they did not guarantee WPG would survive COVID; well, yes, but the

34

Complaint alleges that they misleadingly stated that they had addressed WPG's bond covenants. They argue that a statement that a company had "flexibility" is puffery. But while flexibility is the upshot of renegotiating all WPG's covenants, the statements are misleading because they say that all WPG's covenants had been renegotiated.[23]

Defendants also argue that Conforti's statements about "banking/debt partners" "throughout the capital structure/stack" cannot be misleading because he was answering a question about a particular modification. Def.Br. 32. Speakers frequently go beyond the scope of a particular question to make a broader point. Indeed, here, Conforti made statements touting WPG's redevelopment and claiming that it was "the logical aggregator in this business", ¶237, neither of which has anything to do with one particular transaction.[24]

---

[23] None of Defendants' cases concerned statements that included concrete descriptions of the present. In *Indiana State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc.*, 583 F.3d 935, 943 (6th Cir. 2009), the Sixth Circuit held that a statement that the company had a "growth outlook" was puffery, a banality that says nothing about the present and little about the future. An executive's statement that he was "100% confident" of FDA approval referenced the executive's own subjective belief ("confidence"), did not purport to rely on undisclosed facts, and as that FDA approval is never certain, is too hyperbolic to be a concrete statement of fact. *In re Sona Nanotech, Inc. Sec. Litig.*, 562 F. Supp. 3d 715, 725 (C.D. Cal. 2021). A company's statement that it would in the future exercise "fiscal discipline" was a mere generalization about its strategy and not a guarantee that it would maintain the strategy or exercise good judgment in the future. *Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*, 153 F. Supp. 3d 628, 648-50 (S.D.N.Y. 2015). A company's claim that its balance sheet was strong "based on current expectation" made in early 2008 was not false just because the Great Recession dashed the company's expectations. *Gissin v. Endres*, 739 F. Supp. 2d 488, 512 (S.D.N.Y. 2010).

[24] *Furher v. Ericsson LM Tel. Co.*, 363 F. App'x 763, 764 (2d Cir. 2009) is a two-page decision. The much more detailed district court opinion shows that the defendants' prepared statement and the slides the defendant was presenting themselves showed that the plaintiffs had misinterpreted the allegedly false statement. Slip Opinion, at 10-13 (Horne Dec. Ex. 2). Here, Conforti's statements by their terms went beyond the question asked of him.

35

## C. The Complaint Alleges that Defendants Engaged In a Scheme To Defraud In Violation of SEC Rules 10b-5(a) and 10b5-(c)

SEC Rule 10b-5, which underlies Plaintiffs' primary claims, "capture[s] a wide range of conduct", as it must, because it "intended to root out all manner of fraud in the securities industry." *Lorenzo v. Sec. & Exch. Comm'n*, 139 S. Ct. 1094, 1104 (2019). Thus, in addition to sanctioning fraudulent statements, Rule 10b-5 prohibits using "any device, scheme, or artifice to defraud" or "engag[ing] in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person," referred to as "scheme liability". 17 C.F.R. § 240.10b-5(a), (c).

The Complaint alleges that Defendants "engaged in a plan, scheme, conspiracy, and course of conduct [] which operated as a fraud and deceit upon Plaintiffs and the other members of the Class." ¶293.[25] Yet Defendants did not move to dismiss Plaintiffs' scheme liability claims even though they cited *Indiana Public Retirement System*, 2021 WL 1316705, where the court found that the defendants waived a challenge to scheme liability by ignoring substantially similar allegations. *Id.* at *4 (plaintiffs sufficiently raised scheme liability theory by alleging the defendants "employ[ed] devices, schemes and artifices to defraud[.]". Thus, Defendant have waived any challenge to the Complaint's scheme liability allegations. *Id.*

In any case, the Complaint states a claim for scheme liability. While the Sixth Circuit has not defined the elements of scheme liability, *Strougo v. Tivity Health, Inc.*, 2022 WL 2037966, at *10 (M.D. Tenn. June 7, 2022), courts within the Sixth Circuit have found that its elements parallel those of Rule 10b-5(b), except that the plaintiff must plead a "deceptive of manipulative act". *Firstenergy Corp.*, 2022 WL 681320, at *8.  And even under the most restrictive test applied in this circuit, the plaintiff need only "specify with particularity 'what deceptive or manipulative acts

---

[25] Plaintiffs commonly plead all SEC Rule 10b-5 claims in the same count. *Firstenergy Corp.*, 2022 WL 681320, at *7.

36

were performed, which defendants performed them, when the acts were performed, and the effect the scheme had on investors in the securities at issue.'" *Teamsters Loc. 237 Welfare Fund v. ServiceMaster Glob. Holdings, Inc.*, 2022 WL 989240, at \*14 (W.D. Tenn. Mar. 31, 2022).

The Complaint pleads scheme liability under this standard because it alleges:

- "what deceptive or manipulative acts were performed" (manipulating yields and reporting them to investors);

- "which defendants performed them" (Yale and Indest performed the manipulations, and all Defendants presented the yields to investors);

- "when the acts were performed" (the yields were manipulated after projects were approved and reported to investors after being manipulated); and

- "the effect the scheme had on investors in the securities at issue" (convincing investors that WPG was thriving despite closures of middlebrow stores through redevelopment, thus increasing its stock price).

The Supreme Court has held that scheme liability attaches to persons who "disseminate false or misleading statements to potential investors with the intent to defraud." *Lorenzo*, 139 S. Ct. at 1099.  After *Lorenzo* "many [] courts have found that scheme claim liability can be based upon misrepresentations or omissions and not just deceptive acts." *Strougo*, 2022 WL 2037966, at \*10 (and describing such an interpretation as a "growing trend"). Yet even if some deceptive conduct independent of misstatements were still required after *Lorenzo*, *contra Strougo* and the cases it cites, the Complaint alleges such conduct. When Defendants "over time, work[] extensively" "with the deliberate aim of boosting" stock price, the Complaint alleges a scheme. *Swack v. Credit Suisse First Bos.*, 383 F. Supp. 2d 223, 239 (D. Mass. 2004); *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1194 (D. Or. 2015) (efforts to boost stock price

37

through third-party stock promotion was a scheme). Here, Defendants spent four years touting redevelopment as WPG's answer to the retail apocalypse while conspiring to overstate yields to pretend the redevelopment was working. To support their manual adjustments, Yale and Indest created a second set of materially inconsistent books. The creation of such records is a deceptive act. *S.E.C. v. City of Miami, Fla.*, 988 F. Supp. 2d 1343, 1351 (S.D. Fla. 2013) (preparation of misleading financial documents a deceptive act). Further, Defendants signed leases and then issued the tenants nearly interest-free loans, or made equity investments, so the tenants could pay their rent with WPG's money. ¶168. Such round trip transactions are deceptive acts. *S.E.C. v. Hopper*, 2006 WL 778640, at *11 (S.D. Tex. Mar. 24, 2006).

## D. The Complaint Sufficiently Alleges Scienter

To evaluate scienter allegations, courts must accept the alleged facts as true and consider "whether **all** of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23 (emphasis in original). An inference of scienter "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 324. Rather, scienter may be pled even when reasonable, nonculpable inferences exist. *Id.* at 325. A complaint will survive a motion to dismiss "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference." *Id.* at 324. Scienter may take the form of "[1] knowing and deliberate intent to manipulate, deceive, or defraud, [or] [2] recklessness." *Frank*, 646 F.3d at 958-59 (citation omitted).[26]

---

[26] Defendants maintain that establishing accounting fraud requires "extreme 'in your face facts' that 'cry out' scienter". *Loc. 295/Loc. 851 IBT Emp. Grp. Pension Tr. & Welfare Fund v. Fifth Third Bancorp.*, 731 F. Supp. 2d 689, 724 (S.D. Ohio 2010). In fact, that was how courts in the Sixth Circuit determined the strength of an inference of scienter when all the plaintiff had were accounting violations without any other facts supporting scienter, such as internal

38

The Sixth Circuit cites a "non-exhaustive list of factors" that do not necessarily establish scienter but are "usually relevant" to its analysis ("*Helwig* Factors"). *Id.* at 959 n.2. Yet the Court examines these allegations holistically. *Id.* at 961 ("Our former method of reviewing each allegation individually before reviewing them holistically risks losing the forest for the trees[.]").

This is a classic case of saying one thing internally and telling investors something completely different. At Investment Committee Meetings, Defendants approved specific projects at specific yields. Each Defendant approved all of the projects. Then, after the Investment Committee Meetings, Yale and Indest held meetings in which they manipulated project yields. The manipulated yields were materially higher than the approved yields; globally, the manipulated yields overstated WPG's financial condition by material amounts. Defendants communicated the manipulated yields, but not the true yields, to the public.

If there were any doubt concerning scienter, Yale's and Indest's own admissions settle it. Yale told FE 1 that accurately disclosing yields would reveal to investors that WPG could not complete profitable redevelopment projects; Indest started a manipulation meeting by acknowledging that "we can't disclose this level [of yield]." There is nothing to "infer": Defendants admitted their culpability. [27]

Further, as to all Defendants including Conforti, this is an extraordinarily clear case of a "divergence between internal reports and external statements on the same subject." *Dougherty*, 905 F.3d at 981. Investor scrutiny supports scienter, *Cardinal Health*, 426 F. Supp. 2d at 726, and here according to analyst, "one of the more frequent questions I get is" how WPG would evade

---

communications, as shown by the case *Local 295* relied on, *Konkol v. Diebold, Inc.*, 590 F.3d 390, 400 (6th Cir. 2009).

[27] Because Indest's statement was made at a manipulation meeting rather than an Investment Committee Meeting, it is an admission.

39

the retail apocalypse. ¶57. As Defendant Yale told investors, one of Defendants most important functions was to approve projects as members of the Investment Committee. The specificity and detail of, and amount of exposure to, the information received can support scienter. *Astec*, 29 F.4th at 813-14 (defendants' frequently discussing problem that was materially misstated support scienter). Defendants received detailed and "very specific" deal sheets that that provided them with exact dollar and percentage figures, to the hundredth of a percent, for the projects' costs and yield. And the Investment Committee Meetings were serious with many questions asked. ¶108. The importance of the information disclosed, the precision of the internal and external information, and the clear conflict between the two, amply support an inference of scienter. *Dougherty*, 905 F.3d at 981 (finding inference of scienter almost entirely based on divergence factor); *see also Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000) (scienter adequately alleged when defendant "knew facts or had access to information suggesting that [his] public statements were not accurate.").[28]

Defendants' competing inference is not plausible because it proceeds from erroneous premises. Def.Br. 45. The Investment Committee meetings and the subsequent meetings at which Yale and Indest manipulated yields were categorically different meetings. The latter did not reflect WPG's business judgment; Defendants, instead, were "solving to an answer". ¶112. Defendants' strawman argument ignores not just individual allegations but the Complaint's central thrust.

Further, because the Complaint alleges that at a minimum, Defendants received the information that conflicted with their public statements at Investment Committee Meetings, it

---

[28] In addition, the salaries and bonuses Defendants earned during they four-year scheme, including Conforti's $3.48 million and Yale's $0.96 million bonuses paid just before they initiated the steps that led to WPG's bankruptcy, provided them a "self-interested motivation [] in the form of saving their salaries or jobs." *Frank*, 646 F.3d at 962. Similarly, Defendants disregarded the most current information, the yields set out in the Investment Committee Memoranda, when they made their statements. *Dougherty*, 905 F.3d at 981. Finally, the small period of time between the approval of the projects and disclosure of their yields supports scienter.

*precisely* "identif[ies] specific data that contradicted the reported numbers, which Defendants had that data, when they had that data, or how each Defendant received that data." Def.Br. 46. As in *National Century*, the Complaint alleges what documents were available to Defendants (Investment Committee Meetings and Minutes), why they would have reviewed them (it was their job to, because they were three of the four individuals who had to approve the projects), and the documents would have told him (that the yields WPG disclosed were materially overstated compared to the yields he approved). 541 F. Supp. 2d. at 1003.[29]

In both *In re Comshare Inc. Sec. Litig.*, 183 F.3d 542, 553 (6th Cir. 1999) and *In re SCB Computer Tech., Inc. Sec. Litig.*, 149 F. Supp. 2d 334, 346-56 (W.D. Tenn. 2001), the plaintiffs argued that the magnitude and type of the accounting violation sufficed and did not plead any other facts supporting scienter. Because they had nothing else, the plaintiffs had to show that the violations were "so obvious that any reasonable" company officials would have noticed.

The Complaint also alleges that Defendants made the bond covenant statements with scienter. WPG spent months renegotiating its covenants. They were "a bridge to the other side of the pandemic." Having tried and failed to renegotiate the bond covenants, Defendants knew WPG had ***no*** borrowing capacity. Yet even in the face of these "extreme 'in your face facts' that 'cry out' scienter", Def.Br. 44, Defendants still told investors they had renegotiated all WPG's covenants. Defendants raise no argument to the contrary because they assert that the Complaint's theory is that Defendants guaranteed that WPG would weather the pandemic. Def.Br. 49.

---

[29] Complaints do not employ "group pleading" if they refer to "defendants" collectively, because group pleading refers to the practice of presuming that "false or misleading information is conveyed in prospectuses, registration statements, annual reports, press releases, or other 'group-published information,[] are the collective actions of the officers." *Bridgestone*, 399 F.3d at 689 (6th Cir. 2005). In any case, "[t]here is nothing improper about noting that one fact or rationale [] supports an inference of scienter with regard to two or more different individual defendants." *Bond*, 2022 WL 602432, at *26.

**E.  The Complaint Sufficiently Alleges that Indest Made False Statements and Participated in a Scheme to Defraud**

Under *Janus* "the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011). Though attribution within a statement is "strong evidence that [the] statement was made by [] the party to whom it is attributed", *id.* at 142-43, an unattributed statement is "made" by the corporate officers who drafted and approved it. *E.g. Puddu v. 6D Glob. Techs., Inc.*, 2021 WL 1198566, at *9 (S.D.N.Y. Mar. 30, 2021)(outsider who reviewed and approved SEC filings "made" statements contained therein); *In re Nat'l Century Fin. Enterprises, Inc., Inv. Litig.*, 2006 WL 469468, at *17 (S.D. Ohio Feb. 27, 2006) (attributing statements to corporate insider because plaintiffs alleged insider involved in drafting them); *cf. In re Nat'l Century Fin. Enterprises, Inc.*, 504 F. Supp. 2d 287, 296 (S.D. Ohio 2007) (declining to attribute offering memoranda to outside directors because plaintiff did not plead facts showing they assisted in preparing the memoranda).

Here, the false individual project-level yield statements appeared in unsigned and unattributed Supplemental Reports. To find the statements' maker, the Court must identify the individuals involved in drafting the statements. The Complaint alleges with particularity that Indest, working with Yale, made the manual adjustments and decided what numbers to report. Thus, like the *National Century* insider, Indest "had ultimate authority over the statement[s], including [their] content and whether and how to communicate [them]." *Janus*, 564 U.S. at 142.

Moreover, the Complaint sufficiently alleges Indest's scheme liability because she and Yale decided on and entered the manipulative "manual adjustments". *Firstenergy*, 2022 WL 681320, at *15-16 (upholding scheme liability claims against five defendants who never made a statement but oversaw scheme to bribe officials that was subject of false statements).

42

**F. The Complaint Sufficiently Alleges Loss Causation**

To adequately plead loss causation, a plaintiff need only "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind [] which is not meant to impose a great burden upon a plaintiff." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005); *accord Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 384 (6th Cir. 2016) ("*Freddie Mac*"). Loss causation allegations suffice if they are plausible. *Freddie Mac*, 830 F.3d at 384. Plaintiffs need not show that the disclosures were a mirror image of the concealed facts but only that "the **subject** of the fraudulent statement or omission was the cause of the actual loss suffered."  *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 261 (2d Cir. 2016) (emphasis in original).

Plaintiffs can allege loss causation by pleading that a corrective disclosure revealed defendants' fraud. *Freddie Mac*, 830 F.3d at 384-85. But plaintiffs can also allege that a fraudulent statement concealed a risk concealed by the fraudulent statement materializes. *Id.* In those cases, "'a misstatement or omission is the "proximate cause" of an investment loss if the risk that caused the loss was within the zone of risk **concealed** by the misrepresentations and omissions alleged by a disappointed investor.'" *Id.* (emphasis in original).

    *1.    The Complaint Sufficiently Alleges a Materialization of the Risk Theory As to the Yield Statements*

Materialization of the risk is adequately alleged when "the fraudulent statement that induced [the plaintiff] to invest can also be shown to have made her investment, in fact, ***more disposed to suffer the alleged harm [] than honestly described alternative investments.***" *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 186 (2d Cir. 2015).[30]

---

[30] In *Freddie Mac*, the Sixth Circuit adopted the materialization of the risk theory from the Second Circuit. 830 F.3d at 384. With a dearth of case law within the Sixth Circuit, courts have tended to

The materialization of the risk theory is commonly pled where a company faces a liquidity crisis or bankruptcy. For example, loss causation was adequately alleged when (a) a defendant made misstatements about the quality of a portfolio and (b) the portfolio collapsed in the 2008 Great Recession. *Id.* at 189. Similarly, unanticipated asset sales can serve as the materialization of the risk concealed by a false statement that a company has a "very strong balance sheet." *Vivendi*, 838 F.3d at 246. And if a company fraudulently invents a contract that will provide substantial revenues, a liquidity crisis can be the materialization of the risk that the revenues never existed. *Schleicher v. Wendt*, 529 F. Supp. 2d 959, 966 (S.D. Ind. 2007).

The Complaint alleges that Defendants' statements about yield concealed that WPG's malls were still decrepit, which risk materialized when the market learned that WPG had taken steps towards bankruptcy.[31] While many companies might build up a cash fund they can access in financial emergencies, REITs must distribute 90% of their income as dividends every quarter or lose their tax advantage. ¶40. Indeed, Funds From Operations, a critical REIT metric, removes interest income from cash flows because such income is a temporary aberration. ¶42 c. Instead, REITs turn to other sources to meet liquidity crises, chiefly debt financing and asset sales.

Defendants had long touted their ability to sell assets to raise the funds they needed for operations. Asked whether selling malls was an "option for future liquidity", Yale said "[o]f course" and Conforti added that "at the right price [] we are a seller of one asset or the entire company[.]" ¶205. Later, asked whether WPG could secure funding, Conforti emphasized that

rely on out-of-circuit cases. *E.g. Grae v. Corr. Corp. of Am.*, 2021 WL 1100799, at *22 (M.D. Tenn. Mar. 23, 2021).

[31] In a footnote, Defendants declare that the Complaint does not allege materialization of the risk. Def.Br. 16 n.9. They do not cite the Complaint, make any arguments, or otherwise explain the basis for their statement.

WPG had been contacted by an "impressive list" of institutional investors and always had available the "Faustian deal" of selling malls. ¶209.

Defendants' promises that WPG could liquidate assets for cash were illusory. Defendants' lies about yields concealed the risk that WPG's malls could not be resold for ready cash, whether during normal times or emergencies. ¶218. Thus, the risk that WPG's assets could not be sold in an emergency fell within the zone of risk concealed by their false statements.

COVID was a temporary emergency and the gap between the cash WPG needed to weather it and the cash it had on hand was modest. While WPG's cash flows from operations fell by $130.7 million from 2019 to 2020, WPG preserved $195.2 million in cash by cutting its dividend. ¶¶202-03. Even though it could not borrow any more funds, WPG should have been able to survive COVID by selling its newly-redeveloped malls.

COVID did not destroy the market for all malls. Instead, it sharpened existing differences between the markets for good and bad malls. ¶211.  While good malls could still be sold, bad malls were worth "land minus the costs of demolition." ¶217. Defendants' statements about yield gave investors the impression that WPG's redeveloped malls were precisely the prize assets that could be sold at reasonable prices during COVID.  But because those statements had been false, WPG could only sell them for their land value. ¶¶217-18.With no good malls to sell for operating cash, WPG had to enter into a costly bankruptcy. Investors suffered losses when WPG announced that it had failed to make a payment on its bonds and again when Bloomberg revealed that WPG was securing bankruptcy financing, the preparatory steps to its bankruptcy. ¶¶252-54.

Defendants' own statements show they reasonably could have foreseen, and did foresee, that overstating redevelopment yields would leave WPG with no assets to sell in a downturn, leaving WPG unable to respond to a liquidity crisis. Thus, investors lost money when one of the

45

risk concealed by Defendants' statements materialized. The Complaint sufficiently alleges loss causation.

Plaintiffs need only allege a plausible claim, not the most likely one, *Freddie Mac*, 830 F.3d at 388, and they need only show that the false statements were a substantial cause of their damages, not the only one. *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 233 (2d Cir. 2014). Thus, Defendants' claim that WPG's bankruptcy is due to COVID, not the risk concealed by their false statements about yields, does not show Plaintiffs' claims are implausible. Both COVID and Defendants' misstatements were necessary. COVID created a gap in WPG's operating cash but WPG filed for bankruptcy because it had no assets to sell to plug the gap, which Defendants' statements had concealed.  Loss causation is adequately alleged even when a company suffers significant setbacks not related to the fraud. *Schleicher*, 529 F. Supp. 2d at 967-68.

Similarly, Defendants argue that WPG's financial position was not so precarious and failing to make the bond payment and filing for bankruptcy were tactical decisions. It fails for the same reason: in evaluating loss causation, the court does not compare the strength of competing explanations. *Freddie Mac*, 830 F.3d at 388. Moreover, Defendants' explanation is implausible; companies with options do not usually choose bankruptcy as a first resort. And here, the mere act of filing for bankruptcy turned WPG into a guarantor of all its subsidiaries' mortgage which it could otherwise have walked away from. ¶¶247-48. And even if WPG had options other than bankruptcy, these options were bad *because* WPG had no assets to sell, so the explanation does not break the chain of causation.

The cases Defendants cite are inapposite. In *Indiana State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc.*, 583 F.3d 935, 945 (6th Cir. 2009), the

46

plaintiffs alleged that when the government raided a company for evidence of Medicare fraud, it implicitly revealed that the company's financial statements were misstated. The raid could not serve as a materialization of the risk of **false financials**, because the plaintiff alleged that the Medicare fraud caused the financial misstatements, not the other way around. Further, the theory was entirely speculative, rather than based in Defendants' own statements as in this case, and that the auditors continued to certify GAAP compliance undercut the plaintiffs' speculation, while WPG's bankruptcy supports Plaintiffs' theory. *Id.*[32]

*D.E.&J. Ltd. P'ship v. Conaway*, 133 F. App'x 994, 999 (6th Cir. 2005) was about giving notice to defendants sufficient to prepare a defense. That complaint pled that the stock price fell when the defendant filed for bankruptcy, but it did not make any attempt to link the stock price decline to the defendants' false statements. Defendants thus had no notice of what the plaintiffs' legal theory was. Because the Complaint alleges a legal theory, *Conaway* is inapposite. *Lentell* is inapposite for the same reason. 396 F.3d at 176.

2.      *The Complaint Sufficiently Alleges A Corrective Disclosure Theory As To the Bond Statements*

Defendants' misstatements about covenants gave investors the misleading impression that WPG had renegotiated its bond covenants. On November 6, 2020, Defendants corrected their misstatements: they admitted that not only had WPG not addressed the bond covenants, it was in

---

[32] *In re Almost Fam., Inc. Sec. Litig.*, 2012 WL 443461, at *12 (W.D. Ky. Feb. 10, 2012) predates *Freddie Mac* and the plaintiffs alleged that the defendants' scheme was revealed through newspaper articles rather an event. Defendants cite *Salvani v. ADVFN PLC*, 50 F. Supp. 3d 459, 476 (S.D.N.Y. 2014), *aff'd sub nom. Salvani v. InvestorsHub.com, Inc.*, 628 F. App'x 784 (2d Cir. 2015), but there, the court was merely recognizing that the plaintiffs had not alleged a materialization of the risk theory. *Wandel v. Gao*, 2022 WL 768975, at *7 (S.D.N.Y. Mar. 14, 2022) was not about loss causation. Instead, the court found that the defendants' statements were not misleading because they had no duty to set out a COVID-19 survival plan in mid-January 2020. It is completely irrelevant.

47

breach.  ¶241. WPG's stock price fell after the corrective disclosure. Thus, the Complaint pleads a simple classic corrective disclosure theory.

In arguing that there was no loss causation in connection with the covenants, Defendants divorce their statements from the context in which they were made. They assert that Defendants had warned before August 17 that they might not be able to negotiate full covenant relief. Def.Br. 22. Well, yes, but on August 17, Defendants claimed that they *had* obtained full relief. Thus, unlike in *KBC*, the Complaint "identif[ies] sufficiently new evidence that was revealed to the market." 572 F. App'x at 360.[33]

## IV.  THE COMPLAINT SUFFICIENTLY ALLEGES SECTION 20(a) CLAIM

As Defendants raise no other arguments in support of their motion to dismiss the Complaint, because it states a Section 10(b) claim, it also states a Section 20(a) controlling person claim. Moreover, the Complaint alleges controlling person claims against Defendant Indest. Thus, even if the Court finds that Indest did not make a statement, she should remain in this case as a controlling person defendant.

---

[33] Defendants cite a Fourth Circuit case, but that Circuit imposes a higher pleading standard (Rule 9(b)) on allegations of loss causation. *Katyle v. Penn Nat. Gaming, Inc.*, 637 F.3d 462, 471 (4th Cir. 2011)("The degree of specificity demanded is that which will 'enable the court to evaluate whether the necessary causal link exists.'"). In this Circuit, the plaintiff need merely plausibly allege a link. In any case, the issue in *Katyle* was that the plaintiff had not sufficiently shown that the true cause of a delay in approving a leveraged buy-out was the risk concealed (lenders balking) rather than the apparent cause (regulatory holdups). *Katyle*, 637 F.3d at 474-75. In *Gordon Partners v. Blumenthal*, 293 F. App'x 815, 817-18 (2d Cir. 2008), the plaintiffs did not attempt to show loss causation because they mistakenly believed it was not an element of their claim. In *In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 261, 266 (S.D.N.Y. 2005), the plaintiffs alleged that the defendants had lowballed earnings guidance so they could consistently surpass it. The disclosure—the defendants' eventual failure to meet guidance—could not be corrective because investors would *expect* companies to sometimes fail to meet guidance if the guidance was honest. *In re TransDigm Grp., Inc. Sec. Litig.*, 440 F. Supp. 3d 740, 772 (N.D. Ohio 2020) merely holds that there was no loss causation where a corrective disclosure merely republished information widely available elsewhere, but only Defendants knew they had not renegotiated their bond covenants.

48

## V.    PLAINTIFFS MAY SUE WPG NOMINALLY TO RECOVER FROM ITS INSURERS

Defendants argue that the bankruptcy order forecloses Plaintiffs from pursuing claims against WPG to the extent of the available insurance. They do not cite any cases. In fact, they never acknowledge that courts **routinely** allow plaintiffs who did not make a claim in the bankruptcy to sue discharged debtors to recover from the debtor's insurance. [34]

"[I]t is well settled the [sic] permanent discharge injunction contained in 11 U.S.C. § 524(a)(2) does not prevent suit against the debtor, such as [debtor], solely to determine liability in order to collect from the debtor's (or another entity's) insurer." *In re Rodgers*, 266 B.R. 834, 836 (Bankr. W.D. Tenn. 2001). That is because the bankruptcy code's "fresh start" policy is not intended to allow "an insurer [to] escape its obligations based on the financial misfortunes of the insured." *In re Morris*, 430 B.R. 824, 828 (Bankr. W.D. Tenn. 2010). Thus, "a creditor does not violate the discharge injunction by proceeding in a lawsuit against a debtor in order to determine liability for the purposes of collecting from a third party[]" *Id.* "Costs and expenses incurred by debtors in such situations ordinarily are insufficient reasons to prohibit a creditor, such as [creditor], from proceeding against a third party to recover on a cause of action." *Rodgers*, 266 B.R. at 837.[35] Thus, Plaintiffs may bring claims against WPG solely to the available insurance, which is what they do.

---

[34] Defendants assert that WPG has not been served with process. It has. Dkt. # 5. Because WPG was served with process, the only service necessary thereafter is that required by Federal Rule of Civil Procedure 5(b), which was effected on it counsel through CM/ECF.

[35] 11 U.S.C.A. § 524(e) provides that a discharge does not affect the liability of non-debtors, barring circumstances not present here. For example, a discharge does not prevent a creditor from foreclosing on a debtor's home. *In re Isaacs*, 895 F.3d 904, 913 (6th Cir. 2018). In *In re White Motor Credit*, 761 F.2d 270, 274 (6th Cir. 1985), a reorganized automobile manufacturer faced 160 products liability lawsuits. The claims were covered by insurance, to a point, and a fund set aside in the company's bankruptcy. Faced with these existing demands on limited funds, the bankruptcy court entered an equitable order prohibiting the filing of new lawsuits, which the Sixth

## VI.    CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to dismiss.

DATED: July 22, 2022                                        Respectfully submitted,

                                                           **KARON LLC**

                                                           *Daniel R. Karon*
                                                           Daniel R. Karon
                                                           700 W. St. Clair Ave., Ste 200
                                                           Cleveland, Ohio 44113
                                                           Telephone: (216) 622-1851
                                                           Email: dkaron@karonllc.com

                                                           *Liaison Counsel for Plaintiffs*

                                                           **THE ROSEN LAW FIRM, P.A**

                                                           Laurence M. Rosen *(pro hac vice)*
                                                           Jonathan Horne *(pro hac vice)*
                                                           275 Madison Avenue, 40th Floor
                                                           New York, New York 10016
                                                           Telephone: (212) 686-1060
                                                           Email: lrosen@rosenlegal.com
                                                           Email: jhorne@rosenlegal.com

                                                           *Lead Counsel for Plaintiffs*

---

Circuit affirmed on appeal without any analysis. *In re White Motor Credit Corp.*, 37 B.R. 631, 646 (N.D. Ohio 1984), *aff'd sub nom. In re White Motor Credit*, 761 F.2d 270 (6th Cir. 1985). But here, there is no limited fund; as far as Plaintiffs know, they are the only claimants on WPG's Directors' & Officers' liability insurance proceeds. In any case, at least four Circuits have rejected *White*, *Morris*, 430 B.R. at 830, including the Fifth, where WPG filed. *Matter of Edgeworth*, 993 F.2d 51, 54 (5th Cir. 1993). Even if an order from a court within this Circuit **could** have discharged claims against WPG's insurers, the question is whether discharge order entered in WPG's bankruptcy ("Discharge Order") **actually did**. To answer the question, the Court relies on Fifth Circuit precedent. *See Smith v. Railworks Corp.*, 2012 WL 752048, at *5 (S.D.N.Y. Mar. 6, 2012) (when determining whether transferor court had jurisdiction, relying on binding precedent from transferor court's Circuit). The Discharge Order does not unlawfully go further than Fifth Circuit precedent allows, leaving Plaintiffs free to pursue WPG's insurers.

## CERTIFICATE OF SERVICE

I hereby certify that on July 22, 2022, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

/s/ Daniel R. Karon