**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**

|  |  |
|---|---|
| IN RE: WASHINGTON PRIME GROUP, INC. SECURITIES LITIGATION | Master File No.: 2:21-cv-2757 <br><br> Hon. James J. Graham <br> Mag. Kimberly A. Jolson <br><br> **ORAL ARGUMENT REQUESTED** |

**DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS**
**PLAINTIFFS' AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

Dated: August 22, 2022

**TABLE OF CONTENTS**

*Page*

I.    PLAINTIFFS FAIL TO PLEAD LOSS CAUSATION ..................................................4

    A.    Plaintiffs Have Abandoned Their Corrective Disclosure Argument for Statements of Yield ..........................................................................................4

    B.    General and Specific Yield Estimates Were Not Risks that Later "Materialized" .........................................................................................................5

    C.    Yale's and Conforti's Statements Regarding the Bond Covenants Did Not Concretely Assure Investors that WPG Had "Obtained Full Relief" on its Debt Covenants ...................................................................................7

II.    PLAINTIFFS FAIL TO PLEAD SCIENTER ..................................................9

III.   PLAINTIFFS DO NOT PLEAD SCHEME LIABILITY ...........................................13

IV.   PLAINTIFFS FAIL TO ALLEGE ANY ACTIONABLE MISSTATEMENT OR OMISSION WITH RESPECT TO YIELD ESTIMATES ....................................17

    A.    Plaintiffs' Distinction Between Investment Committee Meetings and Meetings Between Yale and Indest to Estimate Yield Is Irrelevant ......................18

    B.    Plaintiffs Erroneously Attempt to Classify Forward-Looking Yield Estimates and Opinions and Optimism Regarding the Redevelopment Strategy as "Statements of Fact" ..............................................................18

    C.    Plaintiffs Still Cannot Show that the Purported "Tricks" by WPG Rendered Yield Estimates False or Misleading .....................................................21

    D.    Plaintiffs Fail to Allege That Yield Estimates For Individual Redevelopment Projects are Material ...............................................................24

    E.    WPG's Cautionary Language Was Appropriate and Adequate Given the Nature of Estimates, Which are Inherently Subjective ..........................................25

    F.    Plaintiffs' Puffery Arguments are Unconvincing .................................................26

V.    PLAINTIFFS DO NOT ALLEGE THE BOND COVENANT STATEMENTS WERE FALSE AND MISLEADING ...............................................27

VI.   PLAINTIFFS IGNORE THE BANKRUPTCY ORDER ...........................................29

VII.  CLAIMS AGAINST INDEST MUST BE DISMISSED ...........................................29

VIII.  PLAINTIFFS STILL CANNOT BRING SECTION 20(A) CLAIMS ........................29

ii

## TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*In re Aetna, Inc. Sec. Litig.*,
617 F.3d 272 (3d Cir. 2010)............................................................................................19

*In re AT&T/DirecTV Now Sec. Litig.*,
480 F. Supp. 3d 507 (S.D.N.Y. 2020)................................................................. *passim*

*In re Burlington Coat Factory Sec. Litig.*,
114 F.3d 1410 (3d Cir.1997)............................................................................................23

*Burr* v. *Equity Bancshares, Inc.*,
2020 WL 6063558 (S.D.N.Y. Oct. 14, 2020) .........................................................17

*In re Career Educ. Corp. Sec. Litig.*,
2006 WL 999988 (N.D. Ill. Mar. 28, 2006)..................................................................21

*Dailey* v. *Medlock*,
551 F. App'x 841 (6th Cir. 2014) ..................................................................................17

*Doral Fin. Corp. Sec. Litig.*,
563 F. Supp. 2d 461 (S.D.N.Y. 2008)...........................................................................10

*In re Downey Sec. Litig.*,
2009 WL 736802 (C.D. Cal. Mar. 18, 2009).............................................................22

*In re Duke Energy Corp. Sec. Litig.*,
282 F.Supp.2d 158 (S.D.N.Y.2003)...............................................................................23

*In re Empyrean Bioscience, Inc. Sec. Litig.*,
255 F. Supp. 2d 751 (N.D. Ohio 2003)........................................................................11

*Heller* v. *Goldin Restructuring Fund, L.P.*,
590 F. Supp. 2d 603 (S.D.N.Y. 2008)..............................................................................5

*In re HEXO Corp. Sec. Litig.*,
524 F. Supp. 3d 283 (S.D.N.Y. 2021).......................................................................6, 13

*Hirtenstein* v. *Cempra, Inc.*,
348 F. Supp. 3d 530 (M.D.N.C. 2018),
*aff'd sub nom.* (4th Cir. 2020)............................................................................19

*Hoffman* v. *UBS-AG*,
591 F. Supp. 2d 522 (S.D.N.Y. 2008)..........................................................................24

*In re Humana, Inc. Sec. Litig.*,
  2009 WL 1767193 (W.D. Ky. June 23, 2009)..........................................................................24

*Indiana State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund*
  v. *Omnicare, Inc.*,
  583 F.3d 935 (6th Cir. 2009) ........................................................................................18, 28

*In re JP Morgan Chase Sec. Litig.*,
  363 F.Supp.2d 595 (S.D.N.Y.2005)....................................................................................24

*Kang* v. *PayPal Holdings, Inc.*,
  2022 WL 3155241 (N.D. Cal. Aug. 8, 2022) .................................................................14, 15

*Karam* v. *Corinthian Colleges, Inc.*,
  2012 WL 8499135 (C.D. Cal. Aug. 20, 2012)........................................................................20

*In re KBC Asset Mgmt. N.V.*,
  572 F. App'x 356 (6th Cir. 2014) ......................................................................................8, 9

*Lentell* v. *Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005)................................................................................................14

*Lighthouse Fin. Grp.* v. *Royal Bank of Scotland Grp., PLC*,
  2013 WL 4405538 (S.D.N.Y. Aug. 5, 2013),
  *aff'd sub nom.*, 783 F.3d 383 (2d Cir. 2015)..............................................................................6

*Loc. 295/Loc. 851 IBT Emp. Grp. Pension Tr. & Welfare Fund* v. *Fifth Third*
  *Bancorp.*,
  731 F. Supp. 2d 689 (S.D. Ohio 2010) ........................................................................2, 3, 10

*Loc. No. 38 Int'l Bhd. of Elec. Workers Pension Fund* v. *Am. Exp. Co.*,
  724 F. Supp. 2d 447 (S.D.N.Y. 2010),
  *aff'd sub nom.* 430 F. App'x 63 (2d Cir. 2011) ..........................................................................9

*Lopez* v. *Ctpartners Exec. Search Inc.*,
  173 F. Supp. 3d 12 (S.D.N.Y. 2016)....................................................................................20

*Menaldi* v. *Och-Ziff Cap. Mgmt. Grp. LLC*,
  164 F. Supp. 3d 568 (S.D.N.Y. 2016)..................................................................................15

*Miller* v. *Champion Enterprises Inc.*,
  346 F.3d 660 (6th Cir. 2003) ..............................................................................................19

*In re Mindbody, Inc. Sec. Litig.*,
  2020 WL 5751173 (S.D.N.Y. Sept. 25, 2020)......................................................................15

*Mizzaro* v. *Home Depot, Inc.*,
  544 F.3d 1230 (11th Cir. 2008) ..........................................................................................21

iv

*Norfolk Cnty. Ret. Sys.* v. *Tempur-Pedic Int'l, Inc.*,
22 F. Supp. 3d 669 (E.D. Ky. 2014) ...................................................................................24

*Omnicare, Inc.* v. *Laborers Dist. Council*,
135 S. Ct. 1318 (2015)........................................................................................................19

*In re Omnicom Grp., Inc. Sec. Litig.*,
597 F.3d 501 (2d Cir. 2010)...............................................................................................6, 9

*Onel* v. *Top Ships, Inc.*,
806 F. App'x 64 (2d Cir. 2020) ..........................................................................................15

*OPERS* v. *Fed. Home Loan Mortg. Corp.*,
830 F.3d 376 (6th Cir. 2016) ..............................................................................................5

*Parnes* v. *Gateway 2000, Inc.*,
122 F.3d 539 (8th Cir. 1997) ..............................................................................................23

*Plymouth Cnty. Ret. Ass'n* v. *ViewRay, Inc.*,
556 F. Supp. 3d 772 (N.D. Ohio 2021)...........................................................................10, 11

*Pub. Pension Fund Grp.* v. *KV Pharm. Co.*,
679 F.3d 972 (8th Cir. 2012) ..............................................................................................14

*In re PXRE Grp., Ltd., Sec. Litig.*,
600 F. Supp. 2d 510 (S.D.N.Y.),
*aff'd sub nom.* (2d Cir. 2009)..............................................................................................11

*Rochester Laborers Pension Fund* v. *Monsanto Co.*,
883 F. Supp. 2d 835 (E.D. Mo. 2012)................................................................................26

*Salvani* v. *ADVFN PLC*,
50 F. Supp. 3d 459 (S.D.N.Y. 2014)...................................................................................5

*SEC* v. *Lorenzo*,
139 S. Ct. 1094 (2019)................................................................................................ *passim*

*SEC* v. *Sason*,
433 F. Supp. 3d 496 (S.D.N.Y. 2020)......................................................................13, 14, 15

*Setzer* v. *Omega Healthcare Invs., Inc.*,
968 F.3d 204 (2d Cir. 2020)..........................................................................................22, 23

*Shields* v. *Citytrust Bancorp, Inc.*,
25 F.3d 1124 (2d Cir. 1994)................................................................................................28

v

*Solow* v. *Citigroup, Inc.*,
   2012 WL 1813277 (S.D.N.Y. May 18, 2012),
   *aff'd*, 507 F. App'x 81 (2d Cir. 2013) ...................................................................................7

*Stein* v. *U.S. Xpress Enterprises, Inc.*,
   2020 WL 3584800 (E.D. Tenn. June 30, 2020) .......................................................................9

*Suez Equity Invs., L.P.* v. *Toronto-Dominion Bank*,
   250 F.3d 87 (2d Cir. 2001) .......................................................................................................7

*Teamsters Loc. 237 Welfare Fund* v. *ServiceMaster Glob. Holdings*,
   2022 WL 989240 (W.D. Tenn. Mar. 31, 2022) ...............................................................13, 14

*In re Teva Sec. Litig.*,
   2021 WL 231130 (D. Conn. Jan. 22, 2021) .............................................................................14

*Tongue* v. *Sanofi*,
   816 F.3d 199 (2d Cir. 2016) ....................................................................................................19

*W. Palm Beach Firefighters' Pension Fund* v. *Conagra Brands, Inc.*,
   495 F. Supp. 3d 622 (N.D. Ill. 2020), *aff'd sub nom.* 2022 WL 1449184
   (7th Cir. May 9, 2022) .............................................................................................................18

*In re Westinghouse Sec. Litig.*,
   90 F.3d 696 (3d Cir.1996)........................................................................................................23

*In re Wet Seal, Inc. Sec. Litig.*,
   518 F. Supp. 2d 1148 (C.D. Cal. 2007) ..................................................................................10

*Winer Fam. Tr.* v. *Queen*,
   503 F.3d 319 (3d Cir. 2007).....................................................................................................11

*WPP Luxembourg Gamma Three Sarl* v. *Spot Runner, Inc.*,
   655 F.3d 1039 (9th Cir. 2011) .................................................................................................14

## SUMMARY OF REPLY ARGUMENT

Plaintiffs' Opposition confirms that their alleged securities fraud claims are tied solely and exclusively to WPG's bankruptcy and are nothing more than classic fraud by hindsight pleading, which is routinely dismissed and should be here as well.  Plaintiffs do not and cannot connect any of the financial issues WPG faced during the pandemic to Defendants' yield *estimates* or their *truthful* statements about WPG's debt covenants.  Thus, Plaintiffs' fail to plead an actionable securities fraud claim and the Amended Complaint should be dismissed in its entirety.

*First*, Plaintiffs fail to plead loss causation as to either category of statement.  This alone warrants dismissal.  (*Infra* § I, pp. 3-7.)  Because Plaintiffs cannot overcome any of the arguments in Defendants' motion concerning Plaintiffs' failure to plead any corrective disclosures as to yield estimates, Plaintiffs' Opposition abandons that theory altogether.  Instead, Plaintiffs now argue that those yield estimates purportedly concealed a "risk" that materialized by virtue of the bankruptcy.  *OPERS* v. *Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 384-85 (6th Cir. 2016) (to plead a materialization of risk, plaintiff mush show "[t]hat negative investor inferences, drawn from a particular event or disclosure, caused the loss and were a foreseeable materialization of the risk concealed by the fraudulent statement.").  But Plaintiffs fail to show how these estimates constitute a "risk" at all.  Moreover, the purported corrective disclosures do not even mention or relate to yield.

Further, loss causation is not pled as to the statements regarding the bond covenants because they did not reveal any "new" information to the market.  (Mot. at 20-23; *infra* § I, pp. 7-9.)  Investors were well aware of WPG's issues and investors were predicting it would enter bankruptcy, which information was reflected in the market by WPG's dropping share price. Despite Plaintiffs' implausible interpretation of WPG's statements about its debt obligations, WPG

remained clear that it faced significant risks associated with its debt covenants and, while it was making every effort to survive the pandemic, the risks associated with COVID-19 put WPG's compliance with those covenants at risk.

*Second*, Plaintiffs fail to establish scienter because they do not plead with requisite particularity that any Individual Defendant was aware of facts that contradicted their public statements.  (*Infra* § II, pp. 9-13.) While Plaintiffs posit in their Opposition that the Amended Complaint identifies "specific data" that contradicts reported yield estimates, that argument is wholly conclusory and does not satisfy Plaintiffs' obligation to plead with particularity. Moreover, their arguments rest on an invented dichotomy between the metrics used by the Investment Committee to determine whether to invest in a project and those used to calculate yield estimates.  But fatal to that argument is that there is nothing pled in the Amended Complaint that those two figures were calculated in the same manner.

With respect to the bond covenants, Plaintiffs offer no allegations at all, and rather rely on the logic that because WPG was ultimately wrong about its optimism that it could survive the pandemic and maintain all its debt obligations, it must have known at the time that its optimism was false.  Courts routinely reject such hindsight pleading and this Court should as well.

*Third*, Plaintiffs make the argument that there was a "scheme" to defraud investors, but there are no well pleaded allegations of any such behavior other than WPG using its business judgement to prepare *estimates* of *future* return.  (*Infra* § III, pp. 13-17.)  Indeed, Plaintiffs can point to no allegations other than the making of the statements themselves, which is insufficient to state a claim for scheme liability, even after the Supreme Court's decision in *SEC* v. *Lorenzo*, 139 S. Ct. 1094, 1096 (2019).

*Fourth*, Plaintiffs fail to allege a false or misleading statement. (*Infra* § IV, pp. 17-27; *see generally* Ex. 20.)  As to yield estimates, while Plaintiffs point to a few anecdotal examples of alleged "tricks" purportedly used to "artificially inflate" WPG's yield estimates for an immaterial number of properties, they fail to allege that each statement was false or misleading as required by the Sixth Circuit's statement-by-statement analysis and Rule 9(b).  Plaintiffs attempt to cast these forward-looking yield estimates, not as projections of future return, but rather as statements of then-present fact.  This interpretation is directly contradicted by WPG's SEC filings containing those projections which plainly identify these statements as estimates and belies common sense.

With respect to the Individual Defendants' optimism regarding its debt obligations, Plaintiffs argue that WPG concretely assured investors that it had modified its debt obligations such that it would face no issues in the future.  WPG did no such thing.  (*Infra* § V, pp. 27-28.)  Rather, WPG expressed optimism about its efforts to renegotiate debt covenants and hope that it would be able to have enough "flexibility" in those obligations to survive the pandemic.  Such optimism is not actionable.

*Fifth*, Plaintiffs cannot pursue claims against WPG nominally or otherwise.  The bankruptcy clearly discharged all claims against WPG.  (*Infra* § VI, pp. 28-29.)

*Sixth*, Plaintiffs' claims against the Individual Defendants fail because they fail to plead a primary violation and, moreover, as to Indest, she did not "make" any of the allegedly false or misleading statements.  (*Infra* § VII-VIII, p. 29.)

Accordingly, Plaintiffs' Amended Complaint should be dismissed in its entirety with prejudice.

3

**ARGUMENT**

**I.     PLAINTIFFS FAIL TO PLEAD LOSS CAUSATION.**

> **A.     Plaintiffs Have Abandoned Their Corrective Disclosure Argument for Statements of Yield.**

Plaintiffs have not and cannot address the fact that the alleged "corrective" disclosures in the Amended Complaint simply do not relate to yield—whether general or for the Individual Redevelopment Projects.[1]  Conceding this fact, Plaintiffs abandon a corrective disclosure theory of loss causation altogether, and instead argue that they have pled loss causation for those statements related to yield estimates through a "materialization of risk" theory.  (Opp. at 43.)  But such allegations simply do not appear in the Amended Complaint and Plaintiffs' pleading is clear that they intended to pursue the more direct theory of corrective disclosure.  (*See* ¶ 281[2] (describing the class as "all those who purchased or otherwise acquired [WPG] securities during . . . . and were damaged ***upon the revelation of the alleged corrective disclosures***" (emphasis added); ¶ 1 (same); ¶¶ 244-254 (in section titled "Loss Causation" plaintiffs point only to corrective disclosures rather than purported "risks" that later materialized).)

Despite the absence of any actual allegations to support their newest theory, Plaintiffs try to make a connection between estimated yield and the bankruptcy by arguing that "Defendants' statements about yield concealed that WPG's malls were still decrepit" which purportedly "materialized when the market learned that WPG had taken steps towards bankruptcy."  (Opp. at 44.)  However, the alleged "risk" that the malls were still "decrepit" is not a risk at all, it is a statement of present condition more suited, at best, to a misstatement or omission analysis.  Indeed, Plaintiffs continue to frame this "risk" as a misstatement, saying "Defendants' statements about

---

[1] Capitalized terms have the same meaning as in Defendants' opening motion, ECF No. 52.
[2] Citations to (¶ _) refer to the Amended Complaint filed April 1, 2022, ECF No. 47.

4

yield gave investors the impression that WPG's redeveloped malls were precisely the prize assets that could be sold" but "those statements had been false." (Opp. at 45.)  Remarkably, Plaintiffs do not even mention the word "risk" in their Amended Complaint except to quote statements from the Individual Defendants or to describe their allegation that WPG was required to take a "provision" for potential tenant bankruptcies.  (¶¶ 80-82, 96, 166, 234, 242, 261, 263, 267, 277.)  Moreover, Plaintiffs repeatedly claim in their Opposition that yield estimates are "statements of fact," but when it suits them for loss-causation purposes, yield is purportedly reflective of undisclosed risk.  Plaintiffs cannot have it both ways.

Even assuming that Plaintiffs' newest theory of loss causation was pled in the Amended Complaint, it still fails as explained below.

> B.      General and Specific Yield Estimates Were Not Risks that Later "Materialized."

To plead loss causation through "materialization of risk," Plaintiffs must sufficiently allege "that negative investor inferences, drawn from a particular event or disclosure, caused the loss and were a foreseeable materialization of the risk concealed by the fraudulent statement." *OPERS* v. *Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 384-85 (6th Cir. 2016).  In other words, "[w]here the alleged misstatement conceals a condition or event which then occurs and causes the plaintiff's loss, a plaintiff may plead that it is the materialization of th[is] undisclosed condition or event that cause[d] the loss." *Heller* v. *Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 623-24 (S.D.N.Y. 2008).  The connection between the concealed risk and Plaintiffs' alleged losses cannot be speculative. *Salvani* v. *ADVFN PLC*, 50 F. Supp. 3d 459, 475 (S.D.N.Y. 2014) ("The materialization of risk theory . . . requires a direct connection between the risk that is hidden from investors and the subsequent loss suffered by those investors.").

5

As an initial matter, in their effort to frame WPG's statements about yield as "concealed risk," Plaintiffs argue that "COVID was a temporary emergency" and therefore, "WPG should have been able to survive COVID by selling its newly-redeveloped malls."  (Opp. at 45.) Plaintiffs' arguments both ignore reality and are irrelevant.  As Plaintiffs acknowledge, COVID made "[i]n-person shopping . . . a hazard rather than a hobby." (AC ¶ 20.)  WPG's strategy at that time was to develop outdated malls into "vibrant community spaces" that "might also host concerts or similar activities" that could "serve[] as de facto town centers." (AC ¶ 59.)  Given that in-person shopping was now dangerous, let alone leisure activities like concerts or community gathering, Plaintiffs simply ignore the reality of the challenges WPG faced in light of COVID (which was far from "temporary" as Plaintiffs suggest).

Moreover, Plaintiffs claim that WPG "should" have been able to sell its malls has nothing to do with yield estimates.  Yield, as described by WPG in its SEC filings, is a statement of future return, not then-present value. (Mot. at 19.)  Plaintiffs' argument that a risk materialized because WPG "should" have been able to sell the malls so that it would avoid bankruptcy is tenuous and ultimately irrelevant.

Plaintiffs do not—and cannot—plead that the "risk" materialized by virtue of the bankruptcy given that Amended Complaint "does not establish that any of the partial disclosures establish loss causation under the materialization of concealed risk theory." *Lighthouse Fin. Grp.* v. *Royal Bank of Scotland Grp., PLC*, 2013 WL 4405538, at *11 (S.D.N.Y. Aug. 5, 2013), *aff'd sub nom.*, 783 F.3d 383 (2d Cir. 2015).  Even if Plaintiffs' claim WPG "made poor business judgments" or that the company was in "dire shape" is true, nothing in the Amended Complaint connects WPG's bankruptcy or financial troubles with its yield estimates. *See id.* ("Nothing in the [Amended Complaint] alleges that these write-downs were fueled by the market realizing that RBS

had far more assets than it had revealed"); *see also In re HEXO Corp. Sec. Litig.*, 524 F. Supp. 3d 283, 309 (S.D.N.Y. 2021) (reasoning that "[p]laintiffs' 'fundamental disagreement with Defendants' business judgments . . . are not actionable under Section 10(b) and Rule 10b-5'"). Plaintiffs simply do not plead a "loss" flowing from yield estimates that purportedly serves as a proxy for the quality of WPG's malls, which Plaintiffs allege they should have been able to sell in order to avoid bankruptcy. *See In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501 (2d Cir. 2010) ("The event that plaintiff claimed to be a 'materialization of the risk' concealed by that alleged improper accounting (a director's resignation and resulting negative press) revealed no new information about the subject of the fraud."). The loss causation inquiry "typically examines how directly the subject of the fraudulent statement caused the loss, and whether the resulting loss was a foreseeable outcome of the fraudulent statement," and, here, there alleged connection between the purportedly inflated yield estimates and WPG's ultimate bankruptcy is too tenuous to be "plausible" as Plaintiffs claim. *See Suez Equity Invs., L.P.* v. *Toronto-Dominion Bank*, 250 F.3d 87, 96 (2d Cir. 2001). In sum, "[n]otwithstanding the [Amended Complaint's] series of events purporting to demonstrate the materialization of the risks Defendants" concealed, the [Amended Complaint] fails to adequately link these events to the risks Defendants allegedly concealed. *See Solow* v. *Citigroup, Inc.*, 2012 WL 1813277, at *8 (S.D.N.Y. May 18, 2012), *aff'd*, 507 F. App'x 81 (2d Cir. 2013) ("[A]lthough Plaintiff states that the decision to consolidate these assets negatively impacted Citigroup's capitalization, Plaintiff does not link the decision to consolidate with any concealed risks to Citigroup's status as a 'well-capitalized' institution.").

        C.     <u>Yale's and Conforti's Statements Regarding the Bond Covenants Did Not Concretely Assure Investors that WPG Had "Obtained Full Relief" on its Debt Covenants.</u>

Plaintiffs allege that statements by Yale and Conforti regarding WPG's bond covenants "gave investors the misleading impression that WPG had renegotiated its bond covenants" (Opp.

at 47) and argue that the repeated risk warnings given by WPG should apparently be ignored (*id.* at 48).  They further claim that WPG stated on August 17, 2020, that WPG "***had*** obtained full relief" with respect to its debt obligations pursuant to the bond covenants.  (Opp. at 48.)  This is not true.  The only statements by Yale and Conforti identified by Plaintiffs are: (1) Yale's statements that modifications should provide necessary "flexibility" and "provide a bridge to the other side of the pandemic" and that WPG "made sure we got the flexibility"; and (2) Conforti's statements that "we have our banking partners throughout the capital structure," that it is a "function of us focusing on" redevelopment projects and that "this was a very favorable outcome of every kind of modification."  (¶¶ 277-80.)

As is clear from the context, Yale's and Conforti's statements were not so concrete to assure investors WPG "***had*** obtained full relief" such that the later bankruptcy constitutes a revelation of "new" information.  Rather, in response to questions about WPG's efforts to survive strains from COVID-19, Yale and Conforti expressed that WPG "*should* have the necessary flexibility," had been working with its "banking partners" and had a "bridge to get through the other side" of the pandemic.  (¶¶ 277, 279.) These are far from concrete assurances that WPG had permanently renegotiated its bond covenants such that it would never face any issues in the future.

Moreover, WPG repeatedly warned investors about the risks associated with COVID-19, and explicitly warned investors that failure "to comply with [debt] covenants could result in an event of default, which, if not cured or waived, could accelerate our repayment obligations."  (*See, e.g.*, Ex. 3[3] (Feb. 27, 2020 Form 10-K) at 15.)  And while WPG stated that it hoped to maintain compliance, it also warned investors that "no assurances can be made" regarding its ability to

---

[3] Citations to "Ex." are to SEC filings and documents referenced or relied upon in the Complaint and included herewith as Exhibits to the declaration of Thomas H. Stewart filed at ECF No. 53 and the supplemental declaration of Thomas H. Steward, filed concurrently herewith.

continue to modify and comply with those agreements.  (Ex. 7 (May 8, 2020 Form 10-Q) at 14 (emphasis added).)   In fact, analyst communications made in the months prior to WPG's bankruptcy filing make clear that analysts foresaw a potential WPG bankruptcy.  (*See, e.g.*, Ex. 20 (Feb. 21, 2021 Article)[4] ("The state of the current financials suggests that there is a high likelihood for WPG to follow in the footsteps of CBL (CBL) which declared bankruptcy last year.  It comes down to the large debt and high leverage profile.").  Because no "new" information was revealed when WPG filed for bankruptcy, Plaintiffs have failed to plead loss causation as to the bond covenant statements as well.  *See In re KBC Asset Mgmt. N.V.*, 572 F. App'x 356, 360 (6th Cir. 2014) ("The problem with [Plaintiffs'] theory is that the May 31 affidavits—the alleged corrective disclosures—were old news. . . . All of this was public information that the market absorbed long before.")[5]; *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 513 (2d Cir. 2010) ("[A]ppellant failed to demonstrate any new information in the June 12 article regarding Omnicom's alleged fraud.").

## II.    PLAINTIFFS FAIL TO PLEAD SCIENTER.

Plaintiffs' entire theory of scienter rests on the argument that the Individual Defendants were aware of information that contradicted public statements of yield or WPG's debt covenants, but they fail to plead with particularity that such information actually contradicted their public statements.  *See, e.g.*, *Loc. No. 38 Int'l Bhd. of Elec. Workers Pension Fund* v. *Am. Exp. Co.*, 724 F. Supp. 2d 447, 460 (S.D.N.Y. 2010), *aff'd sub nom.* 430 F. App'x 63 (2d Cir. 2011) (failing to

---

[4] *Available at* https://seekingalpha.com/article/4406284-thoughts-on-washington-prime-debt-preferred-and-common-stock-in-2021.

[5] Plaintiffs attempt to differentiate *KBC* by stating that unlike there, Defendant claimed they have obtained "full relief" as to their debt covenants.  (Opp. at 48.)  As explained herein, however, these statements were not as concrete as Plaintiffs claim and *KBC* is directly on point.  Like *KBC*, Plaintiffs' argument that Defendants concealed the risk of bankruptcy "breaks down" "because the market already knew" that WPG was facing issues related to its debt covenants and faced a risk of accelerated payment (and consequently, bankruptcy) as a result.  *See* 572 F. App'x 356 at 359-61.

plead scienter where "allegations do not establish what specific contradictory information the Individual Defendants received or when they received it"); *see Stein* v. *U.S. Xpress Enterprises, Inc.*, 2020 WL 3584800, at *35 (E.D. Tenn. June 30, 2020) ("[I]t is not even possible to analyze meaningfully whether internal reporting diverged from external statements, or whether any divergence is softened by differing levels of generalization, because the pleading is utterly conclusory.").

    *Scienter as to Yield Estimates*.  Plaintiffs argue that they have pled scienter because this is a "classic case of saying one thing internally and telling investors something completely different." (Opp. at 39.)  Yet, Plaintiffs fail to explain why WPG was under any legal obligation to report purportedly "raw" numbers of yield that do not consider WPG's business judgment in estimating a project's return on invested capital.  Moreover, while claiming this is a "classic case," Plaintiffs cite to no authority for their proposition that scienter is pled as to any Individual Defendant by virtue of a company's initial calculations differing from their ultimate estimates (which, in this case, were accompanied by significant caveats and warnings).  While Plaintiffs posit that the Amended Complaint identifies "specific data" that contradicts reported yield estimates, they do so at the most generic level.  Simply alleging that—generally—Plaintiffs had access to a "spreadsheet" that contradicted reported numbers is not enough to establish scienter.  *See Plymouth Cnty. Ret. Ass'n* v. *ViewRay, Inc.*, 556 F. Supp. 3d 772, 793 (N.D. Ohio 2021) (failing to allege scienter despite allegations that "Defendants publicly told investors that the backlog amounted to $200 million in orders, while internal company records showed $48 million did not qualify as backlog"); *Loc. 295/Loc. 851 IBT Emp. Grp. Pension Tr. & Welfare Fund* v. *Fifth Third Bancorp.*, 731 F. Supp. 2d 689, 722 (S.D. Ohio 2010) (explaining that scienter cannot be inferred from the mere fact that the defendant had access to information); *In re Wet Seal, Inc. Sec. Litig.*, 518 F.

10

Supp. 2d 1148, 1174 (C.D. Cal. 2007) (Allegations that the defendants had access to real time reports allegedly showing deteriorating financial condition are insufficient because plaintiffs have not alleged any specific data that the individual defendants learned from these reports that were inconsistent with public statements.).  This is particularly true with respect to the 27 statements of reported yield estimates, which span from February 22, 2018 to August 9, 2021, which is outside the class period.  Plaintiffs' allegations are rote and lack the required specificity to sustain their claims. *See Doral Fin. Corp. Sec. Litig.*, 563 F. Supp. 2d 461, 466 (S.D.N.Y. 2008) (finding CW's statement that he attended meetings during which reports were circulated and questions were raised to be "so vague as to be meaningless, because [, inter alia,] it contains no time frame within which the meetings occurred, . .  and no information regarding how extensively or in what manner the reports were discussed.").

Indeed, such "contradictions" are only relevant where there is "some divergence between those internal reports and the external statements the company makes on the same subject." *Plymouth*, 556 F. Supp. 3d at 793 (noting that "the mere existence of internal records and reports does not mean an inference of scienter necessarily follow").  Here, despite Plaintiffs' insistence otherwise, they cite no authority or otherwise explain why WPG was required to evaluate a particular project's estimated revenue based on the exact same factors the Investment Committee may have used to determine whether to take on a project.  *See In re Empyrean Bioscience, Inc. Sec. Litig.*, 255 F. Supp. 2d 751, 761 (N.D. Ohio 2003) (scienter not pled where "Plaintiffs also fail[ed] to set forth any factual basis for their conclusion that Empyrean did not monitor [drug trials]").  As pled, the more compelling inference is that these are categorically different metrics and serve different purposes.

In an effort to brush aside the issue of WPG's business judgment in calculating estimates, Plaintiffs claim (without support) that "[t]he Investment Committee meetings and the subsequent meetings at which Yale and Indest manipulated yields were categorically different meetings" and the subsequent meetings in which yield estimates were calculated is somehow insidious.  (Opp. at 40.)  Plaintiffs cannot simply allege that a business practice was "improper" to establish scienter; they must allege with particularity that each of the Individual Defendants was aware of facts that specifically contradict their public statements, which Plaintiffs fail to do.  *Winer Fam. Tr.* v. *Queen*, 503 F.3d 319, 332 (3d Cir. 2007) (plaintiffs failed to establish scienter where they could not show defendants were aware of facts that contradicted defendants' budgets estimates); *see also In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 533-34 (S.D.N.Y.), *aff'd sub nom*. (2d Cir. 2009) (plaintiff's allegation that "Defendants were motivated to misstate their loss estimates in order to maintain a high credit rating and raise money, only to reveal the true extent of their losses several months later" not as compelling as competing inference that "Defendants, without motive to defraud, simply failed in their various models and internal mechanisms to calculate accurately the full extent of losses that were incurred by the unique phenomenon presented by the 2005 hurricane season").

Plaintiffs also claim that investor questions about WPG's strategy to "evade the retail apocalypse" support an inference of scienter.  (Opp. at 40.)  Their authority for this point, *City of Taylor Gen. Emps. Ret. Sys.* v. *Astec Indus.*, does not stand for this proposition. 29 F.4th 802, 809 (6th Cir. 2022).  Rather, the court in *Astec* found scienter was pled where the defendant made suspicious stock sales and was "intimately aware" of a variety of problems at the company's worksites, but nonetheless provided investors with "relentless, unfounded optimism that was

12

contradicted by the undisclosed facts." *Id.*  That is far from the case here, where Plaintiffs take issue with the whole of WPG's judgment—which, good or bad—is not indicative of scienter.

*Scienter as to Statements Regarding Bond Covenants*.  Plaintiffs claim that scienter is established by the "extreme" "in your face fact[]" that "Defendants still told investors they had renegotiated all WPG's covenants" evidencing scienter.  (Opp. at 41.)  This is simply not true. Yale and Conforti expressed optimism that WPG would be able to survive the pandemic and explained that significant risks were associated with WPG's ability to comply with those obligations.  (*See* Mot. at 47.)  "While Defendants' optimism may have proven to be unwarranted, Plaintiffs have not alleged that Defendants reviewed any contemporaneous information that should have undermined the optimism in their strategies."  *In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d 507, 532 (S.D.N.Y. 2020).  Indeed, FE-1 confirms that WPG was actively working to "renegotiate the Bond covenants" (¶ 239), but ultimately WPG was not successful. This is not enough to establish scienter.

## III.    PLAINTIFFS DO NOT PLEAD SCHEME LIABILITY.

### A.    Legal Standard for Scheme Liability.

Scheme liability is a means of proving liability under the Exchange Act for deceptive acts or scheme in connection with the offer or sale of securities.  *See, e.g.*, *SEC* v. *Sason*, 433 F. Supp. 3d 496, 508 (S.D.N.Y. 2020) (noting that scheme liability requires showing of "illegitimate, sham or inherently deceptive transaction").  "To state a scheme liability claim, a plaintiff must show: "(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance."  *See Teamsters Loc. 237 Welfare Fund* v. *ServiceMaster Glob. Holdings*, 2022 WL 989240, at *15 (W.D. Tenn. Mar. 31, 2022).

Plaintiffs argue that after the Supreme Court's 2019 decision in *Lorenzo*, "many [] courts have found that scheme claim liability can be based upon misrepresentations or omissions and not

13

just deceptive acts." (Mot. at 37 (citing *Strougo*, 2022 WL 2037966, at *10).) *Strougo*, however, is not even a case about dismissal, but rather, involves class certification. *See id.* Moreover, *Strougo* stands only for the uncontested proposition that post-*Lorenzo*, misstatements and omissions may form *part* of a claim for scheme liability under the Exchange Act.

As explained recently by the Second Circuit: "*Lorenzo* observes that the subsections of Rule 10b-5 and Section 17(a) are not hermetically sealed. While Lorenzo acknowledges that there is leakage between and among the three subsections of each provision, the divisions between the subsections remain distinct. Until further guidance from the Supreme Court. . . . misstatements and omissions can form part of a scheme liability claim, but an actionable scheme liability claim also requires something beyond misstatements and omissions, such as dissemination." *SEC* v. *Rio Tinto plc*, 41 F.4th 47, 49 (2d Cir. 2022).[6] *See AT&T/DirecTV Now*, 480 F. Supp. at 534 ("Unlike a misrepresentation or omission claim under Rule 10b–5(b), scheme liability claim is aimed at 'inherently deceptive conduct' and does not require a misleading statement or omission."). *Lorenzo* did not hold, as Plaintiffs erroneously suggest, that a statement not shown to be false or misleading under Rule 10b-5(b) may nevertheless be held "deceptive" under Rules 10b-5(a) and (c). Instead, the Supreme Court held that a "plainly fraudulent" statement can form the basis of a scheme claim. *Id.* at 1102. Something more is required, and that something more is lacking from Plaintiffs' Amended Complaint.

---

[6] Plaintiffs' cited authority, *Teamsters Loc. 237 Welfare Fund* v. *ServiceMaster Glob. Holdings*, acknowledges that the predominant view that for scheme liability to attach, Plaintiffs must plead some conduct *other than* the at-issue misstatements and omissions that operates as a "scheme" or "fraud." 2022 WL 989240, at *14 (W.D. Tenn. Mar. 31, 2022), *citing WPP Luxembourg Gamma Three Sarl* v. *Spot Runner, Inc.*, 655 F.3d 1039, 1057 (9th Cir. 2011); *Lentell* v. *Merrill Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005) ("[W]here the sole basis for such claims is alleged misrepresentations or omissions, plaintiffs have not made out a market manipulation claim under Rule 10b–5(a) and (c)[.]"); *see also Pub. Pension Fund Grp.* v. *KV Pharm. Co.*, 679 F.3d 972, 987 (8th Cir. 2012) ("We join the Second and Ninth Circuits in recognizing a scheme liability claim must be based on conduct beyond misrepresentations or omissions actionable under Rule 10b–5(b).").

14

B.        Plaintiffs Do Not Plead Scheme Liability.

Plaintiffs have not pled scheme liability under Rules 10b-5(a) and 10b-5(c) because the only conduct alleged to have been deceptive or to "operate as a fraud" are the purported misstatements and omissions, which as explained below are not false and misleading.  At best, the "primary purpose and effect of [the] purported scheme is to make a public misrepresentation or omission" which "courts have routinely rejected" as an attempt "to bypass the elements necessary to impose misstatement liability under subsection (b) by labeling the alleged misconduct a scheme rather than a misstatement."  *In re Teva Sec. Litig.*, 2021 WL 231130, at *9 (D. Conn. Jan. 22, 2021).

A fraudulent scheme is alleged where there is some "illegitimate, sham, or inherently deceptive transaction."  *Sason*, 433 F. Supp. 3d at 509.  For example, in *Sason*, the SEC alleged scheme liability where the individual defendants "condoned the creation of the falsified [] documents and used them to facilitate the sale of [] shares through bogus registration exemptions." *Id.*  No such similar conduct used to disseminate WPG's securities is alleged here.  This case is akin to *AT&T/DirecTV Now*, in which plaintiffs' scheme liability claims failed because plaintiffs did not "plead any deceptive conduct that is separate from the inadequately pleaded misstatements and omissions underlying" other counts.[7]  480 F. Supp. at 534.

---

[7] Plaintiffs do not appear to claim the purported "scheme" applies to those statements or conduct surrounding the bond covenants or WPG's debt obligations.  Even if they did, Plaintiffs claims would fail because they allege no "scheme" in relation to the bond covenants.  Rather they allege only that Defendants made assurances to investors that they had resolved issues related to payments due under the bond covenants (they didn't) and that the "truth" was revealed by virtue of the bankruptcy filing (it wasn't).  (Opp. at 47-48; *see* Mot. at 20-23.)  Indeed, Plaintiffs cannot base a scheme liability claim on their inadequately plead allegations as to the bond covenant statements.  *See Menaldi* v. *Och-Ziff Cap. Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 586 (S.D.N.Y. 2016) ("To the extent that Plaintiffs allege scheme liability based on underlying uncharged criminal conduct, Plaintiffs' claim fails because, for reasons already stated, that conduct has not been plausibly pleaded."); *Kang* v. *PayPal Holdings, Inc.*, 2022 WL 3155241, at *13 (N.D. Cal. Aug. 8, 2022) ("Just as Plaintiffs have failed to plausibly allege that any of the statements in the complaint were false or misleading, they do not allege any false or misleading conduct.").

Thus, even after *Lorenzo*, where "the entire 'conduct' or 'scheme' complained of is the dissemination of misleading information," as is the case here, "it is indistinguishable from the misstatements and omissions" claim. *In re Mindbody, Inc. Sec. Litig.*, 2020 WL 5751173, at \*19 (S.D.N.Y. Sept. 25, 2020). "Because each of the identified alleged misrepresentations or omissions is not actionable, . . . dismissal of these [scheme] claims [is]appropriate." *Onel* v. *Top Ships, Inc.*, 806 F. App'x 64, 68-69 (2d Cir. 2020).

C.      Defendants Did Not Waive Its Arguments as to Scheme Liability.

Plaintiffs argue that their claims should survive under a theory of scheme liability because Defendants allegedly did not move on such a theory, and therefore waived any such arguments. This is incorrect. Defendants moved to dismiss the Amended Complaint—in its entirety—because of Plaintiffs' failure to plead an actionable misstatement or omission, loss causation, or scienter, all of which are necessary for Plaintiffs' purported "scheme liability claim." *See also Lorenzo*, 139 S. Ct. at 1096 (noting the "considerable overlap among the subsections of the Rule and related provisions of the securities laws"). Moreover, as discussed above, Plaintiffs' Amended Complaint—which uses *pro forma* language to reference a "scheme," fails to identify any scheme or artifice used to defraud investors. Indeed, the word "scheme" appears only in Plaintiffs' description of the Count, and nowhere in the Amended Complaint do Plaintiffs describe the alleged scheme as anything other than based on statements or omissions that are inactionable.

Regardless, as described in detail in Defendants' motion, projected yield estimates are not actionable under Section 10(b) and Rule 10-b(5) and therefore cannot form the basis for a scheme liability claim. (*See generally* Mot. at 24-31.) Indeed, each of Plaintiffs' alleged bases for scheme liability are addressed in Defendants' Motion:

16

| Element (Opp. at 37.) | Alleged Misconduct (Opp. at 37.) | Addressed in Defendants' Motion: |
|---|---|---|
| "[W]hat deceptive or manipulative acts were performed." | "[M]anipulating yields and reporting them to investors." | Mot. at 24-31:  Explaining that Plaintiffs fail to allege that yield was false or misleading or calculated in any incorrect or otherwise "wrong" manner. |
| "[W]hich defendants performed them." | "Yale and Indest performed the manipulations, and all Defendants presented the yields to investors." | Mot. at 38-39, 43-48:  Explaining that Plaintiffs fail to allege that Defendants were aware of facts that contradicted reported yield estimates or otherwise acted with scienter.<br><br>Mot. at 49:  Explaining that Indest made no statements whatsoever. |
| "[W]hen the acts were performed." | "[T]he yields were manipulated after projects were approved and reported to investors after being manipulated." | Mot. at 41-42:  Explaining that Plaintiffs fail to allege with particularly when purportedly wrongful conduct occurred, particularly with respect to the Individual Redevelopment Projects. |
| "[T]he effect the scheme had on investors in the securities at issue." | "[C]onvincing investors that WPG was thriving despite closures of middlebrow stores through redevelopment, thus increasing its stock price." | Mot. at 15-22:  Explaining the lack of connection between the purportedly corrective disclosures and the allegedly misleading statements. |

While Plaintiffs now grasp at straws to keep their inartfully pled Amended Complaint alive, framing their allegations as ones constituting scheme liability does not save them and the Amended Complaint should be dismissed.

## IV.  PLAINTIFFS FAIL TO ALLEGE ANY ACTIONABLE MISSTATEMENT OR OMISSION WITH RESPECT TO YIELD ESTIMATES.

Plaintiffs' arguments as to the actionability of their purported misstatements and omissions in opposition to Defendants' motion are unavailing, as described below.  Moreover, for the Court's convenience, attached as Exhibit 20 is a chart setting forth each alleged misstatement or omission and the reason why each is inactionable.

A.    Plaintiffs' Distinction Between Investment Committee Meetings and Meetings Between Yale and Indest to Estimate Yield Is Irrelevant.

Plaintiffs claim that because Yale and Indest—who are members of the Investment Committee—allegedly made "manual adjustments" to yield estimates after Investment Committee meetings, those "adjustments" are inherently fraudulent.  (Opp. at 13-14.)   Even if all yield estimates were calculated after Investment Committee meetings (which is not clear from the Amended Complaint), Plaintiffs fail to allege how this is fraudulent.  As Plaintiffs allege, the "Investment Committee was responsible for approving individual projects." (¶ 102.)  There is no requirement that companies must disclose internal criterion used to determine which projects a company will take on when reporting estimated yield for that project.  *See Dailey* v. *Medlock*, 551 F. App'x 841, 846 (6th Cir. 2014) (no duty to disclose that company intended to take "valuation loss and thus incur large losses"; noting that omission of this information did not render statements that defendant was "well capitalized" or "overall financial health of the bank" misleading); *Burr* v. *Equity Bancshares, Inc.*, 2020 WL 6063558, at *6 (S.D.N.Y. Oct. 14, 2020) ("[Defendants]' allowances for loan losses did not imply specific facts about [] cash-flow, and disclosure of those facts was not required.").  Indeed, if WPG failed to consider holistic factors in estimating yield, WPG could run the risk of *underestimating* yield.

B.    Plaintiffs Erroneously Attempt to Classify Forward-Looking Yield Estimates and Opinions and Optimism Regarding the Redevelopment Strategy as "Statements of Fact."

Plaintiffs now claim that "yields are not estimates of project returns" (Opp. at 25), rather they are "statements of fact" (Opp. at 14).  This, however, is in direct contradiction to the context in which yield was reported.  Indeed, in each instance where yield is reported in connection with any Individual Redevelopment Project, WPG described the figure as "Estimated Project Yield,"

18

noting that those estimates "are subject to adjustment as a result of changes . . . that are inherent in the development process."  (*See, e.g.*, Ex. 4. at Ex. 99.2, p. 16.)

Plaintiffs claim that "where companies describe exactly how they calculated certain financial metrics and those descriptions are false, their statements are false statements of fact." (Opp. at 14.)  But WPG did not provide "exactly how they calculated" yield.  Plaintiffs' claims that WPG did so uses cherry-picked statements from unrelated earnings calls or conferences to show that WPG never considered "indirect adjacencies" or that WPG never considered "speculative rent."  (Opp. at 14-15.)  These one-off statements do not trump the descriptions of yield in WPG's SEC filings as "estimates" that are "subject to adjustment."[8]  *See Indiana State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund* v. *Omnicare, Inc.*, 583 F.3d 935, 943 (6th Cir. 2009) (dismissing statements where "not only does the statement itself call attention to its predictive character ('growth outlook') but even the complaint identifies it as 'a positive outlook on future revenue.'  Further, to the extent that the reference to the outlook 'remaining' positive implies some present circumstances, that is not enough to take this statement out of the safe harbor.").

In an effort to make yield estimates and other generic statements by Conforti and Yale actionable because "calculating yield was just math based on current commitments" (Opp. at 15), Plaintiffs point to a statement by Conforti that Plaintiffs claim means yield is a then-existing fact because Conforti purportedly described the metric as "numerator/denominator." (Opp. at 15, 25.) This statement by Conforti, however, was made in response to a question of how WPG "look[s] at

---

[8] Moreover, while Plaintiffs seem to think that Individual Defendants were required to include the phrases "I think" or "I believe" to entitle their statements to be opinions, courts require no such language. *See W. Palm Beach Firefighters' Pension Fund* v. *Conagra Brands, Inc.*, 495 F. Supp. 3d 622, 649 (N.D. Ill. 2020), *aff'd sub nom.* 2022 WL 1449184 (7th Cir. May 9, 2022) ("As Plaintiffs point out, the challenged statements do not contain qualifiers such as 'I think' or 'I believe.' But even without qualifiers, the content of future predictions makes the distinction clear: it is hard to express certainty about the future. Defendants' pre-merger predictions were expressions of opinion.").

tenant diversification and if the tenant doesn't renew"—*not* how all of WPG's yield estimates were calculated. (*See* ¶ 261.) Nowhere in Conforti's statement does he assure investors that WPG's yield estimates are strictly calculated based on "numerator/denominator" accounting. *See Miller* v. *Champion Enterprises Inc.*, 346 F.3d 660, 676-77 (6th Cir. 2003) (finding reference to use of term "continuation" in phrase "continuation of outstanding earnings growth" did not transform an otherwise forward-looking prediction into an unprotected mixed statement). Further, this statement lacks sufficient specificity to connect it to the statements of individual yield estimates. *See In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 284 (3d Cir. 2010) ("The statements identified by plaintiffs contain oblique references to Aetna's pricing policy; such references are too vague to ascertain anything on which a reasonable investor might rely.").[9]

Despite Plaintiffs' efforts to cast yield estimates as "statements of fact" they are forward-looking statements because they reflect WPG's estimate of future return based on a number of factors. They do not reflect then-present value. Such estimates of future return are forward-looking statements and inactionable. *See Lopez* v. *Ctpartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 40 (S.D.N.Y. 2016) (statements were "forward-looking projection, insofar as it gave a 'preliminary' calculation of what the final quarterly financial results would be" and dismissing "self-serving speculation" that such statements actually reflected "historical fact").

---

[9] Moreover, this and other phrases about WPG's investment strategy are clear statements of opinion or otherwise not tied to any specific yield estimate. (*See* Mot. at 40-41.) Indeed, statements of opinion are "'not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way,'" and "reasonable investors understand that opinions sometimes rest on a weighing of competing facts." *Tongue* v. *Sanofi*, 816 F.3d 199, 210-12 (2d Cir. 2016) (quoting *Omnicare, Inc.* v. *Laborers Dist. Council*, 135 S. Ct. 1318, 1329 (2015)); *Hirtenstein* v. *Cempra, Inc.*, 348 F. Supp. 3d 530, 558 (M.D.N.C. 2018), *aff'd sub nom.* (4th Cir. 2020) ("vague statements of opinion regarding [medical] data" not actionable).

C.      <u>Plaintiffs Still Cannot Show that the Purported "Tricks" by WPG Rendered Yield Estimates False or Misleading.</u>

Plaintiffs attempt to overcome the inadequacies of their Amended Complaint, by arguing WPG employed various "tricks" that they allege rendered yield estimates false or misleading. Each of Plaintiffs' arguments fails:

*Plaintiffs Fail to Allege Material "Double-Counting*."    Plaintiffs mischaracterize Defendants' motion by claiming that Defendants argue that counting co-tenancy cures must be "excessive" to be actionable.  Not so.  Rather, Defendants argued that Plaintiffs fail to plead such double-counting actually occurred.  Plaintiffs provide only one alleged example of the practice totaling "$450,000" that was allegedly improperly double-counted for one project.  (¶¶ 133.) While FE-1 claims that WPG "improperly double-counted revenues from curing co-tenancy in all projects that had" co-tenancy cures, neither Plaintiffs nor FE-1 provide any facts as to which projects involved double-counting, when the double-counting allegedly occurred, or by how much the projects were overstated.  One relatively small dollar example of double-counting, even assuming its truth for purposes of this motion, is simply not enough to allege the practice was widespread or material.  *See, e.g.*, *Karam* v. *Corinthian Colleges, Inc*., 2012 WL 8499135, at *7 (C.D. Cal. Aug. 20, 2012) (concluding the confidential witnesses statements failed to support the plaintiffs' allegations of widespread misconduct because none of them purported to quantify the total number of students affected by the alleged improper practices); *In re Career Educ. Corp. Sec. Litig.*, 2006 WL 999988, at *5 n. 4 (N.D. Ill. Mar. 28, 2006) (concluding that anecdotal allegations concerning three unqualified students established, at most, that those particular students were admitted, not that the defendants' general statements about the company were false); *Mizzaro* v. *Home Depot, Inc*., 544 F.3d 1230, 1251 (11th Cir. 2008) (concluding "estimates of fraud occurring

21

at one or a few stores . . . are far too shaky a foundation on which to make any reasonable calculus of the total amount of the fraud.").

*Plaintiffs' Fail to Allege that WPG Inappropriately Inflated Estimates Using "Speculative Income."*  Plaintiffs again try to cast yield estimates as statements of then-present fact to argue that WPG rendered its estimates false or misleading by, in certain instances, including income from "speculative" leases.  (Opp. at 17-18.)  Again, while WPG may have approved a particular project based on certain criteria, Plaintiffs' allegations do not sufficiently plead a requirement that WPG use the exact same criteria in preparing estimates of future return given the difference in function of the two figures.  The more compelling inference is that WPG simply used one figure to determine if it was appropriate to begin an initial investment and another to forecast future profitability.  Indeed, nowhere in WPG's disclosures does it state that it will only include "signed leases" in projected return on investment.

*Plaintiffs Fail to Allege that WPG Was Required to "Take a Vacancy Provision."*  Plaintiffs' cursory attention to the alleged "requirement" that WPG take a "vacancy provision" is telling.  (Opp. at 18-19.)  They cite no legal requirement or disclosure to show that WPG was required to—or otherwise told investors that it did—take a "vacancy provision."  Moreover, Plaintiffs fail to address their failure to plead that the practice occurred in relation to any particular project.  Rather, they rely only on FE-1's speculation that a "substantial majority of WPG's tenants were non-credit tenants" and "accounted for about half of the total rent WPG earned." (¶ 169.) This is insufficient to state a claim.  *See In re Downey Sec. Litig.*, 2009 WL 736802, at *8 (C.D. Cal. Mar. 18, 2009) ("Without corroborating facts, it is impossible to conclude that such allegations rest on more than hind-sight speculation.").

*Plaintiffs Fail to Allege that WPG "Hid" Its Inclusion of or Exclusion of Certain Costs*. Plaintiffs maintain that their anecdotal examples of purportedly inappropriate inclusion and exclusion of one-time costs and benefits are sufficient to state a claim. (Opp. at 19-20.)  They are incorrect.  In addition to being anecdotal, Plaintiffs' allegations lack specificity as to which statements the inclusion or exclusion affected or when those purported manipulations took place. (*See* Mot. at 29-30.)

Plaintiffs further speculate as to what the reasonable investor would understand with respect to the statement that yield is derived from "Estimated Total Costs" to argue that the reasonable investor would understand the number to mean "all" and "only project-related costs." (Opp. at 19 (Plaintiffs' emphasis omitted).)  This is belied by the disclosures themselves, which, despite Plaintiffs' claim that they are inadequate, clearly put investors on notice that WPG used internal metrics to determine its estimates.  Indeed, WPG repeatedly disclosed that project yield was "subject to adjustment" (*see, e.g.*, Ex. 4 at Ex. 99.2, p. 16) and, in the case of Southern Park, WPG clearly included a disclaimer that the estimated yield "[d]oes not include unallocated portions of the planned interior renovation" (*id.*).  While Plaintiffs argue that "[a] statement is misleading, not curative, if it discloses the existence of a problem but conceals its scope," its authority for this proposition is inapposite.  *See Setzer* v. *Omega Healthcare Invs., Inc.*, 968 F.3d 204, 213 (2d Cir. 2020).  In *Setzer*, the defendant was not simply disclosing "partial" information, but rather actively misled investors by failing to disclose that the payments it was making on "past due" rents were funded almost entirely from a loan rather than its own capital.  *Id.* at 213-14. Defendants were under a duty to disclose that information in order to render its statements about payments *not misleading*.  Similarly, in *Noto* v. *22nd Century Grp., Inc.*, "Defendants had a duty to disclose" an SEC investigation into its internal controls "in light of the specific statements they

23

made about the Company's accounting weaknesses." 35 F.4th 95, 105 (2d Cir. 2022).  Here,

Plaintiffs fail to explain why WPG's disclosure about the Southern Park yield estimate is

inadequate when it stated that the project did not include interior renovation costs, when, in fact,

it did not.  (*See, e.g.*, Ex. 4 at Ex. 99.2, p. 16.)  Defendants did not violate a duty to disclose (as

there was none) and this true statement is not rendered misleading because Plaintiffs believe—

citing no legal requirement—that WPG should have included those figures when calculating yield.

> D.      Plaintiffs Fail to Allege That Yield Estimates For Individual Redevelopment
>         Projects are Material.

Plaintiffs' Opposition has no response to their failure to allege that the individual

statements of yield for *four* of WPG's *nearly 100* properties are material.  (Mot. at 41-42.)  This

is not surprising given that courts routinely hold that alleged misstatements as to a small amount

of revenue in similar circumstances to these are immaterial as a matter of law:

- a 0.3 percent ($217 million) overstatement of revenues over a two-year period, *see In re Duke Energy Corp. Sec. Litig.*, 282 F.Supp.2d 158, 161 (S.D.N.Y.2003);

- a 0.2 percent understatement of a company's costs of goods sold, *see In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1427 (3d Cir.1997);

- an overstatement of a company's loan-loss reserves where "[t]he charge that would have followed the write-down of this asset would have amounted to merely 0.54% of [the company]'s net income of $234 million for that quarter," *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 715 (3d Cir.1996);

- a two percent ($6.8 million) overstatement of a company's assets, *see Parnes* v. *Gateway 2000, Inc.*, 122 F.3d 539, 547 (8th Cir. 1997); and

- a $2 billion understatement of a company's outstanding loans and a $2 billion overstatement of its derivative receivables, where the amount involved was about 0.3 percent of the company's total assets, *see In re JP Morgan Chase Sec. Litig.*, 363 F.Supp.2d 595, 630-31 (S.D.N.Y.2005).[10]

---

[10] Plaintiffs' attempt to distinguish *Hoffman* v. *UBS-AG* is incorrect.  There the court stated that, as relevant here. "Plaintiffs point to no case law which holds that the payment of 1% is material for the purpose of establishing a duty to disclose.  Moreover, in other contexts, courts have found that non-disclosure of one percentage point is not material as a matter of law."  *Hoffman* v. *UBS-AG*, 591 F. Supp. 2d 522, 536 (S.D.N.Y. 2008).

While Plaintiffs provide "ranges" of allegedly misstated yield estimates of purportedly overstated revenue (Opp. at 21-22), they do not state with any specificity how that purported inflation in yield affected any reported financials, which they cannot because, as explained herein (§ IV.B.), yield is a predication of future revenue, not WPG's financial health at any given time.

      E.       WPG's Cautionary Language Was Appropriate and Adequate Given the Nature of Estimates, Which are Inherently Subjective.

Plaintiffs argue that WPG's cautionary language as to its yield estimates was not sufficiently meaningful to warn investors of the risks WPG faced with respect to its redevelopment strategy and/or Individual Redevelopment projects. (*See* Opp. at 26; Mot. at 38.) Specifically, they argue that WPG's cautionary language was not "meaningful" because it is "inherently true that WPG's redevelopment projects might not achieve their goals" is unpersuasive. (Opp. at 26.) Courts routinely consider adequate cautionary language that warns of the risk at issue. *See In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d 507, 532 (S.D.N.Y. 2020) (warning that "[i]f we are unable to restrain these costs or provide programming desired by our customers, it could impact margins and our ability to attract and retain customers."); *In re Humana, Inc. Sec. Litig.*, 2009 WL 1767193, at *14-15 (W.D. Ky. June 23, 2009) (concluding the cautionary language was meaningful because it warned of risks similar to those that ultimately led defendant to revise its earning guidance); *Norfolk Cnty. Ret. Sys.* v. *Tempur-Pedic Int'l, Inc.*, 22 F. Supp. 3d 669, 681 (E.D. Ky. 2014) (concluding the cautionary language provided in the 10-K filing was adequate under the safe harbor provision because it warned of the particular factor that the class claimed should have been disclosed—that a competitor had a competing product which could affect its sales). Indeed, "Defendants' public statements disclosed that they believed [COVID-19] to be an issue, albeit one that they believed [they] could address." *AT&T/DirecTV*, 480 F. Supp. 3d at 527. Plaintiffs also cite *Gormley* v. *Magicjack Vocaltec Ltd.*, for the proposition that WPG's warnings

25

to investors were inadequate because WPG included the same warning each quarter during the class period.  Opp. at 26; 220 F. Supp. 3d 510, 515 (S.D.N.Y. 2016).  However, in *Gormley*, the language of the disclosures was not even before the court.  *Id.*  Moreover, the case *Gormley* cites for the proposition, *In re Salix Pharms.*, simply stands for the proposition that "word-for-word" cautionary statements were not meaningful because defendants "fail[ed] to update these statements from quarter to quarter and from year to year . . . in light of the changing circumstances and risk." 2016 WL 1629341, at *12 (S.D.N.Y. Apr. 22, 2016).  That is not the case here, where the risk of default and subsequent challenges associated with COVID were present *throughout* the at-issue period.  (Mot. at 21-22, 38.)

Moreover, while Plaintiffs argue that cautionary warnings are inadequate because "Defendants knew the yield estimates they disclosed were misrepresentations because Defendants had manipulated," for the reasons stated above and in Defendants' motion, Plaintiffs do not allege sufficient facts to demonstrate that any of the Individual Defendants *knew* they were reporting false estimates in their supplemental filings.  (*See* Mot. at 44-48.)

F.      Plaintiffs' Puffery Arguments are Unconvincing.

Plaintiffs argue that Defendants statements about its redevelopment strategy are not puffery because the context in which those statements were made makes them "concrete representations" and argue that Defendants brief is a "cut and paste job."  (Opp. at 27-28.)  Plaintiffs misrepresent Defendants' brief.  Defendants do not argue that the whole of particular statements constitute inactionable optimism.  Rather, statements by Conforti and Yale regarding WPG's *general redevelopment strategy* which are not tied to any individual project are loosely optimistic statements that courts routinely find immaterial.  *See, e.g.*, *Rochester Laborers Pension Fund* v. *Monsanto Co.*, 883 F. Supp. 2d 835, 870 (E.D. Mo. 2012) (corporate officer's statements that new product was "literally a game changing technology," that other product was "positioned very well,"

26

was puffery, and that new products delivered "great" or "exceptional" performance and "me[t] our requirements" constituted inactionable puffery).

Plaintiffs try to manufacture "concrete" statements by arguing that the "context" renders these vague statements of optimism actionable. For instance, Plaintiffs argue that the bolded language renders the remainder of the statement actionable: "We are extraordinarily rigorous pursuant to our investment methodology. And there is no wink and a nod. **There is a no taking indirect adjacencies that we are going to pick up a x-% just because**. It's very methodical, our approach." (¶ 263.) This language changes nothing given that Conforti's statement was made in response to a question on how to prioritize particular malls when deciding which spaces to invest in. (*Id.* (Q: "However, in the event that you have more scenarios where you have several Tier 1 malls with multiple anchor vacancies, how does your prioritization – in terms of capital and time – how does that change . . .").) It is *not*—as Plaintiffs claim without authority—a statement of how yield estimates are calculated.

## V. PLAINTIFFS DO NOT ALLEGE THE BOND COVENANT STATEMENTS WERE FALSE AND MISLEADING.

Defendants' statements regarding the bond covenants were not false and misleading because they were true when made and Plaintiffs point to zero allegations that Yale and Conforti did not believe the veracity of those statements when made. Plaintiffs' arguments flow from the flawed premise that Yale's and Conforti's statements "implied WPG had modified its bond covenants" and even more outrageously, that "WPG had had obtained covenant relief for all of its debt." (Opp. at 34.) This is simply not true. Rather, Yale's and Conforti expressed optimism regarding WPG's efforts to renegotiate or otherwise survive the strain of its debt obligations. (*See* Mot. at 31-33.) Despite Plaintiffs' claims as to what Yale and Conforti's statements purportedly "imply," neither individual ever assured investors that WPG would not face issues with its bond

covenants in the future.  Rather, Yale warned investors that given the "uncertainty associated with COVID," there were "significant risks" with "any projections."  (¶ 277.)  Moreover, if the statements were as "concrete" as Plaintiffs insist, it stands to reason that analysts and market commentators would have ceased their discussion of WPG's debt obligations—which they did not.  (*See, e.g.*, Ex. 22 (Dec. 11, 2020 Article) (noting that WPG  was experiencing "foot traffic declines; lots of debt; cash flow declines; and "a high proportion of tenants that have filed for bankruptcy."); Ex. 21 (Feb. 21, 2021 Article) ("The state of the current financials suggests that there is a high likelihood for WPG to follow in the footsteps of CBL (CBL) which declared bankruptcy last year.  It comes down to the large debt and high leverage profile.").  Indeed, the topic of WPG's debt covenants and WPG's efforts to manage them was continually discussed and WPG continually issued warnings regarding its ability to comply with those covenants.  For example, Yale's August 11, 2020 statement was accompanied by limiting language and warnings about the ability to project WPG's obligations:

> We should also mention that we are in compliance with the bond covenant as ***of the second quarter of 2020***, both prior to and pro forma for the credit facilities modification.  ***When considering the uncertainty associated with COVIDs significant risk exist to any forecasting in the current environment***, notwithstanding based upon our current projections, we believe that companies should have the necessary flexibility that will allow us to navigate and maintain compliance with our modified credit facilities and bond covenants ***for the foreseeable future***.  For covenant forecasting purposes, ***this assumes a slow recovery with continued pressure from the pandemic,*** especially for the remainder of this year.

(¶ 277.)  Such limiting language far from suggests that WPG had permanently modified its credit facilities and would face no other issues with its debt covenants in the future.  Plaintiffs' arguments are simply hindsight pleading that fail to state a claim.  *See Shields* v. *Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994) ("We have rejected the legitimacy of 'alleging fraud by

28

hindsight.'").   Indeed, "a statement  of opinion is not misleading just because external facts show the opinion to be incorrect." *Omnicare*, 575 U.S. at 188.

## VI.  PLAINTIFFS IGNORE THE BANKRUPTCY ORDER.

Plaintiffs' Opposition arguments do not change the fact that the Confirmation Order and the Plan discharged WPG from all prepetition claims for damages arising from the purchase or sale of its securities, including the claims in the instant action. (Ex. 1 (Conf. Order) at 12, ¶ 14; Ex. 2 (Plan) at Art. III(B).)  While Plaintiffs allege that suit of WPG is proper because they are allowed to determine WPG's "liability" so as to proceed against available insurance proceeds, pursuant to the Confirmation Order, the liability to be determined is *not* WPG's because that liability was expressly discharged as part of the Bankruptcy.  (Ex. 1 (Conf. Order) ¶ AAA.80.)  As a result of the Bankruptcy, suit is only permitted against *directors and officers* to the extent of available insurance proceeds.  (*Id.*)  Plaintiffs cannot overcome WPG's discharge, which Slipher himself acknowledged in opposing WPG's motion for compliance with the protective order, stating that "***the Reorganized Debtors bear no potential liability to the Securities Plaintiffs***." (Ex. 11 ¶ 13.)

## VII.  CLAIMS AGAINST INDEST MUST BE DISMISSED.

Plaintiffs concede that Indest made no actionable misstatements.  Indeed, in response to Defendants' argument on this point (Mot. at 49), they merely respond that they have pled "controlling person claims against" Indest, so, even if she did not make a statement "she should remain in this case." (Opp. at 48.)  This concession is fatal to Plaintiffs' claims for primary liability under Section 10(b) as to Indest.

## VIII.  PLAINTIFFS STILL CANNOT BRING SECTION 20(A) CLAIMS.

Plaintiffs fail to plead control person liability under Section 20(a) as to Conforti, Indest, or Yale because they fail to plead a primary violation.  (Mot. at 49.)

29

## CONCLUSION

For these reasons and those in Defendants' opening brief, Plaintiffs Amended Complaint should be dismissed with prejudice.

Dated: August 22, 2022

Respectfully submitted,

**BLANK ROME LLP**

*/s/ Thomas H. Stewart*
Michael L. Cioffi
Thomas H. Stewart
1700 PNC Center
201 East Fifth Street
Cincinnati, Ohio 45202
Phone: 513-362-8701/04
Fax: 513-362-8702/93
michael.cioffi@blankrome.com
tom.stewart@blankrome.com

Evan H. Lechtman (*pro hac vice*)
One Logan Square
130 North 18th Street
Philadelphia, PA 19103
Phone: 215-569-5500
Fax: 215-569-5555
evan.lechtman@blankrome.com

Andrew T. Hambelton (*pro hac vice*)
1271 Avenue of the Americas
New York, New York 10020
Phone: 212-885-5000
Fax: 212-885-5001
andrew.hambelton@blankrome.com

*Counsel for Defendants,*
*Washington Prime Group Inc.,*
*Louis G. Conforti, Mark E. Yale,*
*and Melissa Indest*

30

**CERTIFICATE OF SERVICE**

I hereby certify that on August 22, 2022, a true and correct copy of the foregoing the Reply in Support of Defendants' Motion to Dismiss was electronically filed with the Clerk of Court using the CM/ECF system which will send notification to all counsel of record.


*/s/ Thomas H. Stewart*
Thomas H. Stewart